UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES THORNTON,          )<br>            Plaintiff           )<br>                                      )<br>                                      )<br>v.                                  )<br>                                      )<br>                                      )<br>UNITED PARCEL SERVICE INC., )<br>            Defendant         )<br>                                      ) | Civ. Action No. 05-10210- MEL |

## UNITED PARCEL SERVICE INC.'S
## MOTION FOR SUMMARY JUDGMENT,
## REQUEST FOR ORAL ARGUMENT, AND
## STATEMENT OF MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56, United Parcel Service Inc. ("UPS") moves for summary judgment on all four counts of the Plaintiff's Amended Complaint. There are no material facts in dispute and UPS is entitled to judgment as a matter of law. Accordingly, UPS respectfully requests that the Court enter summary judgment in its favor. In support of its Motion for Summary Judgment, UPS refers the Court to its Memorandum in Support of UPS' Motion for Summary Judgment, UPS' Separate Statement of Undisputed Facts, UPS' Record Materials in Support of its Motion for Summary Judgment, and the Affidavit of Michelle Fleming.

## REQUEST FOR ORAL ARGUMENT

Pursuant to United States District Court of Massachusetts, Local Rule 7.1 (D), UPS requests an oral argument on its Motion for Summary Judgment.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to United States District Court of Massachusetts, Local Rule 56.1, UPS submits the following concise statement of undisputed facts. As required under Rule 56

of the Federal Rules of Civil Procedure, the facts set forth below are either undisputed or, if there is a dispute, are stated in the light most favorable to Mr. Thornton. Certain of the facts set forth below would be challenged by UPS if there were a trial on this matter.

    1.    UPS hired Mr. Thornton in February 1968. (Deposition of Charles Thornton, hereinafter "Thornton Tr." 15, attached at <u>Tab A</u>)[1]. From the early 1980s until he retired in 2002, Mr. Thornton worked as a "Feeder Driver." (Thornton Tr. 18-19). A UPS Feeder Driver drives a large UPS tractor trailer truck and transports packages from one UPS facility to another. (Deposition of Kenneth Mundry, hereinafter "Mundry Tr." 17, attached at <u>Tab B</u>). There are approximately 103 Feeder Driver jobs that run out of the UPS Chelmsford facility. (Mundry Tr. 17-19).

    2.    Each Feeder Driver job is classified as either a "single" or a "double." A "single" Feeder Driver job means the driver drives only one trailer and is not required to perform heavy lifting; a "double" means the driver drives two trailers and on occasion must lift a seventy pound dolly in order to take apart the trailers. (Mundry Tr. 21-23, 40-41). Kenneth Mundry was the Feeder Driver Manager from 1998-2001. (Mundry Tr. 8).

    3.    Mr. Thornton was a member of the Teamster's union ("Union") and there was collective bargaining agreement between the Union and UPS that governed the terms and conditions of his employment. (Thornton Tr. 20, 37-38). Under the collective bargaining agreement, a Feeder Driver bids on his choice of jobs at the annual bid and again at various times throughout the year when management reopens the bid based upon business needs. (Thornton Tr. 20-21). As part of the bid process, drivers submit their

---

[1] Unless otherwise specified, all exhibits are attached to Record of Material in Support of UPS' Motion for Summary Judgment, Tabs A – Z.

top choices on paper and jobs are awarded based on the driver's seniority.  (Thornton Tr. 21-24).

    4.    Mr. Thornton's seniority date was February 1968.  (Thornton Tr. 24).  At the 2000 annual bid, Mr. Thornton successfully bid on a single trailer job that involved driving from Chelmsford to the Worcester Rail yard each day (the "Chelmsford to Worcester job").  (Thornton Tr. 28).  Mr. Thornton could physically perform this job.  (Thornton Tr. 29).

