UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
CHARLES THORNTON,        )
       Plaintiff        )
               )        Civ. Action No. 05-10210- MEL
               )
v.        )
               )
               )
UNITED PARCEL SERVICE INC., )
       Defendant        )
_____)

## UNITED PARCEL SERVICE INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### Introduction

    Charles Thornton worked for United Parcel Service Inc. ("UPS") as a driver from 1968 until he retired in September of 2002. Two years and four months after he retired, he brought this action against UPS, alleging that UPS had discriminated against him on the basis of an alleged disability. UPS is entitled to summary judgment on all of Mr. Thornton's claims under Mass. Gen. L. ch. 151B and on most of his claims under the Americans with Disabilities Act, because the claims are either time barred or were not the subject of a proper administrative complaint, or both. Even setting aside these dispositive procedural grounds, UPS would be entitled to summary judgment on all of his claims because (1) Mr. Thornton was not, at any relevant time, "disabled" under the Americans with Disabilities Act and (2) UPS nonetheless reasonably accommodated Mr. Thornton's medical restrictions and did not discriminate against him in any way.

### Statement of Undisputed Facts

    As required under Rule 56 of the Federal Rules of Civil Procedure, the facts set forth below are either undisputed or, if there is a dispute, are stated in the light most favorable to Mr. Thornton. Certain of the facts set forth below would be challenged by UPS if there were a trial on this matter.

UPS hired Mr. Thornton in February 1968.  (Deposition of Charles Thornton, hereinafter "Thornton Tr." 15, attached at Tab A)[1].  From the early 1980s until he retired in 2002, Mr. Thornton worked as a "Feeder Driver."  (Thornton Tr. 18-19).  A UPS Feeder Driver drives a large UPS tractor trailer truck and transports packages from one UPS facility to another.  (Deposition of Kenneth Mundry, hereinafter "Mundry Tr." 17, attached at Tab B).  There are approximately 103 Feeder Driver jobs that run out of the UPS Chelmsford facility.  (Mundry Tr. 17-19). Each Feeder Driver job is classified as either a "single" or a "double."  A "single" Feeder Driver job means the driver drives only one trailer and is not required to perform heavy lifting; a "double" means the driver drives two trailers and on occasion must lift a seventy pound dolly in order to take apart the trailers.  (Mundry Tr. 21-23, 40-41).  Kenneth Mundry was the Feeder Driver Manager from 1998-2001.  (Mundry Tr. 8).

Mr. Thornton was a member of the Teamster's union ("Union") and there was collective bargaining agreement between the Union and UPS that governed the terms and conditions of his employment. (Thornton Tr. 20, 37-38).  Under the collective bargaining agreement, a Feeder Driver bids on his choice of jobs at the annual bid and again at various times throughout the year when management reopens the bid based upon business needs.  (Thornton Tr. 20-21).  As part of the bid process, drivers submit their top choices on paper and jobs are awarded based on the driver's seniority.  (Thornton Tr. 21-24).

Mr. Thornton's seniority date was February 1968.  (Thornton Tr. 24).  At the 2000 annual bid, Mr. Thornton successfully bid on a single trailer job that involved driving from Chelmsford to the Worcester Rail yard each day (the "Chelmsford to Worcester job").  (Thornton Tr. 28).  Mr. Thornton could physically perform this job.  (Thornton Tr. 29).

---

[1] Unless otherwise specified, all exhibits are attached to Record of Material in Support of UPS' Motion for Summary Judgment, Tabs A – Z.

2

Sometime in the spring of 2000, Mr. Thornton told management that his right shoulder hurt and he agreed to see Dr. Albert Franchi. (Thornton Tr. 30-31). This began a series of disagreements between medical professionals. On May 9, 2000, Dr. Franchi examined Mr. Thornton, determined that he needed surgery on his right shoulder and prohibited him from driving a tractor trailer until after the surgery. (Thornton Tr. 29-33; see also Thornton Deposition Exhibit 3, "Franchi Medical Note dated May 9, 2000," attached at Tab C). On July 10, 2000, Mr. Thornton's own physician, Dr. Kasparyan, agreed that surgery was needed but opined that Mr. Thornton could continue driving until the surgery was performed. (Thornton Tr. 34-35; see also Exhibit 4 of Thornton deposition, "Lahey Clinic Medical Note dated July 10, 2000," attached at Tab D). On July 11, 2000, Dr. Franchi re-examined Mr. Thornton and decided that Mr. Thornton could resume tractor trailer driving but only after three weeks. (Thornton Tr. 35-36; see also Thornton Deposition Exhibit 5, "Franchi Medical Note dated July 11, 2000," attached at Tab E). On July 26, 2000, Dr. Kasparyan changed his opinion and no longer gave Mr. Thornton medical clearance to drive. (Thornton Tr. 36-37; see also Exhibit 6 of Thornton deposition, "Lahey Clinic Medical Note dated July 26, 2000," attached at Tab F).

