UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLIE THORNTON, )
    Plaintiff, )
     ) CIVIL ACTION NO.: 05-10210-MEL
v. )
     )
UNITED PARCEL SERVICE, INC., )
    Defendant. )
     )

**PLAINTIFF'S L.R. 56.1 STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to L.R. 56.1, the Plaintiff hereby submits the following statement of material facts:

1. The Plaintiff, Charlie Thornton, began working for Defendant United Parcel Service ("U.P.S.") in 1968 and continued to do so until his retirement in 2002. Affidavit of Charlie Thornton, ¶3, attached hereto as Exhibit A. When he retired, he held the position of feeder driver, a job which requires driving a tractor trailer from one point to another. Deposition of Kenneth Mundry, January 11, 2006, pg. 17, attached hereto as Exhibit B. Drivers at U.P.S. bid on the available feeder driver routes in order of seniority. Ex. B, pg. 37.

2. In 1993, Mr. Thornton filed a Charge of Discrimination alleging discrimination on the basis of a disability with the Equal Employment Opportunity Commission (hereinafter "E.E.O.C."), Docket Number 16C930585 and a corresponding Charge of Discrimination with the Massachusetts Commission Against Discrimination (hereinafter "M.C.A.D.), Docket Number 93BEM0030.

1

3. In 1995, the Plaintiff and Defendant entered into a settlement regarding that charge in which U.P.S. agreed, at the minimum, to abide by the following medical restrictions: no lifting more than thirty pounds and no driving longer than ninety minutes without a break. Exhibit A ¶4; Deposition of Charlie Thornton, Nov. 28, 2005, pg. 190, attached hereto as Exhibit C.

4. From at least 1995 to the present, Mr. Thornton suffered from a chronic back injury, shoulder injuries, and hand injuries, for which he repeatedly sought reasonable accommodations from U.P.S.

5. On October 2, 1996, the E.E.O.C. disposed of Mr. Thornton's charges of discrimination docket number 16C930585 subject to the agreement U.P.S. to perform its promises and representations made on August 7, 1995. See 1993 Charge and Dismissal, attached hereto as Exhibit D.

6. Notwithstanding the agreement in August 1995 of U.P.S. to abide by Mr. Thornton's work restrictions, on numerous occasions from 1995 to 2002, U.P.S. refused to accommodate the Plaintiff's injuries. In fact, whenever the Plaintiff's injuries flared up, U.P.S. doctors would attempt to put him out on medical leave rather than allowing him to work with accommodations.

7. For example, in May of 2000, the Plaintiff complained to management that he had pain in his shoulder. U.P.S. scheduled him for an exam with their physician, Dr. Albert Franchi, on May 9, 2000. Ex. C, pg. 30-31. Dr. Franchi diagnosed Mr. Thornton with chronic ulnar nerve neuropathy on the right side and severe nerve impingement of the right shoulder. The physician further noted that Mr. Thornton required surgical intervention and that he could not drive a tractor trailer until the

surgical procedure was completed.  See Franchi Note, attached to Defendant's motion as Exhibit C; Deposition of Holly Manzo, Jan. 25, 2006, pg. 52, attached hereto as Exhibit E.  Since he was not cleared to drive, U.P.S. would not allow him to work.  Ex. E, pg. 48.

8. As a result of the medical report of May 9, 2000, Mr. Thornton was forced to take a medical leave of absence.  Ex. C, pg. 33.

9. He obtained a second opinion from his own doctor, Dr. N. George Kasparyan, who cleared him to drive, and thus return to work under his old limitations.  See Kasparyan Note, attached to Defendant's motion as Exhibit D.

10. Under the collective bargaining agreement in place between the Teamsters Union and U.P.S., when two physicians disagree, the employee and employer agree on a third doctor who makes a binding recommendation.  See Third Doctor Procedure, attached to Defendant's motion as Exhibit G.

11. That third doctor, Dr. Ralph Wolf, found that, despite the Plaintiff's injuries and medical limitations, he was cleared to drive a tractor trailer.  See Wolf Note, attached to Defendant's motion as Exhibit I.  The Plaintiff's supervisor, Kenneth Mundry, saw this note and assumed it meant the Plaintiff had no medical restrictions.  Ex. B, pgs. 54-55.

12. Mr. Thornton returned to work on September 18, 2000 as a tractor trailer driver and found that, at that time, there was a driving route within his previous work restrictions.  See September bid sheet, attached hereto as Exhibit F.

