UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLIE THORNTON,           )
        Plaintiff,          )
                            )  CIVIL ACTION NO.: 05-10210-MEL
v.                          )
                            )
UNITED PARCEL SERVICE, INC.,)
        Defendant.          )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF HIS CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

The Plaintiff, Charlie Thornton, opposes the Defendant's summary judgment motion on the grounds that material facts are still in dispute which must be decided by a jury as to most of his claims. He further contends that he is entitled to summary judgment on his claim that he is "disabled" within the meaning of the Americans with Disabilities Act and M.G.L. ch. 151B, §4 as there are no material disputes of fact on that element. As grounds therefore, the Plaintiff incorporates his L.R. 56.1 statement of material facts with accompanying exhibits and submits this memorandum of law.

## INTRODUCTION

The Plaintiff filed a claim against the Defendant, United Parcel Service, Inc., alleging violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. and its state-law counterpart, M.G.L. ch. 151B, §4. Specifically, the Plaintiff alleges that the Defendant maintains a policy and practice in which it requires all employees to obtain a "100% medical release" before they are allowed to return to work from injury leave. This policy means that U.P.S. requires an employee to be medically cleared to do every

1

function (essential or not) which it believes to be required of his particular position, without accommodation, or U.P.S. does not allow that employee to work.

As a result of this policy, the Defendant, on numerous occasions from 2000 to 2002, failed to accommodate the Plaintiff's disability by refusing even the slightest requested modification to the available feeder driver routes, thus forcing the Plaintiff to either: 1) bid on a job outside his medical limitations; or, 2) go on unpaid medical leave.

In August of 2001, the Plaintiff filed a charge with the Massachusetts Commission Against Discrimination ("MCAD"). That complaint alleged that the Defendant failed to accommodate the Plaintiff's disability by forcing him to work outside of his medical restrictions. In October, 2003, the MCAD dismissed the complaint. It found that the Plaintiff was a qualified individual with a disability who could perform the essential functions of the feeder driver position.[1] It determined, however, without any analysis, that the Plaintiff had failed to show he suffered any adverse employment action because the Plaintiff himself had "selected" his driving routes.

On November 4, 2004, the Plaintiff received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") relative to the allegations in his August, 2001 MCAD complaint. On February 1, 2005, the Plaintiff filed his claim in this Court, alleging that the Defendant repeatedly failed to accommodate his disability.

On February 10, 2006, the Plaintiff moved to amend his complaint to add two claims of policy and practice discrimination. The motion was unopposed by the Defendant. On March 20, 2006, that motion was allowed by this Court, and the amended complaint was subsequently answered by the Defendant.

---

[1] The Defendant does not dispute that the Plaintiff was able to perform the essential functions of the feeder driver position with or without reasonable accommodation. See Def. Memo at 19.

2

## ARGUMENT

**I.    THE PLAINTIFF IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON HIS CLAIM THAT HE IS A QUALIFIED INDIVIDUAL WITH A DISABILITY AND IS ENTITLED TO A JURY TRIAL ON ALL OTHER CLAIMS**

The Plaintiff is entitled to judgment as a matter of law on his claim that he is a "qualified individual with a disability." 42 U.S.C. §12111. He is entitled to proceed to trial on all other counts alleged in his complaint because he has satisfied the necessary procedural requirements and has presented sufficient evidence to raise a genuine dispute of fact as to each of his claims.

Despite Defendant's assertions to the contrary, it is clear that the Plaintiff properly exhausted his administrative remedies. First, he filed a timely charge with the Massachusetts Commission Against Discrimination. That charge alleged that the Defendant refused to accommodate the Plaintiff's disability by forcing him to perform work outside his medical limitations. See Pl. Stmnt. of Mat. Facts at ¶42. The Plaintiff's then filed his complaint in this Court within ninety days of receiving his right-to-sue letter from the EEOC. See Pl. Stmnt. of Mat. Facts at ¶43.

The Plaintiff is entitled to recover for each and every discriminatory act alleged in his complaint because these acts were part of a continuing violation. The ongoing violations were the Defendant's maintenance of an unlawful employment practice requiring all employees to have a "100% medical release," or to be "100% healed," in order to work, and its repeated failures to accommodate the Plaintiff. See Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d 396, 400 (1st Cir. 1990) (continuing violation theory applies when a plaintiff can show a number of discriminatory acts emanating from the same discriminatory animus, each action constituting a separate

wrong); Id. at 400 ("so long as the [unlawful] policy or practice itself continues into the

limitations period, a challenger may be deemed to have filed a timely complaint."); see

also McGregor v. AMTRAK, 187 F.3d 1113, 1116 (9th Cir. 1999), citing Hutchinson v.

United Parcel Serv., 883 F. Supp. 379, 397 (N.D. Iowa 1995) and Sarsycki v. United

Parcel Serv., 862 F. Supp. 336, 341 (W.D. Okla. 1994) ("100% healed" or "fully healed"

policies are per se violations of the ADA).

