UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES THORNTON,<br>          Plaintiff<br><br>v.<br><br><br>UNITED PARCEL SERVICE INC.,<br>          Defendant | )<br>)<br>)      Civ. Action No. 05-10210- MEL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**UNITED PARCEL SERVICE INC.'S
OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT
AND REPLY TO PLAINTIFF'S OPPOSITION TO
UPS' MOTION FOR SUMMARY JUDGMENT**

United Parcel Service Inc. ("UPS") opposes the Plaintiff's Cross Motion for Summary Judgment on the grounds that as a matter of law Charlie Thornton was not a disabled individual as defined under the American's with Disabilities Act ("ADA") and UPS did not regard him as a disabled individual.  Although Mr. Thornton makes the conclusory statement that eight of his major life activities were substantially impaired and therefore he is entitled to partial summary judgment, Mr. Thornton fails to put forth any evidence to support these conclusions.  In addition, Mr. Thornton fails to put forth any evidence that, as a matter of law, UPS perceived him to be disabled.  Even if, for purposes of summary judgment, UPS does not dispute the facts put forth by Mr. Thornton in his motion for partial summary judgment, UPS is still entitled to summary judgment as a matter of law on Mr. Thornton's ADA claims, and the Plaintiff's Motion for Partial Summary Judgment should be denied.

In addition, UPS is also entitled to summary judgment because (1) Mr. Thornton fails to put forth a genuine dispute of material fact that he was subjected to an adverse employment

action and; (2) his claims are either time barred or were not the subject of a proper administrative complaint or both.

I. **THE PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED AND UPS SHOULD BE GRANTED SUMMARY JUDGMENT ON MR. THORNTON'S ADA CLAIMS**

In addition to opposing UPS motion for summary judgment on his ADA claims, Mr. Thornton also moves for partial summary judgment on the issue of whether he was disabled. UPS requests that the court deny Mr. Thornton partial summary judgment and grant UPS summary judgment on the ADA claims (Counts I and II) because there are no genuine disputes of material fact and as a matter of law, Mr. Thornton was not disabled under the ADA. Specifically, the undisputed facts show that Mr. Thornton was not substantially limited in a major life activity and that UPS did not perceive Mr. Thornton as a disabled individual.

    a. **Charlie Thornton is not substantially limited in any major life activity**

The ADA defines a handicap as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." See 42 U.S.C. § 12102 (2). The Supreme Court has held that these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled. See Toyota Motor Manufacturing Kentucky, Inc. v. Ella Williams, 534 U.S. 184, 197 (2002); Benoit v. Technical Manufacturing Corp., 331 F.3d 166, 175 (1st Cir. 2003).

Mr. Thornton claims that he was substantially limited in the major life activities of "walking, eating, sleeping, sitting, lifting, learning, caring for himself and performing manual tasks." (See Plaintiff's Memorandum at 11, hereinafter "Pl. Mem."). He states in his affidavit that he has difficulty walking more than thirty minutes and sitting more than ninety minutes, has lingering weakness and numbness and limited ability to "lift and manipulate small objects," and

has side effects from his medications, such as drowsiness, constipation, problems concentrating and lost appetite. (See Thornton Affidavit ¶19, 27, 28, & 29, hereinafter "Thornton Aff.").

Even if one or more of the listed major life activities were impaired, there is no evidence of a substantial limitation. To be substantially limited, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Williams, 534 U.S. at 198. The word "substantial' precludes impairments that interfere in only a minor way. Id. at 196. Mr. Thornton's statements in his affidavit do not depict a substantial limitation on any of the eight listed major life activities. The inability to walk for more than thirty minutes without a rest and the inability to sit for more than ninety minutes without stretching are not substantial limitations on the major life activities of walking or sitting. See Taylor v. Pathmark Stores Inc., 177 F.3d 180 (3rd Cir. 1999)(the plaintiff's inability to walk or stand more than fifty minutes without a rest was not a disability). A lack of appetite, constipation and drowsiness, are not substantial limitations on one's ability to eat, eliminate one's waste and to sleep. (See Thornton Aff. ¶ 28). Mr. Thornton claims that he had difficulties focusing, but Mr. Thornton doesn't describe the extent of this impairment and nothing indicates that this was a substantial limitation on his ability to concentrate. Id. In addition, Mr. Thornton's claims that he "often had to grab small objects with two hands" and had to use his non-dominant hand to brush his teeth also do not evidence a substantial limitation on a major life activity. (See Thornton Aff. ¶ 29). Overall, the undisputed facts show that Mr. Thornton did not have a disability as defined under the ADA.

