UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLIE THORNTON,           )
    Plaintiff,                  )
                                ) CIVIL ACTION NO.: 05-10210-MEL
v.                          )
                                )
UNITED PARCEL SERVICE, INC.,)
    Defendant.                  )
                                )

**PLAINTIFF THORNTON'S SUR-REPLY TO DEFENDANT U.P.S.'
OPPOSITION AND REPLY TO THE PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I.   THE PLAINTIFF'S EVIDENCE OF HIS POLICY AND PRACTICE
     CLAIM IS ADMISSIBLE**

It is well-settled that evidence submitted at the summary judgment stage need not be in admissible form. Rather, it must merely be capable of being reduced to admissible form at the time of trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.") In the face of such a standard, U.P.S. argues that the Plaintiff's evidence on his policy and practice claim should be disregarded, either because of improper form or irrelevant content. Neither contention is correct.

    **A.  THE WITNESS STATEMENTS ARE ADMISSIBLE AND
         RELEVANT**

In evaluating a motion for summary judgment, courts can consider evidence such as affidavits, which would be inadmissible at trial, so long as the statements contained therein can later be testified to by the affiant on the witness stand. Thus, while conclusory allegations in an affidavit cannot defeat a summary judgment motion,

information based on personal knowledge contained within an affidavit is sufficient to defeat such a motion. See Fed. R. Civ. P. 56(e). Moreover, where essential facts are not readily reduced to affidavits, the Court may still deny the moving party's motion or "make such other order as is just." See Fed. R. Civ. P. 56(f).

The Court can also consider evidence contained in other materials, whether in an admissible form or not, such as depositions, admissions and interrogatories. See Fed. R. Civ. P. 56(c). Implicit in the Court's ability to consider deposition testimony is its ability to consider exhibits introduced at depositions.

Despite the clearly established latitude in the form of evidence submitted at the summary judgment stage, the Defendant contends that the statements of Jim Fields and Robert Ducheneau should not be considered by the Court because they are not signed under the pains and penalties of perjury. This assertion has no merit.

First, although the statement of Ducheneau filed with the Plaintiff's opposition was unsigned, the Plaintiff has subsequently obtained a signed copy. See Declaration of Ducheneau, attached hereto as Exhibit A. As such, there can be no dispute about its admissibility at this stage.

Second, the Defendant's argument runs contrary to the purpose of the technical requirements for affidavits, which is to eliminate fraud. Notably, U.P.S. does not deny that these individuals are involved in litigation similar to the Plaintiff in this case. Rather it seeks to bar these statements based on mere formalities. With respect to the statement of Ducheneau, U.P.S. has acknowledged, on the record, that Ducheneau filed a complaint against the company in which he alleged that U.P.S. unlawfully prohibited him from

returning to work until his medical restriction limiting him to a power steering vehicle was removed. Depo. Manzo, Jan. 25, 2006, pgs. 92-98, attached hereto as Exhibit B.

In addition to arguing that the form of the statements is improper, the Defendant also contends that the statements are irrelevant. Specifically, it contends that "neither Robert Ducheneau nor Jim Fields' personal claims that UPS maintained a '100% release' policy is relevant to whether Mr. Thornton himself was affected by such a policy because U.P.S. perceived him as disabled." See Def. Resp. Sum. Judg. at 5. Such an argument demonstrates a basic misunderstanding of Federal Rule of Evidence 401: "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

Contrary to the Defendant's contentions, evidence offered by other U.P.S. employees that they were likewise affected by U.P.S.' maintenance of a 100% release policy is certainly relevant to whether the Plaintiff was affected by such a policy. Such testimony tends to prove the existence of that policy, the *sine qua non* of proving its application to the Plaintiff.

Defendant's argument that "neither declaration would be admissible evidence at the time of trial," demonstrates a basic misunderstanding of Rule 56. See Def. Resp. Sum. Judg. at 5. As discussed above, such evidence need not be in admissible form at the summary judgment stage so long as it could be reduced to admissible form at trial. If this matter proceeds further, the Plaintiff could call both of these individuals to the witness stand to testify as to their experiences at U.P.S. with respect to its 100% medical release policy.