    5.    Sometime in the spring of 2000, Mr. Thornton told management that his right shoulder hurt and he agreed to see Dr. Albert Franchi.  (Thornton Tr. 30-31).  This began a series of disagreements between medical professionals.  On May 9, 2000, Dr. Franchi examined Mr. Thornton, determined that he needed surgery on his right shoulder and prohibited him from driving a tractor trailer until after the surgery.  (Thornton Tr. 29-33; see also Thornton Deposition Exhibit 3, "Franchi Medical Note dated May 9, 2000," attached at Tab C).  On July 10, 2000, Mr. Thornton's own physician, Dr. Kasparyan, agreed that surgery was needed but opined that Mr. Thornton could continue driving until the surgery was performed.  (Thornton Tr. 34-35; see also Exhibit 4 of Thornton deposition, "Lahey Clinic Medical Note dated July 10, 2000," attached at Tab D).  On July 11, 2000, Dr. Franchi re-examined Mr. Thornton and decided that Mr. Thornton could resume tractor trailer driving but only after three weeks.  (Thornton Tr. 35-36; see also Thornton Deposition Exhibit 5, "Franchi Medical Note dated July 11, 2000," attached at Tab E).  On July 26, 2000, Dr. Kasparyan changed his opinion and no longer gave Mr. Thornton medical clearance to drive.  (Thornton Tr. 36-37; see also Exhibit 6

3

of Thornton deposition, "Lahey Clinic Medical Note dated July 26, 2000," attached at Tab F).

6. Under the collective bargaining agreement, when two physicians disagree, there is a "third doctor procedure" to resolve the dispute. (Thornton Tr. 38-40, see also Thornton Deposition Exhibit 7, "Article 20, Section 3 of CBA: Third Doctor Procedure," attached at Tab G). Because Dr. Franchi and Dr. Kasparyan disagreed about when and if Mr. Thornton could resume driving, the "third doctor procedure" was implemented. (Thornton Tr. 38-40). UPS provided a list of doctors to the Union and Mr. Thornton chose Dr. Ralph Wolf. (Thornton Tr. 39-40; see also Thornton Deposition Exhibit 8, "Ritchie Letter dated August 9, 2000," attached at Tab H). Dr. Wolf examined Mr. Thornton and determined that Mr. Thornton could resume driving on September 18, 2000, which he did. (Thornton Tr. 40-42; see also Thornton Deposition Exhibit 9, "Wolf Medical Note dated Sept. 13, 2000," attached at Tab I). After discussions with the Union, UPS paid Mr. Thornton the difference between what he would have earned during this time period and what he actually received in workers compensation pay. (Thornton Tr. 42-43). Mr. Thornton immediately resumed the Chelmsford to Worcester Rail job. (Thornton Tr. 43-45).

7. Some time in September 2000, Mr. Thornton took his DOT physical, was recertified, and was cleared to "drive a tractor trailer." (Thornton Tr. 45-46).

8. Shortly after Christmas 2000, UPS reopened the bid. (Thornton Tr. 46). Mr. Thornton successfully bid on the Chelmsford-Worcester-Harford job, which was a single trailer job. (Thornton Tr. 47). Mr. Thornton discussed his choice with UPS

4

management and it was agreed upon that there were no medical restrictions that prevented him from performing this job. (Thornton Tr. 47-49).

9. On or about January 20, 2001, Dr. Richard Hawkins examined Mr. Thornton and determined that he "was not disabled." (Thornton Tr. 49-50; see also Thornton Deposition Exhibit 13, "Hawkins Medical Note dated January 20, 2001," attached at Tab J). Dr. Hawkins suggested that Mr. Thornton's "restriction of no heavy lifting, such as loading and unloading trucks" should remain. Id. This lifting restriction did not prevent Mr. Thornton from performing the Chelmsford-Worcester-Hartford job, because the job did not require lifting. (Thornton Tr. 51; Mundry Tr. 68-69, 72, 84-85).