Under the collective bargaining agreement, when two physicians disagree, there is a "third doctor procedure" to resolve the dispute. (Thornton Tr. 38-40, see also Thornton Deposition Exhibit 7, "Article 20, Section 3 of CBA: Third Doctor Procedure," attached at Tab G). Because Dr. Franchi and Dr. Kasparyan disagreed about when and if Mr. Thornton could resume driving, the "third doctor procedure" was implemented. (Thornton Tr. 38-40). UPS provided a list of doctors to the Union and Mr. Thornton chose Dr. Ralph Wolf. (Thornton Tr. 39-40; see also Thornton Deposition Exhibit 8, "Ritchie Letter dated August 9, 2000," attached at Tab H). Dr. Wolf examined Mr. Thornton and determined that Mr. Thornton could resume driving on September 18, 2000, which he did. (Thornton Tr. 40-42; see also Thornton Deposition Exhibit 9, "Wolf Medical

3

Note dated Sept. 13, 2000," attached at Tab I).  After discussions with the Union, UPS paid Mr. Thornton the difference between what he would have earned during this time period and what he actually received in workers compensation pay.  (Thornton Tr. 42-43).  Mr. Thornton immediately resumed the Chelmsford to Worcester Rail job.  (Thornton Tr. 43-45).  Some time in September 2000, Mr. Thornton took his DOT physical, was recertified, and was cleared to "drive a tractor trailer."  (Thornton Tr. 45-46).

Shortly after Christmas 2000, UPS reopened the bid.  (Thornton Tr. 46).  Mr. Thornton successfully bid on the Chelmsford-Worcester-Harford job, which was a single trailer job. (Thornton Tr. 47).  Mr. Thornton discussed his choice with UPS management and it was agreed upon that there were no medical restrictions that prevented him from performing this job. (Thornton Tr. 47-49).  On or about January 20, 2001, Dr. Richard Hawkins examined Mr. Thornton and determined that he "was not disabled."  (Thornton Tr. 49-50; see also Thornton Deposition Exhibit 13, "Hawkins Medical Note dated January 20, 2001," attached at Tab J).  Dr. Hawkins suggested that Mr. Thornton's "restriction of no heavy lifting, such as loading and unloading trucks" should remain.  Id.   This lifting restriction did not prevent Mr. Thornton from performing the Chelmsford-Worcester-Hartford job, because the job did not require lifting.  (Thornton Tr. 51; Mundry Tr. 68-69, 72, 84-85).

Less than one month later at the 2001 annual bid, Mr. Thornton bid on a "sleeper team" job. (Thornton Tr. 59).  This was a double trailer job that required a team of two drivers.  (Thornton Tr. 53,54, 59; Thornton Deposition Exhibit 15, "Job Picks," attached at Tab K).  Double trailer jobs are classified as "DBLS" on the bid sheet.  (Mundry Tr. 41; Thornton Tr. 54; Thornton Exhibit 16 "UPS North New England District Bid Sheet," p. 5, route number "NEO1804" and "NEO1805," attached at Tab L).  Drivers are to pick their team members prior to the bid.  (Thornton Tr. 59-61; Thornton Deposition Exhibit 17, "Article 43, section 2: Sleeper Team Operations," attached at Tab

4

M). Because Mr. Thornton failed to pick his team member prior to the bid, he could not bid on either his first or second choices, which were both sleeper team jobs (Thornton Tr. 64).

For purposes of the 2001 bid, Mr. Thornton had submitted five choices on his bid sheet – the first two were the sleeper team jobs. (See Tab K). Mr. Thornton's third choice was the Chelmsford-Worcester-Hartford job that he held prior to the bid. (Thornton Tr. 65-66). This job continued to be a single trailer job and he was physically able to perform this job. (Thornton Tr. 65, 70-71; Mundry Tr. 84-85; see Tab L at p. 2, route # C09B). Mr. Thornton's fourth and fifth choices were also single trailer jobs, from Chelmsford to Worcester (routes numbered C07M and C07N), and were jobs that Mr. Thornton could also physically perform. (Thornton Tr. 82-84; see also Tab K; Tab L at p. 2).

Mr. Thornton did not actually bid on any of his last three choices. (Thornton Tr. 82, 85-86). Ordinarily if a driver does not receive his first or second bid choices, the driver automatically takes the next choice listed on his bid sheet. (Mundry Tr. 75-76). Instead, Kenneth Mundry allowed Mr. Thornton to submit an entirely new bid. Id. On his second bid sheet, Mr. Thornton chose the Chelmsford to Philadelphia job (route #CPHL), a "premium job" where the driver works only three and a half days each week. (Thornton Tr. 86-87; Thornton Deposition Exhibit 19, "Job Picks dated 2/12/01," attached at Tab N; see also Tab L p. 5, Route "CPHL").