13. This assignment required Mr. Thornton to drive a tractor trailer roundtrip from Chelmsford, MA to Hartford, CT three days out of the week; the other portion of

the assignment required Mr. Thornton to drive a tractor trailer roundtrip three times a day from Chelmsford, MA to Worcester, MA two days out of the week. Ex. B, pgs. 67, 72-73. As the Chelmsford-Worcester-Hartford route was a driving only assignment, Mr. Thornton satisfactorily performed this assignment from September 18, 2001 to January 2001. Ex. B, pg. 84; Ex. C, pg. 51.

14. On September 20, 2000, the Plaintiff underwent his bi-annual physical for the U.S. Department of Transportation ("D.O.T."). The examining doctor concluded that the Plaintiff was "ok to drive tractor-trailer *only*." See 2000 D.O.T. medical report, attached hereto as Exhibit G (emphasis added). U.P.S. was in possession of this medical report. Ex. E, pg. 63. Manzo claimed that when she received reports regarding injured employees, she referred them to her supervisor to determine if an accommodation was needed. Ex. E, pg. 13. She only remembered one instance in which U.P.S. made an accommodation. It involved an individual who had difficulty seeing his computer screen. Ex. E, pg. 12. She does not recall any such referrals pertaining to the Plaintiff since 1992. Ex. E, pgs. 13-14.

15. On January 20, 2001, Mr. Thornton underwent a medical evaluation at the request of U.P.S. related to a worker's compensation claim from the previous summer. As a result of that exam, Dr. Richard Hawkins diagnosed the Plaintiff with "a lumboscral strain with history of degenerative disk disease, rotator cuff strain, right shoulder with impingement syndrome, [and] carpal tunnel syndrome, right wrist, status post carpal tunnel release." See Hawkins Note, attached to Defendant's motion as Exhibit J.

4

16. According to the Hawkins Note, U.P.S. had inquired whether the injuries were caused by the Plaintiff's 1991 industrial accident, thus requiring U.P.S. to pay Worker's Compensation.  Dr. Hawkins, who was contracted to do the examination by Liberty Mutual, the U.P.S. Worker's Compensation insurer, found that the Plaintiff was not "disabled" solely for Worker's Compensation purposes, meaning that he had not been "disabled" by a job-related injury.  Id.  As part of the evaluation on January 20, 2001, Hawkins recommended the continuation of the "permanent work restrictions of no heavy lifting, such as loading and unloading of trucks" because "[the restrictions] have been effective in allowing him to continue to work on a regular basis."  Id.

17. The Hawkins Note was sent to U.P.S.  Ex. E, pgs. 64, 76.  Upon the Plaintiff's return to work, however, Mundry told him that, since he was no longer "disabled," he no longer had any medical restrictions.  Ex. B, pg. 56.  Manzo could not recall any employee who, upon returning to work from worker's compensation leave, had ever been given an accommodation.  Ex. E, pg. 80.  Requests for accommodations would be referred by Mundry to the Human Resources Department.  Mundry never had any discussions about the Plaintiff with anyone from that department.  Ex. B, pg. 15.

18. In February 2001, shortly before the bidding process for driving assignments concluded, Mr. Thornton was informed that the duties involved in the Chelmsford-Worcester-Hartford route had been changed to include heavy lifting.  Ex. C, pg. 74-77.  Sometimes U.P.S changes the duties involved in a particular route without reposting it or opening it up for bidding.  Ex. B, pgs. 90, 97, 99.

19. Mr. Thornton was advised to bid on other available jobs or to face the prospect of loosing his job at U.P.S. Mr. Thornton initially bid on an assignment that included a second driver to share long distance driving responsibilities and heavy lifting. Mr. Thornton was unsuccessful in obtaining this bid because he could not find a driving partner within such a short period of time as the bidding process for assignments ended on or about February 12, 2001. Ex. B, pgs. 74-75; See Annual bid 2001, attached hereto as Exhibit H; bid slip attached to Defendant's motion as Exhibit K.

20. As an alternative to taking a route with heavy lifting, Mr. Thornton requested the opportunity to perform other available "light duty" or "inside jobs." Ex. A, ¶13. Pursuant to U.P.S. policy, the Plaintiff was not allowed to bid on an "inside job." Ex. B, pgs. 80-81.

21. The term "inside" jobs includes but is not limited to the following jobs: operations clerk, car washer, sorter, irregular processor, preloader, pick off/high volume, pick off/runout belt. Ex. B, pg. 27.

22. In February 2001, Mr. Thornton was denied the opportunity to work available light duty or "inside" jobs. Ex. A, ¶13.

23. As a consequence, Mr. Thornton reluctantly chose to drive a tractor trailer from Chelmsford, MA to Buffalo, N.Y. because, in his estimation, this route was the least physically demanding assignment available. Ex. A, ¶13.

24. The Chelmsford-Buffalo route included tasks clearly outside of Mr. Thornton's identified work restrictions because this assignment required lifting a dolly weighing 70-90 pounds in order to attach double trailers and it required Mr.