　　　　As to the merits of his claims, the Plaintiff has shown as a matter of law that he is

"disabled," in two ways, either of which standing alone would be sufficient to grant the

Plaintiff's motion for partial summary judgment. First, he has shown that he has "a

physical or mental impairment that substantially limits one or more of [his] major life

activities." 42 U.S.C. §12102(2). Second, he has shown that he is "regarded as having

such an impairment" by the Defendant. Id.; Pl. Stmnt. of Mat. Facts at ¶¶36-39.

　　　　Finally, the Plaintiff has clearly raised a triable issue on his assertion that he

suffered adverse employment action. Under the ADA and its state-law counterpart, the

Plaintiff can show a genuine dispute on this element when he offers evidence of a per se

unlawful employment practice and its applicability to him. See Teamsters v. United

States, 431 U.S. 324, 349 (1977). In this case, the Plaintiff has shown that the

Defendant's "100% release" policy forced him to either work outside his restrictions

without accommodation or take unpaid leave. Pl. Stmnt. of Mat. Facts at ¶¶6-8, 17, 38,

39. Second, the Plaintiff has shown he suffered adverse employment action because the

Defendant failed to accommodate his disability. Higgins v. New Balance Athletic Shoe,

Inc., 194 F.3d 252, 264 (1st Cir. 1999) (noting that a failure to accommodate is a form of

discrimination); Pl. Stmnt. of Mat. Facts at ¶¶18-20, 22-24, 28-30, 35.

4

## A. THE PLAINTIFF HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES AS TO ALL HIS ALLEGATIONS

While it is true that a Title VII suit may not extend beyond the parameters of the underlying administrative charge, see Fine v. GAF Chem. Corp., 995 F.2d 576, 578 (5th Cir. 1993), this does not mean that the scope of the suit is strictly limited to the allegations in the administrative complaint. Rather, the suit must only "bear some close relation to the allegations presented to the agency." Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005).

The purpose of the administrative charge is to "afford[] formal notice to the employer and prospective defendant of the charges that have been made against it." Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990). Thus, the scope of the civil complaint may include the charges filed with the administrative agency, as well as "the investigation which can reasonably be expected to grow out of that charge." Id.

Furthermore, "an administrative charge is not a blueprint for the litigation to follow. . . . [and] the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow. White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 263 (1st Cir. 2000). Rather, the critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC [or MCAD] investigation which can reasonably be expected to grow out of the charge of discrimination. Id.

In cases where, as here, the employee files pro se, the administrative charge is liberally construed in order to afford the complainant the benefit of any reasonable doubt. Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996); see also Alvarado v. Board of Trustees of Montgomery Community College, 848 F.2d 457, 460 (4th Cir. 1988)

5

(construing administrative charges of discrimination "with utmost liberality.") Moreover,

an equitable exception to "the exhaustion requirement is available [when the MCAD]

representative misleads the plaintiff" concerning his claim. Rodriguez v. Airborne

Express, 265 F.3d 890, 901-02 (9th Cir. 2001).

### i. Investigation of identical conduct occurring after the filing of the discrimination complaint would reasonably be expected to grow out of the original charge

The Plaintiff's complaint at the MCAD alleged that in March of 2001, the

Plaintiff was the victim of disability discrimination. Specifically, he alleged that his

medical "restrictions were misinterpreted [by U.P.S.] and [he] was doing jobs that [he]

was not physically able to do." Pl. Stmnt. of Mat. Facts at ¶42. In short, the Plaintiff was

alleging that U.P.S. would not accommodate his disabilities. The MCAD dismissed this

complaint in late-2003.

The Plaintiff's complaint in this Court includes allegations of the Defendant's

March, 2001 failure to accommodate as well as its subsequent failures to accommodate in

the late fall of 2001 and September, 2002, just before the Plaintiff ended his employment

at U.P.S. Each of the three failures to accommodate is premised on the same facts: that

the Plaintiff requested U.P.S. find him a driving route without heavy lifting and which

allowed for short breaks every ninety minutes, but was denied his request. The Plaintiff's

theory is that each of U.P.S.' refusals to accommodate was done pursuant to an unlawful

employment policy of never accommodating and improperly requiring employees to

obtain a "100% medical release."

Certainly investigation of identical acts of discrimination committed pursuant to

the same unlawful policy and arising during the pendency of the Plaintiff's MCAD

charge would reasonably be expected to "grow out of" the original charge, Grinnell
Corp., 915 F.2d at 37, especially when the allegations in this Court clearly "bear some
close relation to the allegations presented to the agency." Jorge, 404 F.3d at 556.