    b.    **There is no evidence that UPS regarded Mr. Thornton as a disabled individual**

In order to sustain his burden that as a matter of law UPS regarded Mr. Thornton as a disabled individual, Mr. Thornton must show that it is undisputed that UPS perceived Mr.

Thornton as having an impairment that substantially limited a major life activity.  See Benoit v. Technical Manufacturing Corp., 331 F. 3d 166, 176 (1st Cir. 2003) (a plaintiff claiming that he is "regarded" as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the employer regarded him as disabled within the meaning of the ADA).  Mr. Thornton claims that UPS perceived him as disabled in the major life activity of working in two ways: (1) "by maintaining and subjecting Mr. Thornton to a 100% release policy," and (2) during the time leading up to his retirement, UPS "mistakenly concluded that he was medically unfit to perform a broad class of jobs, when in fact there were positions at UPS he could have physically performed."  Mr. Thornton has not put forth sufficient evidence to support either allegation.

    i)    There is no admissible evidence that UPS maintained and subjected Mr. Thornton to a 100% release policy

Federal Rule of Civil Procedure 56(c) states that summary judgment "sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact…"  In support of his allegation that UPS maintained a "100% release" policy, which supposedly impacted Mr. Thornton, Mr. Thornton has submitted two "declarations," allegedly made by two former employees of UPS.  (See Plaintiff's Notice of Filing, Exhibit J).  UPS requests that the Court disregard both declarations for purposes of summary judgment on the following two grounds.

First, the declaration of Robert Ducheneau was not signed in any manner, and although the declaration of Jim Fields was signed, it was neither notarized nor properly signed under the penalty of perjury.  See 28 U.S.C. § 1746 (wherever, under any law of the United States or under any rule…any matter is required or permitted to be supported, evidenced, established or proved

4

by the sworn declaration…or affidavit, in writing of the person making the same…such matter may, with like force and effect, be supported, evidenced, established or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury and dated…); see also ISI Systems Inc. v. Equifax, Inc. 1996 U.S. Dist. LEXIS 882, *9 (an unsigned affidavit is not admissible evidence). Therefore neither declaration constitutes a valid affidavit for purposes of summary judgment under Federal Rule Civ. P. 56.

Second, the facts contained in the declarations are irrelevant and therefore neither declaration would be admissible evidence at time of trial. See Federal R. Civ. P. 56(e) (supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein); see also Federal Rule Evidence 402 (evidence which is not relevant is not admissible). Neither Robert Ducheneau's nor Jim Fields' personal claims that UPS maintained a "100% release" policy is relevant to whether Mr. Thornton himself was affected by such a policy because UPS perceived him as disabled. Accordingly, Mr. Thornton should be precluded from relying on either declaration for purposes of summary judgment.