### B. THE STATEMENTS OF THE U.P.S. SUPERVISORS ARE ADMISSIBLE

The statements made by the Plaintiff's supervisors at U.P.S. are clearly admissible.  See Fed. R. Evid. 801(d)(2) (admissions by a party-opponent are not hearsay); see also Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005) ("The statements made by supervisors are admissible as non-hearsay statements of the defendant's agents made within the scope of their employment.")  In addition, such statements are alone sufficient to create a triable dispute on the Plaintiff's policy and practice claim.

Furthermore, the statements show that U.P.S. regarded the Plaintiff as substantially limited in the major life activity of working.  See Henderson v. Ardco, Inc., 247 F.3d 645, 650 (6th Cir. 2001).  Moreover, the supervisors' statements demonstrate that U.P.S. engaged in serial and systemic violations of the ADA and ch. 151B, defeating any statute of limitations defense.  See O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).

The Defendant contends that Plaintiff's recollection of these statements is "unsupported," and that it is "undisputed" that the two supervisors deposed in connection with this case have "never heard of a '100% medical release' policy."  See Def. Resp. Sum. Judg. at 5-6.  Yet it is hard to imagine how the Plaintiff could be expected to "support" his recollection of a conversation with his supervisor other than to swear under oath that it occurred as he claims.  In addition, Defendant's suggestion that Manzo and Mundry's denials are "undisputed," is at best untrue and at worst materially misleading. It is hardly surprising that U.P.S. would deny the existence of an unlawful employment policy.  The Plaintiff, however, has offered direct, admissible evidence to the contrary.

4

**II.     PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS**

The Plaintiff is entitled to recover for each and every one of his claims because U.P.S. engaged in serial and systemic violations of the ADA and ch. 151B.  The Defendant's claims to the contrary are not persuasive.

The Defendant first claims that the Plaintiff cannot avail himself of the "systemic violation" theory, see Sabree v. United Broth. of Carpenters and Joiners, 921 F.2d 396, 400 (1st Cir. 1990), because he has not produced sufficient evidence of a "100% release" policy.  See Def. Resp. Sum. Judg. at 14.  This is the full extent of the Defendant's argument on this point.  Yet, as discussed above, the Plaintiff has produced the admissions of several U.P.S. supervisors as well as statements from other U.P.S. employees indicating that such a policy did in fact exist.  This evidence is clearly sufficient to raise a triable issue on the existence of the policy and its applicability to the Plaintiff, thus showing the Defendant's "systemic violation" of disability law.

In arguing against application of the "serial violation" doctrine, the Defendant cites the SJC's holding in Ocean Spray Cranberries v. Mass. Comm'n Against Discrimination, 441 Mass. 632, 644 (2004).  In that case, the SJC held that the statute of limitations in a disability case is not restarted for "each day" that the employer fails to accommodate a disabled employee.  Id.  It further determined that the plaintiff in Ocean Spray could not avail himself of the "serial violation" doctrine because his employer's various failures to accommodate were discrete events, each with separate limitations periods.[1]  Id. at 645.

---

[1] The Defendant does not argue that "the [Plaintiff] knew or could have formed a reasonable belief that the earlier violations were discriminatory."  Ocean Spray, 441 Mass. at 644 n.16.  Thus, the argument is waived.

5

With respect to federal law, Ocean Spray has no bearing. This Circuit has held that reasonable accommodation claims under the ADA are amenable to the "serial violation" doctrine. Marcano-Rivera v. Pueblo Int'l, Inc., 232 F.3d 245, 256 (1st Cir. 2000) ("Each episode alleged to have occurred outside the limitations period was a failure to accommodate comparable in nature to the discriminatory accommodation failures occurring within the limitations period…Contrary to defendant's arguments, these failures to accommodate are plainly similar enough to constitute serial violations...We therefore conclude that the continuing violation theory is applicable in this case…")

Furthermore, what was fatal to the plaintiff's claims in Ocean Spray was his failure to connect the various refusals to accommodate. The Plaintiff here has shown that these repeated failures to accommodate were not only similar, but also motivated by the same "discriminatory animus," namely the Defendant's adherence to a per se unlawful employment policy requiring a 100% medical release for all employees. See Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531 (2001) (noting that a serial violation "is comprised of an interlinked succession of related events, stemming from a common discriminatory animus, with at least one act…occurring within the limitations period.")