10. Less than one month later at the 2001 annual bid, Mr. Thornton bid on a "sleeper team" job. (Thornton Tr. 59). This was a double trailer job that required a team of two drivers. (Thornton Tr. 53,54, 59; Thornton Deposition Exhibit 15, "Job Picks," attached at Tab K). Double trailer jobs are classified as "DBLS" on the bid sheet. (Mundry Tr. 41; Thornton Tr. 54; Thornton Exhibit 16 "UPS North New England District Bid Sheet," p. 5, route number "NEO1804" and "NEO1805," attached at Tab L). Drivers are to pick their team members prior to the bid. (Thornton Tr. 59-61; Thornton Deposition Exhibit 17, "Article 43, section 2: Sleeper Team Operations," attached at Tab M). Because Mr. Thornton failed to pick his team member prior to the bid, he could not bid on either his first or second choices, which were both sleeper team jobs (Thornton Tr. 64).

11. For purposes of the 2001 bid, Mr. Thornton had submitted five choices on his bid sheet – the first two were the sleeper team jobs. (See Tab K). Mr. Thornton's third choice was the Chelmsford-Worcester-Hartford job that he held prior to the bid.

(Thornton Tr. 65-66). This job continued to be a single trailer job and he was physically able to perform this job. (Thornton Tr. 65, 70-71; Mundry Tr. 84-85; see Tab L at p. 2, route # C09B). Mr. Thornton's fourth and fifth choices were also single trailer jobs, from Chelmsford to Worcester (routes numbered C07M and C07N), and were jobs that Mr. Thornton could also physically perform. (Thornton Tr. 82-84; see also Tab K; Tab L at p. 2).

12.     Mr. Thornton did not actually bid on any of his last three choices. (Thornton Tr. 82, 85-86). Ordinarily if a driver does not receive his first or second bid choices, the driver automatically takes the next choice listed on his bid sheet. (Mundry Tr. 75-76). Instead, Kenneth Mundry allowed Mr. Thornton to submit an entirely new bid. Id. On his second bid sheet, Mr. Thornton chose the Chelmsford to Philadelphia job (route #CPHL), a "premium job" where the driver works only three and a half days each week. (Thornton Tr. 86-87; Thornton Deposition Exhibit 19, "Job Picks dated 2/12/01," attached at Tab N; see also Tab L p. 5, Route Number "CPHL").

13.     Because the job was a double trailer, Mr. Mundry was concerned about Mr. Thornton's ability to perform the job. (Mundry Tr. 77-78). The Union supported Mr. Thornton and believed that UPS would be denying Mr. Thornton his seniority rights if it prohibited him from bidding on the premium job. (Mundry Tr. 79-80). Mr. Mundry conferred with Bob Ritchie (UPS' North New England District Labor Manager) and Holly Manzo (UPS' Northeast Region Case Manager Supervisor) and the group agreed that Mr. Thornton could bid the job and that UPS would accommodate him by requiring that other employees lift the seventy pound dolly. (Thornton Tr. 133; Mundry Tr. 79-80,

6

113-114). Because it was the annual bid, Mr. Thornton could bid on any available inside job, but instead chose to bid on the Chelmsford to Philadelphia job. (See Mundry Tr. 81).

14. Mr. Thornton injured his back the day after he began working the Chelmsford to Philadelphia job. (Plaintiff's Amended Complaint ¶33). Dr. Wolf examined Mr. Thornton and imposed work related restrictions of no driving longer than ninety minutes without a break, a thirty pound lifting limit, a nine hour maximum work day, and no repetitive lifting or bending. (Thornton Tr. 96-97, 101-102; Thornton deposition Exhibit 20, "Dr. Wolf's Medical Note Dated March 14, 2001," attached at Tab O). Upon his return to work, Mr. Thornton chose the Chelmsford-Worcester-Hartford job, which was the same job he held prior to bidding on the Chelmsford to Philadelphia job. (Thornton Tr. 102-104; see also Thornton Deposition Exhibit 21, "Chelmsford Job List, Week Ending March 31, 2001," attached at Tab P; see also Mundry Tr. 39, 105-106). The requirements of the Chelmsford-Worcester-Hartford job were within his new work restrictions. (Thornton Tr. 104; Mundry Tr. 84-85).