Because the job was a double trailer, Mr. Mundry was concerned about Mr. Thornton's ability to perform the job. (Mundry Tr. 77-78). The Union supported Mr. Thornton and believed that UPS would be denying Mr. Thornton his seniority rights if it prohibited him from bidding on the premium job. (Mundry Tr. 79-80). Mr. Mundry conferred with Bob Ritchie (UPS' North New England District Labor Manager) and Holly Manzo (UPS' Northeast Region Case Manager Supervisor) and the group agreed that Mr. Thornton could bid the job and that UPS would accommodate him by requiring that other employees lift the seventy pound dolly. (Thornton Tr.

5

133; Mundry Tr. 79-80, 113-114).   Because it was the annual bid, Mr. Thornton could bid on any available inside job, but instead chose to bid on the Chelmsford to Philadelphia job.  (See Mundry Tr. 81).

Mr. Thornton injured his back the day after he began working the Chelmsford to Philadelphia job.  (Plaintiff's Amended Complaint ¶33).  Dr. Wolf examined Mr. Thornton and imposed work related restrictions of no driving longer than ninety minutes without a break, a thirty pound lifting limit, a nine hour maximum work day, and no repetitive lifting or bending.  (Thornton Tr. 96-97, 101-102; Thornton deposition Exhibit 20, "Dr. Wolf's Medical Note dated March 14, 2001, attached at Tab O).  Upon his return to work, Mr. Thornton chose the Chelmsford-Worcester-Hartford job, which was the same job he held prior to bidding on the Chelmsford to Philadelphia job.  (Thornton Tr. 102-104; see also Thornton Deposition Exhibit 21, "Chelmsford Job List, Week Ending March 31, 2001," attached at Tab P; see also Mundry Tr. 39, 105-106).  The requirements of the Chelmsford-Worcester-Hartford job were within his new work restrictions.  (Thornton Tr. 104; Mundry Tr. 84-85).

On or about June 20, 2001, UPS removed the Hartford portion from the Chelmsford-Worcester-Hartford job and the job was re-submitted for bids.  (Mundry Tr. 106-108; Thornton Tr. 106-107).   Mr. Thornton could still physically perform the Chelmsford to Worcester job and he successfully bid on it.  Id.

On November 12, 2001, Dr. Wolf reexamined Mr. Thornton and decided that Mr. Thornton no longer required the previously imposed work restrictions.  (Thornton Tr. 107-109; Thornton Deposition Exhibit 24, "Medical Evaluation Form," attached at Tab Q).  Mr. Thornton did not seek a second opinion but rather on the next bid he chose the Chelmsford to Philadelphia job, which was the double trailer job he had held earlier that year.  (Thornton Tr. 109-110, 112, 132; see also Thornton Deposition Exhibit 25, "Chelmsford Job List Week Ending December 8, 2001," attached

6

at Tab R). Mr. Thornton felt that he could physically perform this job. (Thornton Tr. 124). Ken Mundry had concerns and again contacted Bob Ritchie, Rich Reardon (the Business Agent for the Union) and the UPS Health and Safety Department. (Mundry Tr. 109-111). The group determined that Mr. Thornton could do the job and even though Mr. Thornton had no medical restrictions at the time, the group agreed that other employees would continue to lift the dollies for him. (Mundry Tr. 111-114).

At some point during the first week in January 2002, UPS reopened the bid and Mr. Thornton bid on a Chelmsford to Buffalo double trailer job. (Thornton Tr. 125-126). This was another "premium job" and in fact Mr. Thornton preferred this job over the Chelmsford to Philadelphia job because he was able to work Tuesday through Friday, followed by a three day weekend. (Thornton Tr. 125-126). Thornton felt that he could physically perform the job. (Thornton Tr. 128, 131). Again, UPS allowed other employees to assist Mr. Thornton with the dollies. (Thornton Tr. 131; Mundry Tr. 112-114). At the 2002 annual bid, Mr. Thornton bid again on the Chelmsford to Buffalo job. (Thornton Tr. 127-128, 131).

On or about September 16, 2002, Mr. Thornton failed his DOT physical examination and could no longer work as a UPS Feeder Driver. (Thornton Tr. 134; see also Thornton Deposition Exhibit 29, "UPS FMCSA Physical Exam Medical History Questionnaire," attached at Tab S). Mr. Thornton was also unable to physically perform an inside job, such as a loader/unloader, car washer, or sorter. (Thornton Tr. 138-141; see also Thornton Deposition Exhibits 30, "Dr. Kramer letter dated September 19, 2002," and Thornton Deposition Exhibit 31, "Dr. Haffner letter dated December 6, 2002," attached at Tab T). Shortly thereafter Mr. Thornton applied for and received Social Security Disability Benefits. (Thornton Tr. 147-148). Mr. Thornton also filed a workers compensation claim and in July 2003, Mr. Thornton accepted a lump sum settlement of this claim. (Thornton Tr. 151-152). Mr. Thornton eventually retired from UPS. (Thornton Tr.154).