Thornton to drive for more than 90 minutes without a break. Ex. C, pg. 90. Mundry stated that he was concerned about whether the Plaintiff could physically perform the Buffalo job, Ex. B, pg. 77. He claimed, however, that at the Plaintiff's request, U.P.S. agreed to waive his medical restrictions so he could bid on the Buffalo route. Ex. B, pg. 86. Manzo had never heard of anyone at U.P.S. ever agreeing to "waive" medical restrictions. Ex. E, pg. 43.

25. On or about March 5, 2001, during a trip to Buffalo, Mr. Thornton suffered a back spasm, which required medical treatment in the emergency room of a hospital in Buffalo, N.Y. Mr. Thornton's condition was so severe that he had to stay in a hotel overnight in Buffalo, N.Y. and take the train back to Massachusetts the following day. Ex. C, pg. 96.

26. On March 14, 2001, a physician from the U.P.S. medical referral list issued the following work restrictions for Mr. Thornton (1) no driving longer than 90 minutes; (2) 30-pound lifting restriction; (3) a maximum work day of nine (9) hours; and (4) no repetitive lifting. These restrictions are the same restrictions to which U.P.S. agreed on August 7, 1995. See Wolf note, attached to Defendant's motion as Exhibit O.

27. After a few weeks of recuperation, Mr. Thornton returned to work and bid on the Chelmsford-Worcester-Hartford route, as that route had changed back to the earlier duties which fit his restrictions. Ex. C, pg. 103.

28. In late fall of 2001, U.P.S. again changed the duties underlying the Chelmsford-Worcester-Hartford route, thus requiring Mr. Thornton to again bid on the Chelmsford-Buffalo route, a "doubles" route requiring heavy lifting, hooking up

dollies, and long driving times without breaks. Ex. B, pgs. 112-113; Ex. C, pg. 113. Mundry knew this job was outside of the Plaintiff's medical restrictions. Mundry stated, however, that he was told by U.P.S.' Health and Safety Department that the Plaintiff could do the job. Ex. B, pgs. 108, 111.

29. Prior to accepting the Chelmsford-Buffalo route in the late fall of 2001, Mr. Thornton, again, requested to work in an available light duty or "inside" job. U.P.S. denied Mr. Thornton's request to work a light duty or "inside" job. Ex. A, ¶14; Ex. C, pgs. 114-118.

30. Faced with the prospect of loosing his job for the second time within a year, Mr. Thornton reluctantly drove the Chelmsford-Buffalo route. Ex. C, pg. 112.

31. Throughout 2002, Mr. Thornton's back condition and shoulder condition rapidly deteriorated because the Chelmsford-Buffalo assignment involved lifting between 70-90 pounds and driving long distances without a break. Ex. B, pg. 192.

32. On September 16, 2002, Mr. Thornton underwent his biannual physical examination as required by the D.O.T. Mr. Thornton was advised that he had failed the physical examination due to his job-related injuries. Ex. B, pg. 115; 2002 D.O.T. medical report attached hereto as Exhibit I.

33. Based upon the physical evaluation of September 16, 2002, Mr. Thornton was diagnosed as suffering from a permanent medical condition related to his right shoulder injury and a chronic back problem which precluded him from working as a tractor trailer driver. Id.

34. Mr. Thornton immediately advised his supervisor, Ken Mundry, that he had failed the D.O.T. physical examination. Ex. B, pg. 116.

35. Upon learning of Mr. Thornton's failure to pass the D.O.T. examination, Mr. Mundry offered Mr. Thornton an "inside" job. Approximately one hour later, Mr. Mundry rescinded the offer of an "inside" job to Mr. Thornton. Ex. B, pg. 116-117; Ex. C, pg. 137.

36. On September 19, 2002, and December 6, 2002, respectively, physicians selected by U.P.S. decided that Mr. Thornton's medical condition had deteriorated to the point that he was permanently unable to perform various "inside" jobs such as operations clerk, car washer, irregular processor, preloader, pick off/high volume, and pick off/runout belt. One doctor found that his physical injuries and limitations were "permanent/non-remedial in nature." See Doctors' Notes, attached to Defendant's motion at Exhibit T. It was determined, however, that he could physically do the job of small sorter, which is an "inside job" at U.P.S. Id. He was not allowed to work as a small sorter because it was a part-time job, and U.P.S. policy forbids full-time employees from working part-time or changing to part-time status. Ex. B, pgs. 34, 120-122.