Therefore, since the Plaintiff properly filed his complaint at the MCAD, he has
satisfied his exhaustion requirement. See Loe v. Heckler, 768 F.2d 409, 420 (D.C. Cir.
1985) ("where the ends of administrative exhaustion have been served by pursuing
administrative remedies for the underlying complaint, separate exhaustion of
administrative remedies for related post-complaint conduct is not required"); Antol v.
Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) ("[r]equiring a new EEOC filing for each and
every discriminatory act would not serve the purposes of the statutory scheme where the
later discriminatory acts fell squarely within the scope of the earlier EEOC complaint or
investigation."); Webb v. District of Columbia, 864 F. Supp. 175, 184 (D.D.C. 1994)
("To force an employee to return to the state agency and the EEOC every time he claims
a new instance of discrimination in order to have the courts consider the subsequent
incidents along with the original ones would erect a needless procedural barrier.")

### ii. The Plaintiff is entitled to an equitable exception to the exhaustion requirement because the MCAD informed him a second complaint was not necessary

If this Court finds that the Plaintiff should have filed a second charge of
discrimination while the first was pending, an equitable exception to the "the exhaustion
requirement is available [when the MCAD] representative misleads the plaintiff"
concerning his claim. Rodriguez, 265 F.3d at 901-02.

As the affidavit of the Plaintiff makes clear, he was told by an investigator at the
MCAD that any unlawful conduct occurring during the pendency of his complaint would

be encompassed in that charge, so long as the violations were similar. As his counsel's affidavit makes clear, the MCAD's policy would have required it to ignore the Plaintiff's subsequent complaint of disability discrimination because any failures to accommodate occurring after the filing of the Plaintiff's original complaint would have been dealt with during that original investigation. Pl. Stmnt. of Mat. Facts at 42. Thus, the Plaintiff's has satisfied his administrative requirements.

### B. THE PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS BECAUSE THE DEFENDANT ENGAGED IN A CONTINUING VIOLATION OF THE ADA AND CH. 151B

All of Plaintiff's claims are timely because the Defendant engaged in serial and systemic violations of the ADA and ch. 151B continuing into the limitations period. It did so by maintaining a "100% medical release" policy for the duration of Plaintiff's employment and by repeatedly refusing to accommodate him. Thus the Plaintiff is allowed to recover for the entire course of the Defendant's conduct, including that which occurred more than three years before the filing of the complaint. See DeNovellis v. Shalala, 124 F.3d 298, 307-08 (1st Cir. 1997) ("A continuing violation allows a plaintiff not only to allege otherwise time-barred acts, but more concretely, to receive damages, such as back pay, based on and reaching back to those acts.")

Although ch. 151B[2] has a three-year statute of limitations, see ch. 151B, §9, where a violation is "of a continuing nature, the charge of discrimination filed . . . may be timely as to all discriminatory acts encompassed by the violation so long as the charge is filed during the life of the violation or within the statutory period." Pilgrim v. Trustees of

---

[2] The Defendant does not contend that the Plaintiff's ADA claims are barred by the statute of limitations, but rather that he did not file his complaint in this Court within ninety days of obtaining a right-to-sue letter from the EEOC. That is inaccurate. Pl. Stmnt. of Mat. Facts at ¶43.

Tufts College, 118 F.3d 864, 868 (1st Cir. 1997), quoting Kassaye v. Bryant College, 999 F.2d 603, 606 (1st Cir. 1993).  The continuing violation doctrine, applicable to all of the Plaintiff's claims, is also an equitable exception to the statute of limitations that allows an employee to seek damages for otherwise time-barred allegations.  Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1988).

There are two types of continuing violations: serial and systemic.  "A serial violation is a number of discriminatory acts emanating from the same discriminatory animus, each action constituting a separate wrong.  Id.  This theory "ensures that … claims are not foreclosed merely because the plaintiff[] needed to see a pattern of repeated acts before [he] realized that the individual acts were discriminatory."  Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir. 1999)

A systemic violation, on the other hand, "has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint."  Sabree, 921 F.2d at 400 n.7.  Summary judgment on pre-limitations claims is inappropriate "[u]nless there are no material facts in dispute...as to whether a continuing violation occurred."  O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).

The serial violation doctrine applies to this case because there was a violation within the statute of limitations period that anchors the earlier claims.  See Provencher, 145 F.3d at 14; see also Carter v. Commissioner of Correction, 43 Mass. App. Ct. 212, 221 (1997); Clifton v. Mass. Bay Transp. Auth., 62 Mass. App. Ct. 164, 170 (2004) *rev'd on other grounds* (continuing violation theory applies to three-year statute of limitations for ch. 151B claims).  Specifically, the Plaintiff claims that in February, 2001 and late

fall, 2001, U.P.S. refused to accommodate his injuries and denied his request for an inside job. Likewise, in September, 2002, U.P.S. failed to accommodate him. This last allegation anchors his earlier claims since it occurred less than three years before the filing of the Plaintiff's complaint on February 1, 2005.

Furthermore, the systemic violation doctrine applies to this case because the Plaintiff has shown sufficient evidence of an unlawful employment practice[3] continuing into the limitations period. Sabree, 921 F.2d at 400 n.7. Specifically, he has shown that U.P.S. maintained its "100% release" policy during the limitations period. Pl. Stmnt. of Mat. Facts at ¶¶38, 39. Thus, under either continuing violation theory, the Plaintiff's claims are not barred by the statute of limitations. Rather he is entitled to recover for each and every allegation in his complaint.