Other than the declarations, the only other "evidence" Mr. Thornton submits to support his allegation that UPS had a "100% release" policy that impacted Mr. Thornton were unsupported statements in his affidavit that various managers used the term "100% to work at UPS" and "full capacity" and that he was told that if he could not do his job, he should go home. (See Thornton Aff. ¶ 23, 24, and 25). However, it is undisputed that Kenneth Mundry, UPS Chelmsford Feeder Driver Manager, and Holly Manzo, UPS' North New England District Risk

Manager, have never even heard of a "100% medical release" policy. (Manzo Tr. 97-98; Mundry Tr. 15-16). More importantly, it is undisputed that UPS never prohibited Mr. Thornton from bidding on his job of choice - even when he had a lifting restriction. When Mr. Thornton chose to bid on "premium jobs" (the Chelmsford to Philadelphia and the Chelmsford to Buffalo routes) that involved lifting, Mr. Thornton admits that UPS accommodated him by requiring other employees to lift the dollies whenever necessary. In fact, UPS made this accommodation even when Mr. Thornton's lifting restrictions were removed. (See Thornton Tr. 133).[1] Overall, Mr. Thornton has put forth no evidence that he was subjected to a "100% release" policy.

    ii)    <u>There is no evidence that UPS regarded the Plaintiff as disabled during the events leading up to his retirement.</u>

Mr. Thornton alleges that UPS perceived and treated him as disabled near the end of his employment, "when because of his perceived physical limitations, he was not allowed to work at UPS in any capacity." (See Pl. Mem. at 17). The undisputed facts regarding the events leading up to Mr. Thornton's retirement do not show that UPS mistakenly believed that Mr. Thornton was disabled. <u>Sutton v United Air Lines, Inc</u>., 527 U.S. 471, 489 (1999) (to be "regarded as" the covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or a covered entity mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities).

It is undisputed that on or about September 16, 2002, Mr. Thornton failed his DOT physical examination and could no longer work as a UPS Feeder Driver. (Thornton Tr. 134, <u>see also</u> <u>Tab S</u>). Mr. Thornton was also unable to physically perform an inside job, such as a loader/unloader, car washer, or sorter. (See Dr. Kramer letter dated September 19, 2002 and Dr.

---

[1] Although UPS objects to the declarations, UPS would like to point out that in paragraph eight of the "Declaration of Robert Ducheneau" specifically describes "an employee, Charlie Thornton, who was given a reasonable accommodation of not having to lift the 70-pound coupling dolly." (See Plaintiff's Notice of Filing, <u>Exhibit J</u>).

6

Haffner letter dated December 6, 2002, attached at Tab T).   The fact that UPS did not allow him to work in these positions is not evidence that UPS perceived Mr. Thornton to be disabled, but rather it is evidence that UPS was complying with Mr. Thornton's medical restrictions.

Mr. Thornton now claims that he could have done the inside job of a "small sorter" and that UPS refused to transfer him to this position.  A small sorter position is a part-time position, for which UPS hires only from the outside.  (See Mundry Tr. 34, 120 -121).   In order to work as a small sorter, Mr. Thornton would have had to quit his full time position with UPS and apply for a part-time small sorter position.  There is no evidence that Mr. Thornton quit his full time position, applied for the part-time position and that UPS prevented him from applying for the position.

Because Mr. Thornton cannot show that as a matter law he was disabled as defined under the ADA, and because the undisputed facts support UPS' argument that he was not disabled, Mr. Thornton's motion for partial summary judgment should be denied and UPS' motion for summary judgment should be allowed.

II.     **UPS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE MR. THORNTON HAS FAILED TO MEET THE ADMINISTRATIVE  FILING REQUIREMENTS AND HIS CLAIMS ARE TIME BARRED.**

Mr. Thornton's claims under Mass. Gen. L. ch. 151B and under the ADA, should be dismissed because (1) he failed to comply with the administrative filing requirements and (2) the claims are time barred.

On or about July 27, 2000, Mr. Thornton filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") against UPS, alleging that it discriminated against him because of his disability and age when it did not allow him to work because of the disagreement between Dr. Franchi and Mr. Thornton's doctor.  (See MCAD Charge attached at

7

Tab U). The MCAD eventually found lack of probable cause and dismissed this claim. (See MCAD's dismissal at Tab V). Mr. Thornton did not file his complaint with this Court until February 1, 2005, so clearly the he is barred by the three year statute of limitation from seeking damages for these alleged acts under Mass. Gen. L. ch. 151B. In addition, Mr. Thornton also failed to timely file an ADA claim seeking damages for these specific allegations in court within ninety days of receiving a right to suit notice from the Equal Employment Opportunity Commission regarding these particular claims.