## **CONCLUSION**

For the foregoing reasons, the Plaintiff requests that this Court deny the Defendant's motion and grant his cross-motion for partial summary judgment.

                                                        Respectfully Submitted,
                                                        Charlie Thornton
                                                        By his Attorneys

DATED: July 17, 2006                                  <u>//s// Michael Tumposky</u>
                                                        Stephen Hrones
                                                        BBO No. 242860
                                                        Michael Tumposky
                                                        BBO No. 660618
                                                        Hrones, Garrity & Hedges
                                                        Lewis Wharf –Bay 232
                                                        Boston, MA 02110
                                                        (617) 227-4019

## CERTIFICATE OF SERVICE

     I herby certify that, on this the 17th day of July, 2006, I served a copy of this document, where unable to do so electronically, by first-class mail on all counsel of record in this matter.

                                                        <u>//s// Michael Tumposky</u>
                                                        Michael Tumposky

# DECLARATION OF ROBERT R. DUCHENEAU, JR.

1.     I am Robert R. Ducheneau, Jr., a 43-year-old resident of Dracut, Massachusetts. I have worked for United Parcel Service for 17 years. I am currently receiving workers' compensation benefits because of an on-the-job injury. I have been a package car driver out of UPS's Chelmsford, Massachusetts Hub, one of UPS's largest facilities serving much of the northeast, since starting to work at UPS in February of 1988.

2.     I was first injured at UPS in 1993. The injury I suffered at that time was to my right shoulder. I went to a local orthopedic surgeon who treated my right shoulder with electrical impulse and physical therapy. After a couple of months I returned to work, having told the doctor I still had some pain but thought I could return to full duty. I continued through the next 7 years of occasional pain in that shoulder, but it was manageable.

3.     In January, 2000, I sustained an injury to my left shoulder. This injury occurred while I was attempting to stack three 85-pound computer monitors into the back of my package car. When I was stacking the third one, it started to fall and as I tried to keep it from falling, I felt stinging pain in my shoulder. I went to Massachusetts General Hospital seeking care and they told me I would need to see an orthopedic surgeon. I saw Dr. Gary Perlmutter, a renowned shoulder specialist who is on the teaching staff at Mass General and who had been highly recommended. After conservative treatment failed, Dr. Perlmutter recommended surgery.

4.     I underwent distal clavicle resection surgery in September, 2000. During this surgery Dr. Perlmutter found some arthritis and worked on that as well. After a six-week recovery period, I asked him to let me return to work. I still had some residual pain, but felt I could do the job. I noticed real good improvement over the next several months and thought I was "out of the woods." In March 2001 I suffered another injury to my left shoulder. While making a delivery at a UPS customer location, I sustained a nasty fall down a flight of stairs. The customer's landscape contractor had failed to clear away accumulated snow and ice from the stairs used at their delivery dock. When leaving the facility as I was proceeding down the stairs, I hit some ice ruts and went down. I felt immense pain in the same shoulder that had been repaired by Dr Perlmutter. I contacted Dr Perlmutter to let him know what happened and I returned to him for further treatment. After conservative treatment failed, he recommended further surgery.

5.     In August, 2001 I underwent arthroscopic surgery during which the surgeon found further damage in the form of a torn labral ligament and repaired it as well. As a very stubborn former Army Ranger who tries not to allow pain to slow me down, I asked to go back to work again only a month after surgery. The doctor consented, but felt that I should drive only a vehicle equipped with power steering when I returned to work. UPS would not permit me to return to work with the doctor's restriction to a power-steering vehicle unless the doctor specified it as a temporary accommodation lasting no longer than 30 or 60 days.