15. On or about June 20, 2001, UPS removed the Hartford portion from the Chelmsford-Worcester-Hartford job and the job was re-submitted for bids. (Mundry Tr. 106-108; Thornton Tr. 106-107). Mr. Thornton could still physically perform the Chelmsford to Worcester job and he successfully bid on it. Id.

16. On November 12, 2001, Dr. Wolf reexamined Mr. Thornton and decided that Mr. Thornton no longer required the previously imposed work restrictions. (Thornton Tr. 107-109; Thornton Deposition Exhibit 24, "Medical Evaluation Form," attached at Tab Q). Mr. Thornton did not seek a second opinion but rather on the next bid he chose the Chelmsford to Philadelphia job, which was the double trailer job he had

held earlier that year.  (Thornton Tr. 109-110, 112, 132; <u>see</u> also Thornton Deposition <u>Exhibit 25</u>, "Chelmsford Job List Week Ending December 8, 2001," attached at <u>Tab R</u>).  Mr. Thornton felt that he could physically perform this job.  (Thornton Tr. 124).

17.     Ken Mundry had concerns and again contacted Bob Ritchie, Rich Reardon (the Business Agent for the Union) and the UPS Health and Safety Department.  (Mundry Tr. 109-111).  The group determined that Mr. Thornton could do the job and even though Mr. Thornton had no medical restrictions at the time, the group agreed that other employees would continue to lift the dollies for him.  (Mundry Tr. 111-114).

18.     At some point during the first week in January 2002, UPS reopened the bid and Mr. Thornton bid on a Chelmsford to Buffalo double trailer job.  (Thornton Tr. 125-126).  This was another "premium job" and in fact Mr. Thornton preferred this job over the Chelmsford to Philadelphia job because he was able to work Tuesday through Friday, followed by a three day weekend.  (Thornton Tr. 125-126).  Thornton felt that he could physically perform the job.  (Thornton Tr. 128, 131).  Again, UPS allowed other employees to assist Mr. Thornton with the dollies.  (Thornton Tr. 131; Mundry Tr. 112-114).

19.     At the 2002 annual bid, Mr. Thornton bid again on the Chelmsford to Buffalo job.  (Thornton Tr. 127-128, 131).

20.     On or about September 16, 2002, Mr. Thornton failed his DOT physical examination and could no longer work as a UPS Feeder Driver.  (Thornton Tr. 134; see also Thornton Deposition <u>Exhibit 29</u>, "UPS FMCSA Physical Exam Medical History Questionnaire," attached at <u>Tab S</u>).  Mr. Thornton was also unable to physically perform an inside job, such as a loader/unloader, car washer, or sorter.  (Thornton Tr. 138-141;

see also Thornton Deposition Exhibits 30, "Dr. Kramer letter dated September 19, 2002," and Thornton Deposition Exhibit 31, "Dr. Haffner letter dated December 6, 2002," attached at Tab T).

21.     Shortly thereafter Mr. Thornton applied for and received Social Security Disability Benefits. (Thornton Tr. 147-148). Mr. Thornton also filed a workers compensation claim and in July 2003, Mr. Thornton accepted a lump sum settlement of this claim. (Thornton Tr. 151-152). Mr. Thornton eventually retired from UPS. (Thornton Tr.154).

> United Parcel Service Inc.
> By its attorneys,
>
> /s/Laurie Alexander-Krom
> Hugh F. Murray, III, BBO# 557175
> Laurie Alexander-Krom, BBO# 637385
> Murtha Cullina LLP
> 99 High Street
> Boston, MA 02110
> 617-451-9300

Date:  May 1, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). No non-participants (NEF) as noted.

/s/Laurie Alexander-Krom

9