**Procedural History**

On or about July 27, 2000, Mr. Thornton filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") against UPS, alleging that it discriminated against him because of his disability and age when it did not allow him to work because of the disagreement between Dr. Franchi and Mr. Thornton' doctor. (See MCAD Charge dated July 27, 2000 attached at Tab U). The MCAD eventually found lack of probable cause and dismissed this claim. (See MCAD's Dismissal dated December 16, 2002 attached at Tab V). On or about August 30, 2001, Mr. Thornton filed a second charge with the MCAD against UPS, alleging that UPS misinterpreted Dr. Hawkins' January 20, 2001 medical restrictions and that on March 5, 2001, UPS "sent" him to Buffalo, where he was injured. (See MCAD Charge dated August 30, 2001 attached at Tab W). The MCAD again found lack of probable cause and dismissed this second charge on the grounds that Mr. Thornton voluntarily chose the Buffalo job and there was no evidence that UPS had subjected Mr. Thornton to an adverse employment action. (See MCAD's Dismissal dated November 20, 2003 attached at Tab X).

UPS has both generally and specifically requested copies of any and all administrative charges filed by Mr. Thornton, along with copies of any right to suit letters issued by the Equal Employment Opportunity Commission ("EEOC"). (See UPS Request for Production of Documents and Emails from Laurie Alexander-Krom to Michael Tumposky attached at Tab Y). Mr. Thornton has not produced any MCAD or EEOC charges that are more recent than his August 2001 charge, nor has Mr. Thornton produced any right to suit letters.

Mr. Thornton claims that on November 4, 2004, the EEOC issued him a notice of right of suit, however he has not produced a copy of this notice. (See Plaintiff's Amended Complaint, ¶ 56). Michelle Fleming is a law student, who is temporarily working for Murtha Cullina LLP. (See Michelle Fleming Affidavit, "Fleming Aff." ¶ 1). Ms. Fleming contacted the EEOC regarding Mr.

8

Thornton's claims and learned that with regard to the July 27, 2000 charge, the EEOC adopted the MCAD's findings in 2003. (Fleming Aff. ¶ 3). With regard to the August 30, 2001 charge, the EEOC adopted the MCAD's findings in October 2004. (Fleming Aff." ¶ 4). Although no one at the EEOC could find a right to suit letter dated November 4, 2004, the EEOC did inform Ms. Fleming that this letter would have pertained to the August 30, 2001 charge only. (Fleming Aff. ¶ 5).

### Argument

**MR. THORNTON'S CLAIMS AGAINST UPS ARE TIME-BARRED AND THERE IS NO EVIDENCE THAT MR. THORNTON WAS DISABLED AND THAT UPS DISCRIMINATED AGAINST HIM**

Mr. Thornton alleges that he is disabled due to a right shoulder injury and a chronic back problem. He claims that from the approximately 1993 until 2002, UPS intermittently discriminated against him because of this alleged disability in violation of Massachusetts Gen. L. Ch. 151B and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et. seq. However, the last administrative claim Mr. Thornton filed was in August 2001, which bars him from collecting damages on events that occurred after August 2001 under either statute. In addition, Mass. Gen. L. Ch 151B's three year statute of limitations has expired with respect to events occurring prior to February 1, 2002 and the only timely filed claim under the ADA pertains to his allegation that he was "forced" to pick the Chelmsford to Buffalo job in March 2001 and as a result he was injured. All other claims under the ADA are time barred on the grounds that Mr. Thornton failed to timely file them within ninety days of receiving a right to suit letter from the EEOC.

In addition, Mr. Thornton does not meet the definition of disabled, nor is there any evidence that UPS discriminated or failed to accommodate him. Accordingly, UPS is entitled to summary judgment on all four counts of his amended complaint.