37. Thus, when Mr. Thornton offered to change to part-time, he was turned down. Ex. C, pg. 123-124. He felt he could continue to work in some capacity but U.P.S. disagreed. Ex. C, pg 147. The Plaintiff asked for a second opinion but was told he would have to go to his own doctor at his own expense. He chose not to do so for that reason and because it would have started the third doctor procedure again, keeping him on unpaid leave. Ex. C, pgs 143-145; 186. He last worked at U.P.S. on September 16, 2002 and eventually chose to retire rather than

    continuing to file grievances with the union against U.P.S.  Ex. A, ¶22; Ex. C, pg. 141.

38. On several occasions from 1999 through the end of 2002, managers informed the Plaintiff that, if he wanted to work at U.P.S., he had to have a "100% release," or be at "full capacity."  Otherwise, if he was unable or unwilling to perform any part of the feeder driver job, as defined by U.P.S., whether essential or not, then he would be put on unpaid medical leave.  Ex. A, ¶¶23-25; Ex. C, pg. 164.

39. This "100 % medical release" policy forced Mr. Thornton to bid on jobs outside his restrictions because U.P.S. refused to accommodate his medical limitations.  Exhibit A, ¶¶12, 14, 23-25; Ex. C, pg. 164.  Various U.P.S. employees across the country have complained of this same policy.  Witness statements, attached hereto as Exhibit J.

40. Throughout the relevant time period, U.P.S. had the ability, without undue hardship, to modify the available job routes, including the lifting and driving time requirements of the various routes.  At one point in September of 2000, U.P.S. actually created a route for the Plaintiff, on account of his seniority, because he returned to work in the middle of a bidding cycle.  Ex. B, pgs. 63-64.  No routes were ever created or modified to fit the Plaintiff's medical restrictions.

41. At all times relevant, the Plaintiff was either: substantially limited in one or more major life activities, Ex. A, ¶¶26-30; or, regarded by U.P.S. as having such a limitation.  Ex. A, ¶¶20-25.

42. Mr. Thornton has complied with all statutory requirements and conditions precedent necessary to maintain this action by filing a timely charge with the

      MCAD and the EEOC. See August 30, 2001 Complaint, attached to Defendant's motion as Exhibit W; Exhibit A, ¶¶32-33; Affidavit of Michael Tumposky, attached hereto as Exhibit K.

43. On November 4, 2004, the EEOC issued Mr. Thornton a notice of right of suit. Right of Suit Letter, attached hereto as Exhibit L.

                                                Charlie Thornton
                                                By His Attorneys

DATED: June 1, 2006                     //s// Michael Tumposky
                                                Stephen Hrones
                                                BBO No. 242860
                                                Michael Tumposky
                                                BBO No. 660618
                                                Hrones, Garrity & Hedges
                                                Lewis Wharf –Bay 232
                                                Boston, MA 02110
                                                (617) 227-4019

**CERTIFICATE OF SERVICE**

      I, Michael Tumposky, herby certify that, on this the 1st day of June, 2006, I served a copy of this document, where unable to do so electronically, by first-class mail as follows: Laurie Alexander-Krom, Murtha Cullina, 99 High Street, Boston, MA 02110.

                                                //s// Michael Tumposky
                                                Michael Tumposky

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLIE THORNTON, )<br>    Plaintiff, )<br>                                    ) CIVIL ACTION NO.: 05-10210-MEL<br>v.                                  )<br>                                    )<br>UNITED PARCEL SERVICE, INC.,)<br>    Defendant. )<br>                                    ) | |

**NOTICE OF FILING**

The Plaintiff hereby gives notice that that the following exhibits have been hand-filed and are available in paper form only:

   A.  Affidavit of Charlie Thornton

   B.  Deposition of Kenneth Mundry

   C.  Deposition of Charlie Thornton

   D.  1993 Charge and Dismissal

   E.  Deposition of Holly Manzo

   F.  September bid sheet

   G.  2000 D.O.T. medical report

   H.  Annual bid 2001

   I.  2002 D.O.T. medical report

   J.  Witness statements

   K.  Affidavit of Michael Tumposky

   L.  Right of Suit Letter

2

|  |  |
|---|---|
|  | Respectfully Submitted,<br>Plaintiff Charlie Thornton<br>By His Attorneys |
| DATED: June 1, 2006 | //s// Michael Tumposky<br>Stephen Hrones<br>BBO No. 242860<br>Michael Tumposky<br>BBO No. 660618<br>Hrones, Garrity & Hedges<br>Lewis Wharf –Bay 232<br>Boston, MA 02110<br>(617) 227-4019 |

**CERTIFICATE OF SERVICE**

I, Michael Tumposky, herby certify that, on this the 1st day of June, 2006, I served a copy of this document, where unable to do so electronically, by first-class mail as follows: Laurie Alexander-Krom, Murtha Cullina, 99 High Street, Boston, MA 02110.

//s// Michael Tumposky
Michael Tumposky