### C. THE PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA AND CH. 151B

In order to determine if the Plaintiff can prevail on his disability discrimination claims, the Court first must determine whether the Plaintiff is "disabled." The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2). "Major life activities" refer to those activities that are of central importance to daily life. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). These activities include, for example, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. §1630.2(i).

---

[3] This evidence will be addressed in more detail in Section D, infra.

In the case at bar, the Plaintiff is disabled under prong "A" of the statute because he has physical impairments which substantially limit him in the major life activities of walking, eating, sleeping, sitting, lifting, learning, caring for himself and performing manual tasks. Pl. Stmnt. of Mat. Facts at ¶41. Furthermore, he also qualifies under prong "C" because U.P.S. "regarded" the Plaintiff as substantially limited in the major life activity of working. Pl. Stmnt. of Mat. Facts at ¶¶36-39.

### i. THE PLAINTIFF IS SUBSTANTIALLY LIMITED IN A MAJOR LIFE ACTIVITY

To be substantially limited in a major life activity, an individual must have an impairment that prevents or severely restricts him from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term. Toyota, 534 U.S. at 197, citing 29 C.F.R. §1630.2 (j)(2)(ii)-(iii). Whether an impairment substantially limits a major life activity is determined on an individualized case-by-case basis. Rakity v. Dillons Companies, Inc., 302 F.3d 1152 (10th Cir. 2002). The court must also take into account the effects of mitigating or corrective measures when judging whether a person is substantially limited in a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999).

When an impairment results in significant limitations, that impairment is "substantially limiting" even if the limitations are not insurmountable. Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 22 (1st Cir. 2002). "The focus is not on whether the individual has the courage to participate in the major life activity despite [his] impairment, but, rather, on whether [he] faces significant obstacles when [he] does so." Id. Furthermore, a court should take note of "[t]he EEOC's emphasis on 'condition,

manner, or duration' in contrasting how a disabled person performs an activity and how a member of the general public performs that same activity." Id.

The question of whether a plaintiff is substantially limited in a major life activity (other than working) must be analyzed separately from whether he is able to perform his job. In other words, the initial question is not how a plaintiff's impairments affect his job performance, but rather how it affects his everyday life. See, e.g., Toyota, 541 U.S. at 200-01 ("When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.") Thus, the analysis of whether a plaintiff is "disabled" must be done without reference to his employment capabilities.[4]

In paragraphs 27-30 of his affidavit, attached to his L.R. 56.1 Statement of Material Facts at Exhibit A, the Plaintiff outlines the ways in which his injuries have substantially limited his everyday life activities. First, in ¶27 he explains how he is substantially limited in his ability to walk and sit:

> 27. The back injuries I described above substantially limited my ability to walk and sit. After a mere half-hour of walking, I required a twenty-minute break before I could resume. In addition, I could only sit for ninety minutes, at the most. After ninety minutes, I would be in severe pain if I did not stand up and stretch.

In ¶28, he similarly explains how the corrective measures he employs to manage the pain cause further limitation in his ability to sleep, eat, learn and control the elimination of his bodily waste:

---

[4] Normally, such capabilities would come into play under the second element of an ADA claim: whether the employee can perform "the essential functions" of the job with or without accommodation. 42 U.S.C. §12111. In this case, the Defendant concedes that the Plaintiff could perform the essential functions of his position. See Def. Memo at 19. Thus, if the Plaintiff is "disabled" under the ADA, then he is certainly a "qualified individual with a disability." 42 U.S.C. §12111.

28. These injuries required me to take heavy pain medicine such as Tamiflu, Oxycontin (when I was out of work), Percoset, and Divorset. These medicines imposed further substantial limitations on my ability to eat, sleep, relieve myself, and concentrate. When taking these medicines I had no appetite, I was constipated, had difficulty focusing and I was often excessively drowsy when I first awoke. As a result of this drowsiness, it took me an extra sixty to ninety minutes to get ready for work in the morning.

See Sutton, 527 U.S. at 482 ("The court must also take into account the effects of

mitigating or corrective measures when judging whether a person is substantially limited

in a major life activity."); Ryan v. Grae & Rybicki, 135 F.3d 867, 871 (2d Cir. 1998)

("assuming without deciding that the ability to control one's elimination of waste is a

major life activity.")

In ¶29 and ¶30, the Plaintiff describes how he is limited in performing manual

tasks, in caring for himself, and in lifting, due to his shoulder and hand injuries:

29. The shoulder injuries I described above substantially limited my ability to lift and to manipulate small objects because it caused pain and numbness to radiate down my arm. As a result, I would often drop drinking glasses, I had difficulty brushing my teeth, and it was difficult for me to hold a knife and fork. In fact, I often had to grab small objects with two hands. In addition, because I have to use my non-dominant hand, it takes me twice as long to brush my teeth.