Although Mr. Thornton includes these allegations regarding the disagreement that occurred during the summer of 2000 in his complaint, Mr. Thornton does not oppose UPS' argument in its summary judgment motion that the claims contained in Mr. Thornton's July 27, 2000 charge are time barred under Mass. Gen. L. ch. 151B and the ADA. Instead Mr. Thornton focus in his opposition is upon his allegations that UPS failed to accommodate Mr. Thornton in March 2001, in late fall of 2001 and in September 2002. However, these allegations under the ADA and Mass. Gen. L. ch. 151B should also be dismissed because Mr. Thornton has either failed to comply with the administrative filing requirements or the claims are time barred, or both.

a) Because Mr. Thornton has failed to comply with the administrative filing requirements, he is precluded from seeking damages on any event other than the March 2001 event.

It is clear under state and federal law that a complaint of employment discrimination must be filed with either the Massachusetts Commission Against Discrimination ("MCAD") or the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. See Mass Gen. L. ch. 151B, § 5; see also 42 U.S.C. § 12117 & § 2000e-5(c)-(e)(a claim is timely filed within 180 days of the challenged conduct, or if filed within 300 days

8

if proceedings are initiated in a deferral state); see also Luciano v. Coca-Cola Enterprises Inc., 2004 U.S. Dist. LEXIS 17186 at *2 (2004)(federal and state law require that an administrative charge be filed by a claimant before an employment discrimination lawsuit may be brought); Slaman v. GSS Inc., 1998 U.S. LEXIS 2184, *2 (1998)(a timely charge must be filed with the relevant state or federal agency in order to pursue claims of discrimination (J. Lasker)).

In August 2001, Mr. Thornton filed a second MCAD charge specifically claiming that UPS discriminated against him when it misinterpreted a doctor's note and forced him to bid on the Chelmsford to Buffalo route. (See Tab W). Because Mr. Thornton has filed no other subsequent charge with either the MCAD or the EEOC, he is precluded in this case from seeking damages on any event other than that which is described in his August 2001 charge. See Kenney v. MML Investors Servs., 266 F. Supp. 2d 239 (D. Mass. 2003)("plaintiff ought to be limited to the four corners of her charge"); Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005)(a Title VII suit may extend as far as, but not beyond, the parameters of the underlying administrative charge) *citing* Fine v. GAF Chemical Corp., 995 F.2d 576, 578 (5th Cir. 1993).

In his Opposition, Mr. Thornton tries to argue that the subsequent incidents where UPS failed to accommodate him (late fall 2001 and September 2002) should be allowed in because these incidents involved "identical conduct that could reasonably be expected to grow out of the original charge." See Fine v. GAF Chemical Corp., 995 F.2d 576, 578 (5th Cir. 1993)(a rule of reason permits the scope of a Title VII suit to extend as far as, but no further than, the scope of the EEOC investigation which could reasonably grow out of the administrative charge). However, based upon Mr. Thornton's description of these events, the events of the fall of 2001 and September 2002 are different from the March 2001 event and therefore would not reasonably be expected to be within the scope of the administrative charge.

9

Mr. Thornton alleges that in March 2001, UPS discriminated against him when it misinterpreted a doctor's note and forced him to take the Chelmsford to Buffalo route. After the one trip to Buffalo, Mr. Thornton came back to work with additional work restrictions that had been placed upon him. Mr. Thornton then took a job (Chelmsford-Worcester- Hartford route) that admittedly fit these work restrictions. (Thornton Tr. 104).