6.     Over the next year I continued to have moderate to severe pain in my left shoulder, along with a return of pain in my right shoulder. Though there were plenty of power-steering vehicles available to assign to me and though UPS knew I had been driving a vehicle equipped

with power steering because of the multiple shoulder injuries I had suffered on the job, in October of 2002, after I had a dispute with a manager, he retaliated against me by taking away my power steering vehicle. After only 1 ½ days of using the non-power steering vehicle, I called Dr. Perlmutter in the middle of my shift to schedule an appointment to resume treatment because it became apparent that with the excruciating pain I was experiencing, exacerbated by my driving the non-power steering vehicle, I just could not continue. Upon hearing this, the supervisor who was in the package car with me on a scheduled OJS ride, demanded the keys and left me standing on the pavement at the side of the road, seven to ten miles from the Chelmsford Hub, to find my way back on foot on a rural road with no sidewalks. It was only after my workers' compensation attorney, whom I contacted by cell phone from the side of the road, called the company that UPS sent someone to pick me up an hour later.

7. After treating with Dr. Perlmutter for several months, in January 2003 he put me on permanent lifting restrictions of no lifting over 10-15 pounds, no continuous overhead work and driving only power steering equipped vehicles. When Dr. Perlmutter imposed these restrictions in January 2003, I tried to return to work, but was told that I could not return to work unless I could come back to full duty with no restrictions on my release to return to work. At that time, I asked my center manager for a reasonable accommodation and without any hesitation and with no further discussion, he refused. He stated there was no work at UPS to fit my restrictions. I stayed on workers compensation for three months and suffered financially to the point that I asked Dr. Perlmutter to let me go back to full duty to try one last time to see if I could continue as a package car driver. I lasted a week. Dr. Perlmutter then took me out of work again and re-instituted the same restrictions. I again asked the manager for a reasonable accommodation and they again refused. I have been on workers' compensation ever since. The pain that has resulted from my shoulder injuries has greatly limited my ability to lift objects greater than 10 to 15 pounds and has greatly affected my activities both at work and at home.

8. While I was off work on workers' compensation, in approximately May 2003 my manager Mike Monteif told me that I could not enter the Chelmsford facility; preventing me from entering the building effectively prohibits me from access to job postings which are posted in the facility per union requirements. In addition to that, in February 2004, during the contractually required "Annual Bid," I was denied the opportunity to bid on any job, including an available Yard Shifter Position which I could have performed within my work restrictions and as a reasonable accommodation. At the time I knew of an individual filling a position of Yard Shifter with less seniority than I have. This job does not require lifting, but the company claims you must be able to lift a 70 pound coupling dolly. Not only is there an employee, Charlie Thornton, who was given a reasonable accommodation of not having to lift the 70-pound coupling dolly in the past with the infrequent lifting of the coupling dolly transferred to other employees, but more recently the company has instituted the use of dolly spotters at my facility that negate altogether the need for the workers to lift these dollies.

9. While I was off from work on workers' compensation, in October 2003 the company had retirements in the Tractor Trailer Department and had to hold a Commercial Drivers License ("CDL") Training School to get enough drivers qualified to fill these openings. I asked my Local Union President if the company would allow me to attend the school, since I

2

knew I had enough seniority (16 years) to attend. If I had been permitted to attend the school I would have been qualified to bid on a position as a tractor trailer driver at the time of the Annual Bid. UPS denied my request to attend the school and gave me no reason at the time for the denial. Still short of tractor trailer drivers, the company held another CDL training school in March of 2004, but I was not permitted to attend.

10. I finally had a meeting with the Division Manager, Union President, Union Business Agent and myself in attendance on April 9, 2004. At that contractual, required meeting the Division Manager informed me they would not reassign me to another position. When I asked why I wasn't allowed to attend the school he stated the company didn't have to let me attend. I also asked why I was not allowed to bid to another job and he said I could only return to work if I could lift 70 pounds. At that meeting, the Union President recommended to the Division Manager that there are full-time clerk positions with I could fill. A few weeks later, UPS's District Labor Manager notified the Union President that UPS would not transfer me to a clerk's position.