I. **Mr. Thornton's claims should be dismissed because he has failed to meet the administrative filing requirements and the claims are time barred.**

Mr. Thornton's claims under Mass. Gen. L. ch. 151B and under the Americans with Disabilities Act ("ADA"), should be dismissed because (1) he failed to comply with the administrative filing requirements and (2) the claims are time barred. Mr. Thornton is precluded from seeking damages for events that occurred <u>after</u> August 2001 because he failed to comply with the administrative filing requirements under both Chapter 151B and the ADA. Mr. Thornton's claims under Chapter 151B involving events that occurred <u>before</u> February 1, 2002 are time barred by the three year statute of limitations, and Mr. Thornton's claims under the ADA (Counts I and II) are time barred in part because there is no evidence that he filed these claims in court within ninety days of receiving a notice of a right to suit.

    a.    <u>Mr. Thornton has failed to comply with the administrative filing requirements under both Chapter 151B and the ADA.</u>

A complaint of employment discrimination must be filed with either the Massachusetts Commission Against Discrimination ("MCAD") or the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. <u>See</u> Mass Gen. L. ch. 151B, § 5; <u>see</u> <u>also</u> 42 U.S.C. § 12117 & § 2000e-5(c)-(e)(a claim is timely filed within 180 days of the challenged conduct, or if filed within 300 days if proceedings are initiated in a deferral state); <u>see</u> <u>also</u> <u>Luciano v. Coca-Cola Enterprises Inc.</u>, 2004 U.S. Dist. LEXIS 17186 at *2 (2004)(federal and state law require that an administrative charge be filed by a claimant before an employment discrimination lawsuit may be brought); <u>Slaman v. GSS Inc.</u>, 1998 U.S. LEXIS 2184, *2 (1998)(a timely charge must be filed with the relevant state or federal agency in order to pursue claims of discrimination (J. Lasker)).

Mr. Thornton filed a charge with the MCAD in July 2000 regarding the disagreement during the summer of 2000 around whether he could drive prior to obtaining surgery. (See <u>Tab U</u>). Mr.

10

Thornton filed a second MCAD charge in August 2001 claiming that UPS discriminated against him when it forced him to bid on the Chelmsford to Buffalo route. (See Tab W). The MCAD found lack of probable cause in both cases and these claims were dismissed. (Thornton Tr. 41-42; Tab V; Tab X).

Although it has been requested, Mr. Thornton has produced no evidence that he filed any other administrative charge with either the MCAD or the EEOC subsequent to the charge he filed in August 2001. Accordingly, Mr. Thornton is precluded from seeking damages on any events that occurred after August 2001, including his allegations that "UPS changed the Chelmsford-Worcester-Hartford route in the fall of 2001," that he was subjected to a "100% medical release policy," that UPS failed to accommodate his alleged handicap, and that UPS did not provide him with an inside position after he failed his DOT examination. (See Plaintiff's Amended Complaint, ¶¶ 37-50). See Luciano, 2004 US Dist. LEXIS 17186 at 2 (summary judgment granted where plaintiff failed to file an administrative charge pertaining to her hostile work environment claim); Chatman v. Gentle Dentist Center of Waltham, 973 F. Supp. 228, 233 (D. Mass. 1997) (failure to file a proper charge with the MCAD is fatal to a later claim filed in court under Chapter 151B).

    b.    Mr. Thornton's disability discrimination claims are time barred.

Mr. Thornton's claims under the Mass. Gen. L. ch. 151B (Counts III and IV), involving events that occurred prior to February 1, 2002, are time barred by the three year statute of limitations. See Mass. Gen. L. ch. 151B, §9 (any person aggrieved by a practice made unlawful under this chapter…may, at the expiration of ninety days after the filing of a compliant with the commission…but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages…); Grotlisch v. General Dynamics Defense Systems Inc., 28 Fed. Appx 3, 5 (1st Cir. 2002)(the statute of limitations applicable to claims under Chapter 151B has two components: a plaintiff must complain to the MCAD within the applicable time period (either 300

11

or 180 days) of the alleged act of discrimination, and must also sue within three years of the alleged act).

Because Mr. Thornton filed this Complaint on February 1, 2005, he is precluded from seeking damages on events that occurred prior to February 1, 2002. This would include his claims that UPS did not abide by his work restrictions, that UPS placed him on a forced leave of absence in 2000, that UPS denied his request for light duty in July 2000 and in February 2001, that UPS advised him to bid on jobs outside his medical restrictions, that UPS refused to alter other routes in order to accommodate him, that he was forced to bid on the Chelmsford to Buffalo job in February 2001, and that UPS subjected him to a "100% medical release" policy. (See ¶¶ 4-40 of Plaintiff's Amended Complaint). The only event(s) that occurred after February 1, 2002, which are not time barred, are Mr. Thornton failing his DOT examination in Fall 2002 and Mr. Thornton not being physically able to perform an inside UPS job. These are not acts of discrimination on the part of UPS and regardless, Mr. Thornton is precluded from seeking damages regarding these events because he never first filed the requisite administrative claim. See also Grotlisch, 28 Fed. Appx at 5 (the untimely administrative filing and the tardy commencement of suit bar the maintenance of this civil action).