30. The hand injuries described above were also limiting. Although I had surgery on my hand in 1998, there was lingering weakness and numbness. These symptoms caused limitations similar to those caused by my shoulder injury. In addition, although I am right-handed, my right hand has half the strength of my left due to my injuries.

This Plaintiff's statements are clearly supported by medical documentation, which

demonstrates serious injuries to his back, shoulders and hand. Pl. Stmnt. of Mat. Facts at

7, 9, 11, 15, 32, 33, 36. Furthermore, the doctor conducting the D.O.T. examination

determined that his injuries are permanent and non-remedial. Pl. Stmnt. of Mat. Facts at

36. Therefore, because the Plaintiff is substantially limited in one or more major life

13

activities, he is "disabled" within the meaning of the ADA, and is entitled to summary judgment on that element.[5]

## ii. U.P.S. REGARDED THE PLAINTIFF AS DISABLED

Not only was the Plaintiff substantially limited in several major life activities, but U.P.S. "regarded" the Plaintiff as being substantially limited in the major life activity of "working," thus giving him an alternative basis for summary judgment on his claim that he is "disabled."[6] A plaintiff may assert a "regarded as" claim when "(1) [an employer] mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." Id.

The "regarded as" element "turns on the employer's perception of the employee, a question of intent, not whether the employee has [an actual] disability." Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997). An employer is not shielded from liability under the ADA's "regarded as" element "merely by asserting its belief that [an employee's] known disability will limit her ability to perform a particular job to such an extent as to disqualify her from employment." Gillen, 283 F.3d at 29. Furthermore, even if the employer's belief about an employee's disability is honestly held, "on particular facts a jury still might conclude that it rested on an unfounded stereotype (and, therefore,

---

[5] At the very least, he has raised a genuine dispute on this issue.

[6] Employees "regarded as" disabled are entitled to as much accommodation as employees who are actually disabled. See, e.g., Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996); see also Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 773 (3d Cir. 2004) (collecting cases).

constituted discrimination)." Id., citing Zapata-Matos v. Reckitt & Colman, Inc., 277
F.3d 40, 45-46 (1st Cir. 2002).

   To avoid liability in a "regarded as" case, the evidence must show that the
employer understood the nature, extent, and implications of the employee's particular
impairment, and that the employment decision reflected that understanding. Gillen, 283
F.3d at 29, citing Holiday v. City of Chattanooga, 206 F.3d 637, 643 (6th Cir. 2000).
Only by insisting on this level of proof can courts effectuate one of the primary goals of
the ADA: "to prohibit employers from making adverse employment decisions based on
stereotypes and generalizations associated with the individual's [perceived] disability
rather than on the individual's actual characteristics." EEOC v. Prevo's Family Market,
Inc., 135 F.3d 1089, 1097 (6th Cir. 1998).

   In the case at bar, U.P.S. regarded the Plaintiff as disabled in the major life
activity of working in two distinct ways. First, by maintaining a "100% release" policy,
U.P.S. essentially treated every employee with a medical restriction, including the
Plaintiff, as being unable to work in any function at U.P.S.[7] Second, during the time
leading up to the Plaintiff's retirement, the Defendant mistakenly concluded that the he
was medically unfit to perform a broad class of jobs, when in fact there were positions at
U.P.S. he could have physically performed. Pl. Stmnt. of Mat Facts at ¶¶36, 37.

---

[7] The fact that the Plaintiff "chose" to work outside his restrictions rather than go on unpaid medical leave
does not affect his claim that U.P.S. "regarded" him as disabled. In no way did the Plaintiff's "choice" to
work lessen the impact of U.P.S.' attitudes towards employees with medical restrictions, such as the
Plaintiff. Pursuant to its "100% release" policy, if an employee insisted on an accommodation, U.P.S.
considered him unable to work altogether, and thus substantially limited in the major life activity of
working. See Sutton, 527 U.S. at 491. The Plaintiff cannot be faulted because he instead "chose" to work
and to endure the resulting physical pain. See Emory v. AstraZeneca Pharms, 401 F.3d 174, 181 (3d Cir.
2005) (the fact that a plaintiff, through sheer "force of will" has been able to become a productive member
of society by...working...does not negate the significant disability-related obstacles he has overcome...")

15

### 1. U.P.S. regarded the Plaintiff as disabled because of its "100% release" policy

In Henderson v. Ardco, Inc., 247 F.3d 645, 650 (6th Cir. 2001), the court discussed the interplay between "regarded as" disability claims and "100% release" policies. In Henderson, the plaintiff attempted to return to work with a medical restriction of lifting no more than forty pounds. Id. at 647. The plaintiff was told by his manager that he could not return to work unless he was "100% healed." Id. In overturning the district court's grant of the employer's motion for summary judgment, the court found sufficient evidence that the employer's "100%-healed rule. . . [could] be interpreted as treating [the plaintiff] as incapable of work in a manufacturing operation." Id. at 652.