The alleged incident in late fall of 2001 is different. Mr. Thornton claims that UPS changed the Chelmsford to Hartford route so that he could no longer perform it and was forced to bid on the Chelmsford to Buffalo route. (See Plaintiff's Amended Complaint ¶ 37; Pl Statement of Fact ¶ 28). This did not involve a misinterpretation of medical restriction, since at the time Mr. Thornton had no medical restriction placed upon him. (See Tab Q). The events of September 2002 are even more factually distinct. In September 2002, Mr. Thornton failed his DOT exam and could no longer drive. In addition, two physicians opined that he was also unable to perform any of the full time inside UPS positions. Mr. Thornton claims that UPS discriminated against him in September 2002 when it allegedly failed to allow him to return to work in any capacity.

Mr. Thornton's case is similar to the Fine case, where a pro se plaintiff filed a charge with the EEOC, claiming that the defendant, GAF, refused to hire her as a chemical operator. See Fine v. GAF Chemical Corp., 995 F.2d 576, 578 (5th Cir. 1993). The plaintiff maintained in her charge that she had applied for such a position several times and that her last application occurred in February 1990. However, in her Title VII suit, the plaintiff also tries to allege that GAF once more discriminated against her in October and November 1990 when she orally applied for a plant manager position and was rejected. The court held that because the events cited in her Title VII suit could not reasonably be expected to be within the scope of the EEOC

investigation, they could not be part of her Title VII claim.  See Fine, 995 F.2d at 577-578. Similarly, because the events of late fall 2001 and September 2002 do not fall within the four corners of Mr. Thornton's MCAD charge regarding the March 2001 event, Mr. Thornton should not be allowed to include those subsequent events in his either his 151B or ADA suit.  *Compare with* White v. New Hampshire Department of Corrections, 221 F.3d 254, 263 (1st Cir. 2000) (plaintiff allowed to bring in additional acts of sexual harassment in her lawsuit that had not been specifically included with the acts of sexual harassment already listed in the charge).

Mr. Thornton attempts to argue that he is entitled to an equitable exception to the exhaustion requirement because "the MCAD informed him a second complaint was not necessary."  The First Circuit takes a "narrow view" of equitable exceptions to limitations periods.  See Mack v. The Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 185 (1st Cir. 1989) (we hew to a "narrow view" of equitable exceptions to Title VII limitations periods); Mercado v. The Ritz-Carlton, 410 F.3d 41, 46 (1st Cir. 2005)(the baseline rule is that time limitations are important in discrimination cases, and that federal courts therefore should employ equitable tolling sparingly).  This Court should be even more cautious in Mr. Thornton's case where he is requesting to be entirely excused from filing an administrative charge.  See Rodriguez v. Airborne Express, 265 F.3d 890, 902 n. 11 (9th Cir. 2001) (to excuse the plaintiff entirely from filing an administrative charge creates an exception much broader than equitable tolling of the limitations bar).

The evidence Mr. Thornton puts forth to support his allegation that the MCAD misinformed him is sketchy at best.  Although Mr. Thornton states in his affidavit that Jeanine Rice at the MCAD "would not allow him to file another charge," his attached letter to the MCAD contradicts this statement.  In his December 8, 2003 letter to the MCAD, Mr. Thornton

states: "I called Ms. Rice and she returned my call the week of February 9, 2003. She requested that I send my complaint in writing (see tab 1)." (See letter attached to Thornton Affidavit). According to this letter, Ms. Rice told him in February to send in his complaint and apparently he did not do so until December 8, 2003. It appears that he sent in his subsequent complaint for the first time on December 8, 2003 as an attachment to his letter. At that time more than one year had transpired since September 2002 when UPS allegedly did not allow Mr. Thornton to return to work. Since more than three hundred days had passed his charge was at that time was untimely. See Mass Gen. L. ch. 151B, § 5; see also 42 U.S.C. § 12117 & § 2000e-5(c)-(e)(a claim is timely filed within 180 days of the challenged conduct, or if filed within 300 days if proceedings are initiated in a deferral state).