11. It was shortly after this meeting that I contacted the EEOC. On April 27, 2004, I signed the Charge of Discrimination which the EEOC prepared for me on Form 5 and cross-filed with the Massachusetts Commission Against Discrimination. The EEOC has been investigating the charge since then. After I learned of the class action against UPS and saw that the same policies and practices that UPS had used to keep me from returning to work were applied to many others at UPS facilities all across the country, I told the EEOC investigator assigned to my case about this. The investigation of the practices used by UPS in my case have, among other things, included inquiries into reasonable cause determinations made at EEOC offices elsewhere, an EEOC Consent Decree involving the same practices in the Desert Mountain District and generally, the contentions raised in the class action lawsuit.

12. I have always worked hard for UPS, often working in pain, even driving during a hurricane, always working long hours, and have in my over 16 years of service been regarded as a good employee. Despite the fact that there are jobs at the company that I could do right now, the company treats me as if I am totally disabled and incapable of doing any job in its large, money-making enterprise and refuses to allow me to work. The reduction in income to my family has placed us in dire financial straits, forcing us to refinance our house and creating such stress that I sought out therapy with a clinical psychologist and was put on medication for anxiety and depression by my doctor.

I swear, under penalty of perjury under the laws of the United States, that the foregoing is true. Executed this 6th day of June, 2005, at Dracut, Massachusetts.

Robert R. Ducheneau, Jr

3

Page 92

1    A.   I believe I was there at the lump sum
2    settlement hearing, yes.  I think I recall talking
3    to Charlie.
4    **Q.   Do you recall the subject of those**
5    **conversations?**
6    A.   I think we were talking about family,
7    retirement and grandchildren.
8    **Q.   Nothing work related?**
9    A.   No.  As a matter of fact, I think I
10   wished him luck in his retirement.
11   **Q.   Who is Robert Ducheneau?**
12   A.   Robert Ducheneau is a package car driver
13   out of the Chelmsford facility.
14   **Q.   Is he still employed there?**
15   A.   He's still considered an employee, yes.
16   **Q.   Is he on disability?**
17   A.   He's currently receiving workers' comp.
18   **Q.   Has he attempted to come back to work,**
19   **to the best of your knowledge?**
20   A.   Yes.
21   **Q.   What was UPS's position on that?**
22   A.   That he could not return to work.
23   **Q.   Why not?**
24   A.   There were no positions available for

1  him.

2      **Q. Was it --**

3  A.  Can I just ask a question?

4      MS. KROM:  Well, there's no question

5  pending.  Are you okay with that?

6      MR. TUMPOSKY:  Yes.

7  A.  My only concern is the confidentiality.

8      MS. KROM:  The confidentiality, yes.  I

9  was seeing where he was going with this.  Are

10  you going to be asking questions regarding

11  other UPS employees?

12      MR. TUMPOSKY:  No, just him.

13      MS. KROM:  Okay.  Are you asking anymore

14  questions about him?

15      MR. TUMPOSKY:  Yes, I am.  I just want

16  to ask Charlie something.  We'll just put on

17  the record that this document was sent to us

18  by the individual who gave the affidavit, Mr.

19  Ducheneau.  As far as confidentiality, you

20  may not take my word for it, but he has

21  supplied it to us.

22      MS. KROM:  I guess I'm going to object

23  and ask her not to answer any questions that

24  are related to his medical information that

**HOLLY MANZO**
**January 25, 2006**

Page 94

1   is not contained in that document.  You could
2   ask her questions about the document.  I
3   haven't seen the document, and I'd like to
4   take a look at it.
5        MR. TUMPOSKY:  So as far as medical
6   information in the document you'd be happy to
7   have her -- she can take a look?
8        MS. KROM:  Let me take a look first.
9        MR. TUMPOSKY:  I mean, it is his
10  privilege to assert.
11       MS. KROM:  But at the same time as an
12  employer, confidential medical information
13  needs to be obviously kept confidential.
14       MR. TUMPOSKY:  Right.
15       MS. KROM:  I want a second with Holly
16  just to make sure she hasn't been involved,
17  or it looks like he's involved in a
18  litigation against UPS.  So I'd like a few
19  minutes to talk to my client to figure out if
20  she's involved in it.  That information could
21  constitute attorney work product at that
22  point or communications she had with --
23       MR. TUMPOSKY:  Well, communications
24  she's had with him wouldn't constitute.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**HOLLY MANZO**
**January 25, 2006**