Finally, Mr. Thornton's claims under the ADA (Counts I and II) are time bared in part because there is no evidence that he filed all of his ADA claims within ninety days of receiving a right to suit notice from the EEOC. The ADA follows the same procedures as Title VII, including the requirement to file claim within ninety days of receiving the right to suit notice. See 42 U.S.C. § 12117(a)(the procedures set forth in sections 2000e-5 of this title shall be the powers, remedies, and procedures this subchapter …); 42 U.S.C. § 2000e-5(f)(1)(within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge…); Bonilla v.

Muebles, 194 F.3d 275, 277 (1st Cir. 1999)(the ADA mandates compliance with the administrative procedures specified in Title VII).

Mr. Thornton alleges that on November 4, 2004, the EEOC issued a right to suit notice and ninety days later, on February 1, 2005, Mr. Thornton filed his ADA claims with this Court. According to the EEOC, the November 4, 2004 right to suit notice would have been limited to Mr. Thornton's August 30, 2001 charge. (See Affidavit of Michelle Fleming, ¶¶ 2-5). Accordingly, the only ADA claim that Mr. Thornton timely brought is the claim that UPS allegedly discriminated against him when it "misinterpreted" Dr. Hawkins' medical restrictions and allowed him to bid on the Chelmsford to Buffalo job. This hardly constitutes an allegation of discrimination. The ninety day limit for filing a civil action effectively precludes Mr. Thornton from seeking damages under the ADA on any of the other allegations he has stated in his Amended Complaint. (See Amended Complaint, ¶ 4-21, 36-57); see also Cheney v. Emmaus, Inc., 2004 U.S. LEXIS 19923 * 2-3 (D. Mass. 2004)(the 90 day period for filing suit is jurisdictional and the failure to file within the allotted 90 days is ordinarily fatal).

### II. UPS is entitled to summary judgment because Mr. Thornton cannot establish the essential elements of his disability claim under either Chapter 151B or the ADA.

Notwithstanding that Mr. Thornton's failure to comply with the administrative filing requirements and his failure to timely bring a civil action are fatal to his case, UPS is entitled to summary judgment because Mr. Thornton cannot establish each of the essential elements of his disability discrimination claim. See Fed. R. Civ P. 56; See also Matthews v. Ocean Spray Cranberries, Inc., 426 Mass. 122, 127 (1997)(the moving party may satisfy its burden by demonstrating that the opposing party has no reasonable expectation of proving an essential element of the case at trial).

To survive summary judgment on both his Mass. Gen. L. ch. 151B and ADA claims, Mr. Thornton must put forth sufficient evidence that (1) he suffered from a handicap as defined under Chapter 151B and the ADA; (2) he was nevertheless able to perform the essential functions of his job, with or without a reasonable accommodation, and (3) UPS took an adverse employment action against him because of, in whole or in part, his disability.  See Carroll v. Xerox Corp., 294 F.3d 231, 237-238 (1st Cir. 2002).  As to his reasonable accommodation claim, Mr. Thornton must show that UPS despite knowing of his alleged disability did not reasonably accommodate it.  Id.

      a.      Mr. Thornton is not handicapped under the ADA.

Mr. Thornton claims that he is disabled due to his right shoulder injury and chronic back problem.  Simply because Mr. Thornton claims he has an impairment does not make him disabled for purposes of the ADA.  See City of New Bedford v. Massachusetts Commission Against Discrimination, 440 Mass. 450, 462 (2003).  The ADA defines a handicap as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  See 42 U.S.C. § 12102 (2).  The Supreme Court has held that these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled.  See Toyota Motor Manufacturing Kentucky, Inc. v. Ella Williams, 534 U.S. 184, 197 (2002); Benoit v. Technical Manufacturing Corp., 331 F.3d 166, 175 (1st Cir. 2003).

To be substantially limited, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Williams, 534 U.S. at 198.  The word "substantial" precludes impairments that interfere in only a minor way.  Id. at 196.  The EEOC defines substantially limited as leaving the plaintiff: (1) unable to perform a major life activity that the average person in the general population can perform; or (2) significantly restricted as to the condition, manner or duration under which an individual [plaintiff] can perform a particular major life activity as compared to the condition,

14

manner, or duration under which the average person in the general population can perform that same major life activity.    See 29 CFR § 1630.2(j)(1)(i)-(ii).    An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person.  Williams, 534 U.S. at 198-199.

Mr. Thornton had varying medical restrictions over the years, and at times he had no medical restrictions.  In May 2000 Mr. Thornton was restricted from tractor trailer driving until he received shoulder surgery, by September 2000 he was medically cleared to resume driving.  In January 2001, Dr. Hawkins determined that Mr. Thornton was not disabled and was only restricted from heavy lifting, such as loading and unloading trucks.  After injuring himself in March 2001, per his own request, Mr. Thornton's medical restrictions were no driving longer than ninety minutes, thirty pound lifting limit, no repetitive lifting or bending and a nine hour maximum work day.  All of these restrictions were ultimately lifted in November 2001 and Mr. Thornton worked without any medical restrictions until September 2002.