The court held that, because of its "100% healed" rule, the employer in Henderson treated its employees with medical restrictions as being disqualified from performing a broad class of jobs. Therefore, an employee affected by a "100% healed" rule has shown that he is "regarded as" substantially limited in the major life activity of working, and thus "disabled" under the ADA. Id.; see also Wilson v. Exec. Jet Mgmt., Inc., 2006 U.S. Dist. LEXIS 11088 at * 40 (D. Ohio Feb. 28, 2006) ("Plaintiff further makes a convincing argument that the imposition of a 'one hundred percent healed' rule could be regarded as evidence Defendant regarded him as disabled.")

Similarly, in the case at bar the Defendant's "100% release" policy treated employees with any medical restrictions, like the Plaintiff, as substantially limited in the major life activity of working.[8] See Sutton, 527 U.S. at 489 (an employee is disabled

---

[8] Again, the fact that the Plaintiff "chose" to work outside his limitations is irrelevant to and does not detract from his "regarded as" claim. On the contrary, it goes directly to the third element of an ADA claim: that the Defendant refused to accommodate the Plaintiff's disability.

16

when an employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.") As opposed to engaging in the "interactive process," as required by the ADA[9], U.P.S. concludes that any injured employee is in fact totally disabled, and thus completely unfit to work in any position, even if he could perform the essential functions of the job with or without accommodation.

## 2. U.P.S. regarded the Plaintiff as disabled during the events leading up to his retirement

Not only was the Plaintiff "regarded as" disabled due to the Defendant's unlawful "100% release" policy, but he was also treated as disabled near the end of his employment with U.P.S when, because of his perceived physical limitations, he was not allowed to work at U.P.S. in any capacity.

In September of 2002, due to the fact that he had been forced to work outside his medical restrictions for years, the Plaintiff's physical condition had deteriorated to the point where he failed his D.O.T. physical. Pl. Stmnt. of Mat. Facts at ¶32. Although this legally prohibited him from driving tractor trailers, it did not prevent him from performing other tasks at U.P.S., such as light duty or inside jobs. On December 16, 2002, however, a doctor told the Defendant that the Plaintiff was not fit to perform various inside jobs,[10] although he could physically do the inside job of a "small sorter." Pl. Stmnt. of Mat. Facts at ¶36.

---

[9] This process is defined in the EEOC's regulations. See 29 C.F.R. §1630.2(o)(3); see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 109 (1st Cir. 2005) (recognizing potential employer liability under the ADA and ch. 151B for failing to engage in an "interactive process" with employee).

[10] The Plaintiff does not concede that he was, in fact, medically unfit for each of these positions. For the purposes of his cross-motion for summary judgment, however, it is not necessary to dispute this point. See Gillen, 283 F.3d at 31 ("the mere obtaining of [a medical] opinion does not automatically absolve the employer from liability under the ADA. The employer has an obligation to ensure that its applicants are

17

Therefore, with respect to the position of small sorter, it is clear that the Plaintiff

was a "qualified individual with a disability." 42 U.S.C. §12111. First, he was "regarded

as" substantially limited in the major life activity of working because U.P.S. treated him

as though he were unfit to perform a broad-class of jobs. Second, he was, in fact, able to

perform the "essential functions" of the small sorter position. Therefore, as the Plaintiff

had satisfied the first two elements of an ADA claim as a matter of law, U.P.S. was

required to offer him the reasonable accommodation of the small sorter position, or

engage in the interactive process to determine if he could work at another position within

the company. U.P.S. did neither.[11]

## D. THE PLAINTIFF HAS SHOWN SUFFICIENT EVIDENCE THAT HE SUFFERED ADVERSE EMPLOYMENT ACTION

### i. THE PLAINTIFF HAS SHOWN THAT THE DEFENDANT MAINTAINED AN UNLAWFUL EMPLOYMENT POLICY AND PRACTICE WHICH WAS A PER SE VIOLATION OF THE ADA AND CH. 151B

Courts have consistently found that "100% release," "100% healed," or "fully

healed" policies violate the ADA. McGregor, 187 F.3d at 1116 ("'100% healed' policies

are per se violations of the ADA. A '100% healed' or 'fully healed' policy discriminates

against qualified individuals with disabilities because such a policy permits employers to

substitute a determination of whether a qualified individual is '100% healed' from their

---

treated as individuals; thus, an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.") (internal citations omitted).

[11] Any argument by U.P.S. that the collective bargaining agreement foreclosed the possibility of the Plaintiff working as a small sorter is wholly without merit. Under the ADA, "the term 'discriminate' includes…(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this title (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs)." 42 U.S.C. §12112.

injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without reasonable accommodation."); Beveridge v. Northwest Airlines, Inc., 259 F. Supp. 2d 838, 848 (D. Minn. 2003) (a '[100 percent healed]' policy would ignore the individualized assessment that is required by the ADA, in favor of a categorical, generalized appraisal, and thus, would run[] afoul of the ADA."); Allen v. Pacific Bell, 212 F. Supp. 2d 1180, 1196 (C.D. Cal. 2002) (same); Hutchinson, 883 F. Supp. at 396-97 (same); Norris v. Allied-Sysco Food Services, Inc., 948 F. Supp. 1418, 1437 (N.D. Cal. 1996) (a policy which prohibits an employee from returning to work unless she can do so "without medical restrictions" would be a "per se violation of the ADA's requirement that employers reasonably accommodate employees with disabilities."); Heise v. Genuine Parts Co., 900 F. Supp. 1137, 1154 n.10 (D. Minn. 1995) ("The court notes that a '100% healed' policy is a per se violation of the ADA as such a policy does not allow for a case-by-case assessment of an individual's ability to perform the essential functions of the individual's job, with or without an accommodation.")