    Overall it appears that Mr. Thornton may have simply missed the deadline for filing a subsequent charge regarding the events of the fall of 2001 and September 2002. The evidence he puts forth to support his allegation that the MCAD "would not allow him file another charge" is contradictory. In addition, UPS will prejudiced if Mr. Thornton is excused from the administrative requirement and allowed to seek damages regarding these subsequent allegations. As argued above, these events could not reasonably be expected to be within the scope of the investigation of his August 2001 charge and therefore UPS was not put on proper notice of these additional allegations. See Luciano, 2004 U.S. Dist. LEXIS 17186 at *3 (the purpose of the charge-filing requirement "is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation"). Accordingly, Mr. Thornton's request for equitable relief should be denied. See Frederickson v. United Parcel Service Inc., 1999 U.S. Dist. LEXIS 2650 (N.D. Cal. 1999) (court does not allow additional claims in even though

plaintiff claims that the EEOC officer told her that the additional claims did not need to be included in her administrative charge).

      b)    <u>Mr. Thornton is not entitled to the benefit of the continuing violations theory and his claims under Mass. Gen. L. ch. 151B involving the March 2001 and fall 2001 events are time barred.</u>

Mr. Thornton filed his complaint on February 1, 2005. Therefore, Mr. Thornton's claims under Mass. Gen. L. ch. 151B (Counts III and IV) that involve events occurring prior to February 1, 2002 are time barred by the three year statute of limitations. See Mass. Gen. L. ch. 151B, §9 (any person aggrieved by a practice made unlawful under this chapter…may, at the expiration of ninety days after the filing of a compliant with the commission…but not later than three years after the alleged unlawful practice occurred, bring a civil action for damages…). Mr. Thornton however claims that he is still entitled to seek damages on these otherwise time-barred allegations under the continuing violations theory.

Generally, the continuing violations theory in Massachusetts applies when a plaintiff demonstrates a pattern of harassment or discrimination that includes conduct occurring within the limitations period. A plaintiff can claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period <u>unless</u> the plaintiff knew or reasonably should have known when the untimely events occurred that his work situation was pervasively hostile and was unlikely to improve. See <u>Cuddyer v. The Stop and Shop Supermarket Co</u>., 434 Mass. 521, 539 (2001) (emphasis added).

The Massachusetts Supreme Judicial Court in 2004 applied the continuing violations theory to a case involving a failure to accommodate claim. See <u>Ocean Spray Cranberries Inc. v. Massachusetts Commission Against Discrimination</u>, 441 Mass. 632 (2004). The SJC reasoned in this case that it is the employee's initial request for an accommodation which triggers the

13

employer's obligation to participate in the interactive process. A violation of Massachusetts discrimination laws then occurs when an employer refuses to participate in the process once initiated, or refuses to make a reasonable accommodation once it has been identified. Id. at 644. The court therefore concluded that when an employer refuses an employee's request for a reasonable accommodation, the refusal is a discrete discriminatory act triggering the statutory limitations period. Id. at 268.

Mr. Thornton claims that UPS engaged in serial and systematic violations of the ADA and Mass. Gen. L. ch. 151B when it "maintained a 100% release policy for the duration of Mr. Thornton's employment" and "by repeatedly refusing to accommodate him." (See Pl. Mem. at 8). A systemic violation is defined as the maintenance of a general practice or policy aimed at members of a protected class of employees. See Cuddyer, 434 Mass. at 531, n. 12. A serial violation is comprised of an interlinked succession of related events, stemming from a common discriminatory animus, with at least one act of harassment occurring within the limitations period. Id.