Page 95

1    MS. KROM: No. What I'm saying is that
2    if you're going to ask questions of her
3    regarding his lawsuit, I just want to see
4    what the extent of her involvement has been.
5    MR. TUMPOSKY: Okay. Do you want us to
6    step outside?
7    MS. KROM: Yes.
8    MR. TUMPOSKY: Off the record.
9
10   (Off the record)
11
12   MR. TUMPOSKY: We're back.
13   MS. KROM: Just for the record, this
14   particular employee is in active litigation
15   against UPS. Holly has some involvement in
16   that.
17   MR. TUMPOSKY: What kind of involvement?
18   MS. KROM: As her role. As her job, as
19   part of her job.
20   MR. TUMPOSKY: She hasn't been deposed,
21   obviously.
22   MS. KROM: I don't know. Just to put on
23   the record that obviously if you ask any
24   questions of Holly for information that she's

Page 96

1   discussed with attorneys for UPS, I'm going
2   to object and instruct her not to answer it,
3   since it's attorney-client privilege.
4       MR. TUMPOSKY: Right.
5       MS. KROM: The other thing that I'll be
6   objecting to is there's no confidentiality
7   order in this case. We haven't come to any
8   type of confidentiality or protective order
9   with regard to confidential personnel or
10  medical information regarding other
11  employees. So if I feel that you're delving
12  too deep and that Holly is having to
13  communicate information which I consider to
14  be confidential, medical or personnel
15  information, I will also be objecting and
16  instructing her not to answer. By all means
17  we can enter into a confidentiality agreement
18  and protective order and you can always bring
19  Holly back if you need to.
20      MR. TUMPOSKY: Okay. Now, the terms of
21  his complaint of course -- his allegations
22  would be public record. So I can discuss
23  those with her.
24      MS. KROM: If she knows anything about

Page 97

```
 1         it.
 2              MR. TUMPOSKY:  As much as she knows.
 3         Q.   (By Mr. Tumposky)  So you are familiar
 4   with this case?
 5         A.   I'm familiar with Mr. Ducheneau, yes.
 6         Q.   He alleges that UPS did not allow him to
 7   return to work with the power steering in his
 8   vehicle.  Is that your understanding of his
 9   allegations?
10         A.   I'm not sure.  If he had permanent power
11   steering restrictions, he would not have been
12   allowed to return to work.
13         Q.   Because UPS does not operate any
14   vehicles with any power steering restrictions --
15   with power steering?
16         A.   No, we do.  However, it is only a small
17   portion of our fleet.  We can't guarantee each and
18   every day, if somebody had a power steering
19   restriction, that they would be able to be given a
20   power steering vehicle.  Routes changes, vehicles
21   change, vehicles breakdown.
22         Q.   He alleges that he was told he could not
23   return to work unless he came back with no
24   restrictions on his medical release.  Are you
```

Page 98

1  familiar with that allegation?
2      A.  I'm not.  I don't know who would have
3  told him that.
4      Q.  Are you aware of anyone telling him
5  that?
6      A.  No, I'm not.
7      Q.  Are you aware of anyone ever being told
8  that they could only come back to work if they were
9  given a full release without conditions?
10     A.  Not in those terms, no.
11     Q.  What terms have you heard it used?
12     A.  You can return to work if you can
13 perform the essential functions of the job --
14     Q.  So they don't say --
15         MS. KROM:  Let her finish.
16         MR. TUMPOSKY:  Sorry.
17     A.  -- with or without a reasonable
18 accommodation.  I can't tell you whether a
19 management person, who is not involved in the ins
20 and outs of ADA, may have construed that response.
21 I don't know.  Whomever said it, you'd have to ask
22 them directly.  I don't know why they would have
23 said it that way.
24     Q.  I may have asked this before, but it