At no time between 1995 and 2002, did Mr. Thornton's shoulder and/or back problems substantially limit a major life activity.  Neither a thirty pound and no repetitive lifting restriction, nor the ability to drive a tractor trailer more than 90 minutes at a time, constitutes a major life activity.    First, the capacity to perform heavy lifting or to perform repetitive lifting is not a trait shared by the majority of the population and therefore in itself is not a major life activity. See Gillen v. Fallon Ambulance Service, Inc., 283 F.3d 11, 19 (1st Cir. 2002)("if a restriction on heavy lifting were considered a substantial limitation on a major life activity, then the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape…Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some particularly difficult manual task"); Williams, 534 U.S. at 201 ("repetitive work with hands and arms extended at or above shoulder levels for extended periods of time…is not

15

an important part of most people's daily lives"); Marinelli v. City of Erie, 216 F.3d 354, 364 (3rd Cir. 2000)(a ten pound lifting restriction did not render plaintiff sufficiently different from the general population such that he is substantially limited in his ability to lift).

With regard to Mr. Thornton's driving restriction, it only affected the amount of driving he could do without a break. The inability to drive more than ninety minutes without taking a break might be a minor inconvenience, but it is not a substantial impairment. See Taylor v. Pathmark Stores Inc., 177 F.3d 180 (3d Cir. 1999)(plaintiff's inability to walk or stand more then fifty minutes without a rest was not a disability). Finally, neither of these restrictions were permanent. The heavy lifting restriction was ultimately removed in November 2001 and the restriction on the amount of driving at any given time was only in place from March 2001 to November 2001. Rivera v. Caribbean Refrescos, Inc., 2004 U.S. Distr. LEXIS 17230 (1st Cir. 2004)(plaintiff's temporary five pound lifting restriction was insufficient to demonstrate a substantial limitation).

If Mr. Thornton is claiming that he was substantially limited in the major life activity of working, he has put forth no evidence to support this claim. In order to be substantially limited in the major life activity of working, the individual must show an inability to work in a broad range of jobs rather than one specific job. A Feeder Driver is a single particular type of job. The inability to perform a single, particular job does not constitute the required substantial limitation that the ADA requires. Benoit, 331 F.3d at 176 (plaintiff, who was told to avoid heavy lifting, could not demonstrate that this precluded him from working in a substantial class or broad range of jobs). As further evidence that Mr. Thornton was not substantially limited in the major life activity of working, Mr. Thornton had continued to work as a full-time Feeder Driver up until September 2002. Id. (even though he claimed to be substantially limited in the major life activity of working, the plaintiff had continued working throughout the years); Lebron-Torres v. Whitehall Laboratories, 251 F.3d 236, 240 (1st Cir. 2001)(the evidence failed to show that the plaintiff could not perform the

specific job she had held).   Accordingly, Mr. Thornton cannot put forth sufficient evidence that he was disabled as defined under the ADA.

> b. <u>There is no evidence that UPS failed to adhere to Mr. Thornton's work restrictions nor is there evidence that UPS failed to accommodate Mr. Thornton in violation of Mass. Gen. L. ch. 151B or the ADA</u>.

Mr. Thornton claims that UPS discriminated against him in violation of the Mass. Gen. L. ch. 151B and the ADA when it failed to adhere to the work restrictions in place and when it failed to provide him with an accommodation.  There is no evidence to support either of these claims.

It is undisputed that each job Mr. Thornton bid on and held either fell within the medical restrictions that were in place at the time (<u>if any</u>) or UPS accommodated him so that he could perform the job.  In 2000, Mr. Thornton drove the Chelmsford to Worcester job and admitted that this job fell within his medical restrictions.  At the post Christmas 2000 bid, Mr. Thornton successfully bid on a Chelmsford- Worcester-Hartford Center job, another single trailer job that fell within his medical restrictions.  On January 20, 2001, Dr. Hawkins examined Mr. Thornton, determined he was <u>not</u> disabled but was restricted from heavy lifting.  This lifting restriction did not prevent him from performing the Chelmsford-Worcester-Hartford job, since the job did not require lifting.

At the 2001 bid, Mr. Thornton bid on a sleeper team job that required a designated second driver, but had to withdraw the bid because he had not arranged for a second driver.  Mr. Thornton refused to bid the remaining three choices on his bid sheet, even though his third choice was the job he held prior to the bid, and his fourth and fifth choices were singe trailer jobs and were all within his medical restrictions.  None of these jobs were posted as a double trailer job and, according to Ken Mundry, UPS had not changed the Chelmsford-Worcester-Hartford job that Mr. Thornton previously held. (See Mundry Tr. 91; See also <u>Tab L</u>).  Overall, Mr. Thornton had a 1968 seniority

17

date and could freely bid on any of the single trailer jobs, which were all within his medical restrictions.