In addition, U.P.S. has previously been found to have such a policy, including in one very recent case. See Hohider v. United Parcel Serv., 2005 U.S. Dist. LEXIS 35911 *12-13 (D. Pa. Dec. 23, 2005) (noting that, in 2003, the EEOC found that: "Creditable [sic] Testimony has determined that [the defendant] has a 100% full medical release practice, which it has been determined is a per se violation of the ADA.")

A district court judge discussed this U.P.S. policy in detail in Hutchinson, 883 F. Supp. at 386. In that case, the court noted that counsel for U.P.S. "conceded that at one time there had been a '100% healed' policy for return to work at UPS, but that, upon

advice of counsel, UPS had dropped any such policy." Id. It commented that "[t]he court finds it unfortunate that one of the defendants found to have a policy that constituted a per se violation of the ADA should appear again as a defendant faced with a similar charge…" Id. at 397. Finally, the Hutchinson court held that "not only does the court believe that the '100% healed' policy of UPS would be a per se violation of the ADA, the court finds that there is a genuine issue of material fact as to whether such a policy still exists at UPS." Id.

In the case at bar, the Plaintiff's evidence of the existence of this policy and practice is direct, as well his proof of its applicability to him. Three managers at U.P.S. with supervisory authority over the Plaintiff told him that U.P.S. has a "100% release" policy and that, if the Plaintiff insisted on abiding by his medical restrictions, he would be put on unpaid leave. Pl. Stmnt. of Mat. Facts at ¶¶38, 39. As a result, the Plaintiff was often told to bid on work outside his restrictions. Pl. Stmnt. of Mat. Facts at ¶¶6, 19, 23, 24, 28, 30. Other U.P.S. employees were similarly subjected to this policy by their supervisors. Pl. Stmnt. of Mat. Facts at ¶39.

Taking this evidence in a light most favorable to the Plaintiff, a jury would be entitled to accept this testimony regarding the supervisors' statements for the truth of the matter asserted, and would be entitled to use these statements against U.P.S. See Fed. R. Evid. 801(d)(2) (A statement is not hearsay if "[t]he statement is offered against a party and is. . .the party's own statement… [or is] a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship…"). In other words, a jury would be entitled to find that, as recently as the end of 2002, the Defendant maintained a "100% release" policy, and that

the policy was applied to the Plaintiff. Thus, the Defendant is not entitled to summary

judgment on the Plaintiff's policy and practice claims.

### ii. THE PLAINTIFF HAS SHOWN THAT THE DEFENDANT DISCRIMINATED AGAINST HIM WHEN IT FAILED TO ACCOMMODATE HIS DISABILITY

The Plaintiff has also raised sufficient evidence of the Defendant's failures to

accommodate. Under the ADA, the term "'discriminate' includes . . . not making

reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability." Higgins, 194 F.3d at 264. Unlike other

enumerated constructions of "discriminate," a failure to accommodate claim "does not

require [proof] that an employer's action [was] motivated by a discriminatory animus

directed at the disability." Id. Rather, "any failure to provide reasonable

accommodations for a disability is necessarily 'because of a disability.'" Id. As such,

"an employer who knows of a disability yet fails to make reasonable accommodations[12]

violates the statute, no matter what its intent, unless it can show that the proposed

accommodations would create undue hardship[13] for its business." Id., citing 42 U.S.C.

§12112(b)(5)(A).

Under the ADA, the term "reasonable accommodation" includes:

[J]ob restructuring, part-time or modified work schedules, reassignment to a
vacant position, acquisition or modification of equipment or devices, appropriate
adjustment or modifications of examinations, training materials or policies, the
provision of qualified readers or interpreters, and other similar accommodations
for individuals with disabilities.

---

[12] Defendant oddly contends that the duty to accommodate only arises when the employee *is not* able to
perform the essential functions of the job. See Def. Memo at 19. As a preliminary matter, the cases cited
in support of this proposition deal only with state law, not the ADA. Moreover, to hold that
accommodation is *only* required for employees who *can not* perform the essential functions of the job
would produce an absurd result, since these employees would rarely be a "qualified individual with a
disability" under the ADA or ch. 151B and would thus not be entitled to press a disability claim in court.
[13] U.P.S. does not assert the "undue hardship" defense in its motion, and thus it is waived.