Because, as stated above, Mr. Thornton has not put forth sufficient evidence to prove that UPS maintained and subjected Mr. Thornton to a 100% release policy, Mr. Thornton's continuing violations claim is reduced to a serial violations claim. In this regard, Mr. Thornton tries to argue that the September 2002 event anchors the March 2001 and the fall 2001 events and encompasses them into the limitations period. However, according to the SJC' holding in Ocean Spray, Mr. Thornton is not entitled to the benefit of the continuing violations theory. Mr. Thornton alleges that UPS failed to accommodate him in February/March 2001 when he requested the opportunity to perform other available light duty or inside jobs as an alternative to taking a route with heavy lifting. (See Plaintiff's Statement of Facts, ¶ 20-23). This alleged

failure to accommodate was a distinct, discrete decision, which, according to the SJC's holding in Ocean Spray, triggers the three year limitations period for that event. The same argument applies regarding the alleged failure to accommodate that occurred in the fall of 2001. Accordingly, Mr. Thornton's claims regarding events that occurred prior to February 1, 2002 are time barred.

### III.   UPS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO GENUINE DISPUTE OF FACT THAT MR. THORNTON WAS NOT SUBJECTED TO AN ADVERSE EMPLOYMENT ACTION.

In order to survive summary judgment, a dispute of a material fact must be genuine. A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-248 (1986). In opposing a motion for summary judgment a party cannot rest merely upon conclusory allegations, improbable inferences and unsupported speculation. See Anderson v. Home Depot, 2004 U.S. Dist. LEXIS 145 *19 (D. Mass. 2004).

Mr. Thornton attempts to survive summary judgment on the issue of whether he was subjected to an adverse employment action by arguing: (1) he was subjected to a 100% release policy and; (2) UPS failed to accommodate his alleged disability. First, as argued above, Mr. Thornton has not put forth sufficient evidence that UPS maintained a 100% release policy and that Mr. Thornton was actually subjected to such a policy. (See subpart I(b)(i) above regarding the 100% release policy). Mr. Thornton's unsupported speculation regarding an alleged 100% release policy and it's alleged impact on Mr. Thornton is not sufficient to create a genuine dispute that he was subjected to an adverse employment action.

Second, Mr. Thornton also fails to create a genuine dispute of material fact on the issue of whether UPS failed to accommodate Mr. Thornton's alleged disability. Mr. Thornton claims that UPS first failed to accommodate his alleged disability in February of 2001. He alleges that the duties involved in the Chelmsford-Worcester-Hartford route had changed, that UPS refused to provide him with a modified route or give him an inside position, and that Kenneth Mundry misinterpreted the most recent medical documentation, which stated that he was not disabled. He alleges that he had no other choice but to bid on the Buffalo route, which was a job that was outside his restrictions. (See Pl. Mem. at 22).

These conclusory allegations do not create a genuine dispute of material fact such that a jury would find in Mr. Thornton favor. First it remains undisputed that the Dr. Hawkins January 2001 medical note did state that he was not disabled and that his only work restriction was heavy lifting. This restriction did not prevent him from performing the duties of the Chelmsford-Worcester-Hartford route. (See UPS' Statement of Undisputed Facts, ¶ 9; Thornton Tr. 51). Although Thornton claims that UPS changed the route, he was unable to specify exactly what was changed. (Thornton Tr. 75-76). It is undisputed that on the February 2001 annual bid sheet none of the Chelmsford-Worcester-Hartford routes, including those that Mr. Thornton listed on his bid choice sheet, indicated that heavy lifting was involved (e.g., that the route was a double). (See UPS Statement of Undisputed Facts, ¶ 10-12). It should be noted that Mr. Thornton mis-states Mr. Mundry's testimony when he states in his Opposition "as often the case, UPS had changed the duties involved in that route without reposting it or opening it up for bidding." (See Pl. Mem. at 22) On the contrary, Mr. Mundry testified that if the job changes from a single to a double or if something were added to a job, it would have to be reposted. (Mundry Tr. 90). The facts regarding the jobs Mr. Thornton chose to bid on at the February 2001 bid also remain

undisputed and it is undisputed that when Mr. Thornton successfully bided on a premium job, UPS accommodated his lifting restriction. (See UPS Statement of Undisputed Facts ¶10- 13).