Instead, Mr. Thornton insisted on submitting an entirely new bid and he bid on the Chelmsford to Philadelphia job, a "premium job," where the driver works only three and a half days each week. Although Kenneth Mundry, the Feeder Driver Manager, had concerns about Mr. Thornton driving a double trailer, UPS allowed Mr. Thornton to bid the job, with the understanding that other employees would lift the seventy pound dollies whenever necessary. Mr. Thornton had no then-current medical restriction that would have prevented UPS from awarding him the job he bid upon. Denial of the route could perhaps have generated a colorable charge of disability discrimination; allowing Mr. Thornton to perform the route does not.

On or about March 16, 2001, Dr. Wolf granted Mr. Thornton's request for work related restrictions of no driving longer than ninety minutes, thirty pound lifting limit, nine hour maximum work day and no repetitive lifting or bending. Mr. Thornton returned to the Chelmsford-Worcester-Hartford job, which was the same job he held <u>prior</u> to bidding on the Chelmsford to Philadelphia job and admittedly the job requirements were still within his medical restrictions. On November 12, 2001, Dr. Wolf reexamined Mr. Thornton and removed all of the work restrictions. Based upon Dr. Wolf's assessment, there were no restrictions preventing Mr. Thornton from bidding on the Chelmsford to Philadelphia job and then subsequently on the Chelmsford to Buffalo job. Although Mr. Thornton no longer had a lifting restriction, UPS still accommodated Mr. Thornton by requiring other employees to lift the dollies whenever necessary.

Overall, there is no evidence that Mr. Thornton was required to bid on jobs that were outside his medical restrictions. There is also no evidence that Mr. Thornton was subjected to a "100% medical release" policy. In fact, Ken Mundry, the Feeder Driver Manager, and Holly Manzo, who is now the North New England District Risk Manager, have never even heard of a "100 % medical

release" policy. Regardless, the only time Mr. Thornton was not allowed to work was during the summer of 2000 when Dr. Franchi opined that Mr. Thornton required surgery and should not drive a tractor trailer until after the surgery had been completed. UPS was simply complying with the doctor's orders. When Mr. Thornton was ultimately cleared to resume driving, UPS paid him for any lost wages that he incurred during that time period. Otherwise, UPS never prevented Mr. Thornton from working and it accommodated his restrictions whenever necessary. MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996)(judgment notwithstanding the verdict granted where the plaintiff failed to show that he was subjected to an adverse employment action which materially disadvantaged him).

Finally, there is no evidence that UPS failed to accommodate Mr. Thornton. First, the duty to provide a reasonable accommodation is only triggered when the employee is unable to perform essential functions of his job. Because Mr. Thornton was able to drive a single trailer job without an accommodation, the duty to accommodate was not triggered. Petsch-Schmid v. Boston Edison Co., 914 F. Supp. 697, 703 (1996) (the issue of reasonable accommodation is only considered when a handicapped person is not able to perform the essential functions of the job). Tate v. Department of Mental Health, 419 Mass. 356, 362 (1995)(there is no dispute that the plaintiff was qualified to perform the essential functions of her position; therefore, whether the defendant failed to accommodate her handicap is irrelevant); Beling v. Radiation Monitoring Devices, Inc., 1999 Mass. Super. LEXIS 386 at * 12 (1999)(because it is undisputed that the [plaintiff's] MS did no prevent her from performing the essential functions of her job, whether RMD should have explored or provided a reasonable accommodation is irrelevant).

Regardless, whenever Mr. Thornton chose to bid on a double trailer job, Mr. Thornton admits that UPS accommodated his lifting restriction, even when there was no formal lifting restriction in place at the time. Accordingly, Mr. Thornton's failure to accommodate claim should

be dismissed. See Leach v. Commissioner of the Massachusetts Rehabilitation Commission, 63 Mass. App. Ct. 563, 569 (2005)(no failure to accommodate claim where the employer made an effort to provide reasonable accommodations).

## CONCLUSION

For the above reasons, UPS requests that the Court grant summary judgment in its favor and dismiss all four counts of the Plaintiff's Amended Complaint against it.

United Parcel Service Inc.
By its attorneys,

/s/Laurie Alexander-Krom
Hugh F. Murray, III, BBO# 557175
Laurie Alexander-Krom, BBO# 637385
Murtha Cullina LLP
99 High Street
Boston, MA 02110
617-451-9300

Date: May 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). No non-participants (NEF) as noted.

/s/Laurie Alexander-Krom