21

42 U.S.C. §12111(9)(B). The evidence presented by the Plaintiff certainly raises a triable issue on his claim that U.P.S. failed to accommodate him in any of the ways described in the statute. He has shown that, on three specific occasions, he requested two distinct reasonable accommodations. In response, the Defendant refused his requests, refused to engage in the interactive process, and refused to make any effort to find an accommodation it considered reasonable.

The first instance occurred in February of 2001. At that time, shortly before the annual bidding process concluded, the Plaintiff was informed that the duties involved in the Chelmsford-Worcester-Hartford route had been changed. Pl. Stmnt. of Mat. Facts at ¶18. This job was no longer within his medical restrictions because of the required heavy lifting and the longer driving times without a break. Pl. Stmnt. of Mat. Facts at ¶24. As was often the case, U.P.S had changed the duties involved in that route without reposting it or opening it up for bidding. Pl. Stmnt. of Mat. Facts at ¶18.

The Plaintiff asked U.P.S. to modify an existing route to fit his restrictions or give him an inside job. The Defendant refused both of these requests. Pl. Stmnt of Mat. Facts at ¶20. In fact, the Plaintiff's supervisor, Ken Mundry, erroneously informed him that, since the doctor hired by U.P.S.' Worker's Compensation insurer had determined that he was not "disabled," U.P.S. did not have to honor any medical restrictions. Pl. Stmnt. of Mat. Facts at ¶17.[14]

As such, the Plaintiff was advised to bid on other available jobs or to face the prospect of losing his position at U.P.S. Pl. Stmnt. of Mat. Facts at ¶19. Thus, he was essentially forced to bid on the Buffalo route, a job clearly outside his restrictions,

---

[14] Notably, Holly Manzo could not recall any employee who, upon returning to work from worker's compensation leave, had ever been given an accommodation. Pl. Stmnt. of Mat. Facts at ¶17. This is indicative of U.P.S. "100% release" policy and its failure to accommodate under any circumstances.

because it was the least demanding route available. Pl. Stmnt. of Mat. Facts at ¶¶23, 24; see also Marshall v. Federal Express Corp., 130 F.3d 1095, 1099 (1997) ("if working conditions inflict pain or hardship on a disabled employee, the employer fails to modify the conditions upon the employee's demand, and the employee simply bears the conditions, this could amount to a denial of reasonable accommodation, despite there being no job loss, pay loss, transfer, demotion, denial of advancement, or other adverse personnel action. Such a scenario might be viewed as the ADA equivalent of the hostile working environment claim cognizable under other discrimination laws.").

The same pattern played out again in the late fall of 2001. First, the Chelmsford-Worcester route was modified so that the Plaintiff was no longer able to do it. Pl. Stmnt. of Mat. Facts at ¶28. Second, as he had done prior, the Plaintiff requested that U.P.S. modify an available route or give him an inside job. Again U.P.S. refused and likewise failed to engage in any interactive process. Pl. Stmnt. of Mat. Facts at ¶¶28-30. What makes this conduct even more outrageous is the fact that, in both instances, U.P.S. knew that the available, unmodified jobs were outside of the Plaintiff's medical restrictions. Pl. Stmnt. of Mat. Facts at ¶¶24, 28; Def. Answer to Amended Complaint, ¶30.

Finally, in September of 2002, the Plaintiff's physical condition had deteriorated to the point where he could only do a very limited amount of manual labor, and could no longer drive tractor trailers. Pl. Stmnt. of Mat. Facts at ¶¶31, 32, 36. Although a doctor has specifically told U.P.S. that the Plaintiff could still perform the functions of the small sorter position, he was not allowed to transfer to this part-time position. As a full-time employee, U.P.S. claimed its policy barred the Plaintiff from taking any part-time positions. Despite Plaintiff's request, U.P.S. refused to make an exception to this policy,

refused to allow the Plaintiff to switch from full-time to part-time status, and again failed

to engage in the interactive process to determine whether the Plaintiff was qualified for

any position at U.P.S. with or without an accommodation. Pl. Stmnt. of Mat. Facts at

¶¶35-37.

## **CONCLUSION**

For the foregoing reasons, the Plaintiff respectfully requests that this Court grant

his partial motion for summary judgment and asks that the Defendant's motion for

summary judgment be denied in its entirety.

Respectfully Submitted,
Plaintiff Charlie Thornton
By His Attorneys

DATED: June 1, 2006

//s// Michael Tumposky
Stephen Hrones
BBO No. 242860
Michael Tumposky
BBO No. 660618
Hrones, Garrity & Hedges
Lewis Wharf –Bay 232
Boston, MA 02110
(617) 227-4019

## **CERTIFICATE OF SERVICE**

I, Michael Tumposky, herby certify that, on this the 1st day of June, 2006, I
served a copy of this document, where unable to do so electronically, by first-class mail
as follows: Laurie Alexander-Krom, Murtha Cullina, 99 High Street, Boston, MA 02110.

//s// Michael Tumposky
Michael Tumposky