Finally, it undisputed that when Mr. Thornton injured his back after he began working the Chelmsford to Buffalo job, Dr. Wolf examined him and imposed work related restrictions. Shortly thereafter Mr. Thornton returned to work and chose the Chelmsford-Worcester-Hartford job, which was the same job he held prior to bidding on the Chelmsford to Philadelphia job. (See UPS Statement of Undisputed Facts ¶ 14). Even though it was less than two months since the February 2001 bid, Mr. Thornton testified that the Chelmsford-Worcester-Hartford job had apparently "changed back to a point where I could take this route." (Thornton Tr. 104).

Mr. Thornton then claims that in the fall of 2001, UPS again changed the requirements of the Chelmsford-Worcester-Hartford route and that he was again forced to bid on a job outside his restrictions, which he held until September 2002, when UPS would not allow him to work in any capacity. Mr. Thornton again fails to create a genuine dispute of material fact that UPS failed to accommodate him in the fall of 2001 and/or September 2002. It is undisputed that in the fall of 2001, Dr. Wolf had removed all of Mr. Thornton's work related restrictions and at the very next bid, Mr. Thornton again bid on the Chelmsford to Philadelphia route, which he felt he could physically perform. (See UPS Statement of Undisputed Facts, ¶ 16). It is undisputed that UPS again accommodated Mr. Thornton by requiring other employees to lift the dolly for him, even though he did not have a lifting restriction at the time. (Id. at ¶ 17)

Finally, it is undisputed that in September 2002, Mr. Thornton failed his DOT physical examination and could no longer work as a UPS Feeder Driver. (See Id. at ¶ 20). Mr. Thornton was also unable to physically perform an inside job, such as a loader/unloader, car washer, or sorter. Id.

Mr. Thornton now claims that he could have done the inside job of a "small sorter" and cites to Dr. Haffner's letter dated December 6, 2002 as evidence that "a doctor specifically told UPS that the Plaintiff could still perform the functions of the small sorter position" and that UPS did not allow him to transfer to this part time position. (See Pl Mem. at 23). First, it should be noted that Dr. Haffner's letter stated that "Charlie may be able to adequately perform the duties of small sorter" and then states his concerns that the job will aggravate Mr. Thornton's pre-existing conditions. (See UPS' Record Materials, Tab T). Furthermore, UPS could not simply move Mr. Thornton to a small sorter position. Contractually, a small sorter is a part-time position, for which UPS hires only from the outside. (See Mundry Tr. 34, 120 -121). Mr. Thornton would have had to quit his full time position with UPS and then apply for a part-time small sorter position. There is no evidence that Mr. Thornton attempted to reapply for the small sorter position nor is there evidence that UPS prevented him from doing so. Instead it is undisputed that Mr. Thornton applied for and received Social Security Disability Benefits, filed a workers compensation claim, and in July 2003 accepted a lump sum settlement of his workers compensation claim. (Thornton Tr. 147-148, 151-152). Mr. Thornton then eventually retired from UPS. (Thornton Tr.154).

Based upon the undisputed facts, Mr. Thornton's allegation that UPS failed to accommodate him in March 2001, in the fall of 2001 and again in September 2002 is disingenuine at best. The disputed facts Mr. Thornton does put forth do not create a genuine dispute of fact on this issue to the extent that a reasonable jury could find in his favor. Accordingly, UPS is entitled to summary judgment.

**CONCLUSION**

For the above reasons, UPS requests that the Court deny the Plaintiff's Motion for Partial Summary Judgment and grant UPS' Motion for Summary Judgment on All Counts of the Plaintiff's Amended Complaint.

                    United Parcel Service Inc.
                    By its attorneys,


                    /s/Laurie Alexander-Krom
                    Hugh F. Murray, III, BBO# 557175
                    Laurie Alexander-Krom, BBO# 637385
                    Murtha Cullina LLP
                    99 High Street
                    Boston, MA 02110
                    617-451-9300

Date:  June 22, 2006


**CERTIFICATE OF SERVICE**

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). No non-participants (NEF) as noted.


                    /s/Laurie Alexander-Krom