UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CHARLES THORNTON,<br>　　Plaintiff,<br><br>　　　v.<br><br>UNITED PARCEL SERVICE INC.,<br>　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 05-CV-10210-MEL |

MEMORANDUM AND ORDER

LASKER, D. J.

　　United Parcel Service Inc. ("UPS") moves for summary judgment on all counts and Charles Thornton moves for partial summary judgment on his claim that he is disabled within the meaning of the Americans With Disabilities Act ("ADA") and Mass. Gen. L. ch. 151B ("Chapter 151B").  For the following reasons, Defendant's motion is GRANTED in part and DENIED in part, and Plaintiff's motion is DENIED.

I.

　　Thornton worked for UPS as a driver from 1968 until 2002. During the course of his employment, Thornton suffered a shoulder injury and began experiencing chronic back pain.  In 2000, Thornton was forced to take a medical leave of absence after two physicians who examined his shoulder came to different conclusions regarding whether he was fit to drive a tractor

1

trailer prior to undergoing shoulder surgery.  After a third doctor opined that Thornton could drive up until his surgery, Thornton was reinstated and began driving between Chelmsford, MA, Worcester, MA, and Hartford, CT ("Chelmsford-Worcester-Hartford" route).

In January 2001, Thornton was examined by Dr. Hawkins, who found that he was not "disabled" but that Thornton should remain restricted from doing any heavy lifting on account of his injuries.  Thornton alleges that in February 2001 he was informed that the requirements for the Chelmsford-Worcester-Hartford line had been revised to include heavy lifting.  UPS asserts that Thornton was physically able to fulfil the duties of the Chelmsford-Worcester-Hartford route.  Thornton then attempted to bid on two other routes that included a second driver to share in the responsibilities, but he was unable to find a driving partner.  As an alternative to selecting a new driving route, Thornton alleges that he requested the opportunity to perform an "inside job," such as operations clerk, pre-loader, or car washer, but his request was denied.  UPS claims that Thornton did not ask for an inside job at that time.  Thornton then bid on the Chelmsford-Buffalo job, one which required heavy lifting.

On March 5, 2001, Thornton injured his back on the way to Buffalo, NY, requiring a visit to the emergency room and several weeks of recuperation.  Upon examination by a physician

on March 14, 2001, Thornton was issued the following work restrictions: (1) no driving longer than ninety minutes without a break; (2) a thirty-pound lifting limit; (3) a maximum work day of nine hours; and (4) no repetitive lifting or bending. Thornton then returned to work, driving the Chelmsford-Worcester-Hartford route.

After UPS again changed the requirements for the Chelmsford-Worcester-Hartford line, Thornton reluctantly bid on the Chelmsford-Buffalo route again. Thornton's supervisor was told by UPS's Health and Safety Department that Thornton was able to perform the Chelmsford-Buffalo route. Thornton claims that he again requested an inside job before accepting the Chelmsford Buffalo route, but his application was denied.

Thornton's back and shoulder conditions deteriorated in 2002 and on September 16, 2002, he failed the Department of Transportation's biannual physical exam. After learning of the exam results, Thornton alleges that he again sought an inside job. Following further examinations on September 19, 2002, and December 6, 2002, physicians opined that Thornton was unable to perform various inside jobs and found his injuries "permanent and non-remedial." Thornton asserts that one of the doctors concluded he could still perform the inside job of "small sorter." Thornton requested this part-time inside position but was turned down. Thornton retired from UPS later in 2002.

On August 30, 2001, Thornton filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging that UPS discriminated against him on the basis of his disability and "misinterpreted" his physical restrictions, causing him to take on jobs he was unable to perform.  In October 2003, the MCAD dismissed Thornton's complaint, finding that while he was a "qualified individual with a disability" who could preform the essential functions of his job, he failed to demonstrate that he had suffered any adverse employment action since he had selected his own driving routes.  On November 4, 2004, Thornton received a right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC") concerning his August 2001 MCAD complaint. Thornton filed his complaint on February 1, 2005.

                                II.

Before reaching the merits, it is necessary to determine whether Thornton satisfied (1) the administrative filing requirements under Chapter 151B and the ADA, and (2) the statute of limitations. Prior to filing a civil complaint, a plaintiff must file a complaint with the MCAD or EEOC within 300 days of the alleged discriminatory act.  See Mass. Gen. L. ch. 151B § 5; 42 U.S.C. § 12117 & § 2000e-5(c)-(e).  Chapter 151B requires a plaintiff to file his lawsuit within three years of the date of the alleged discriminatory act.  Mass. Gen. L. ch.151B § 9.

UPS argues first that Thornton's claims under both Chapter 151B and the ADA which are based on incidents allegedly occurring after August 2001 are barred by the 300-day filing rule. Thornton's MCAD complaint was filed in August 2001. Since the ADA and Chapter 151B require Thornton to file his administrative complaint within 300 days of the alleged discriminatory act, UPS contends that Thornton's August 2001 MCAD complaint only applies to events which occurred in the 300 days prior to August 2001. No additional administrative complaint has been filed for any alleged incidents of discrimination occurring after August 2001. According to UPS, Thornton's claims that UPS failed to accommodate his alleged disability, denied him an inside position, and any other allegations involving post-August 2001 incidents are time barred.

Thornton maintains that he has fully satisfied the 300-day time requirement because the allegations in his complaint dealing with events occurring after August 2001 are timely under the "scope of the investigation rule." That rule recognizes that "the scope of a civil action is not determined by the specific language of the charge with the agency, but rather, may encompass acts of discrimination which the MCAD investigation could be reasonably expected to uncover." Davis v. Lucent Technologies Inc., 251 F.3d 227, 233 (1st Cir. 2001).

Thornton's allegations of additional failures to

5

accommodate and adverse employment actions are merely further instances of the same type of alleged discrimination and fall squarely within the scope of the investigation rule. See Perch v. City of Quincy, 204 F.Supp.2d 130, 133-34 (D. Mass. 2002); see also Smith v. Bell Atlantic, 63 Mass.App.Ct, 702, 722 (2005) ("[Chapter 151B] does not require a claimant to re-file or amend her complaint with the MCAD as a prerequisite to relying on later incidents in support of an ongoing violation."). The First Circuit has made clear that a plaintiff's civil complaint need not mirror his administrative charge exactly in order to satisfy Chapter 151B's filing requirement. See Powers v. Grinnel Corp., 915 F.2d 34, 38 (1st Cir. 1990) ("An administrative charge is not a blueprint for the litigation to follow."); Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996). The post-August 2001 alleged acts of discrimination are similar to those cited in Thornton's MCAD complaint and occurred during the pendency of the MCAD investigation. Thornton has satisfied Chapter 151B's filing requirement.

      The analysis is different with regard to Thornton's ADA claims. While Massachusetts law and precedent support the scope of the investigation rule and allow claims that fall outside of the filing period when they are part of a "continuing violation," federal law does not provide similar flexibility. As the Supreme Court announced in National Railroad Passenger Corp. V. Morgan,

536 U.S. 101, 113 (2002), "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." See also Ledbetter v. Goodyear Tire & Rubber Co. Inc., 127 S.Ct. 2162, 2175 (2007) ("Morgan is perfectly clear that when an employee alleges "serial violations," i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation"). An employer's failure to accommodate a disabled person or otherwise discriminate against him is a discrete act. See Elmenayer v. ABF Freight System, Inc., 318 F.3d 130, 134-34 (2nd Cir. 2003) ("Although the effect of the employer's rejection [of an accommodation request] continues to be felt by the employee for as long as he remains employed, that continued effect is similar to the continued effect of being denied a promotion or denied a transfer, denials that Morgan offered as examples of a discrete act."); Cherosky v. Henderson, 330 F.3d 1243, 1247-48 (9th Cir. 2003). Accordingly, Thornton's ADA claims based on events occurring after August 2001 are barred.

UPS further maintains that most of Thornton's claims under Chapter 151B are also barred pursuant to Mass. Gen. L. 151B § 9, which sets a three-year statute of limitations starting from the date of the allegedly discriminatory act. Since Thornton filed his civil complaint on February 1, 2005, UPS contends that all of Thornton's Chapter 151B claims regarding events taking

place before February 2002 are barred by the statute of limitations. Thornton counters that the discriminatory incidents that took place prior to February 2002 were part of a continuing violation and therefore may be included in his complaint.

Under Massachusetts law, the continuing violation doctrine allows plaintiffs to pursue otherwise untimely claims which are part of an ongoing pattern of discrimination. The theory of this rule is that "some claims of discrimination involve a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." See Ocean Spray Cranberries, Inc. v. Massachusetts Commission Against Discrimination, 441 Mass. 632, 642 (2004); see also Carter v. Commissioner of Correction, 43 Mass.App.Ct. 212, 222 (1997) (finding the continuing violation rule applicable to Section 9's statute of limitations). Massachusetts recognizes two types of continuing violations: (1) serial and (2) systemic. A systemic violation is the maintenance of a policy or practice that targets a protected class of employees. A serial violation is a group of interlinked events stemming from a common discriminatory animus, with at least one such violation occurring during the limitations period. Ocean Spray, 441 Mass. at 643 n.14. In order for the continuing violation theory to apply, a plaintiff must ordinarily show that: (1) at least one discriminatory act occurred during the

8

limitations period; (2) the alleged timely discriminatory acts have a substantial relationship to the untimely claims; and (3) earlier alleged violations outside the limitations period did not trigger the plaintiff's awareness and duty to assert his rights. Id. at 643.

While it seems apparent that Thornton has satisfied the first two prongs, the third requirement poses a more difficult question. As the Massachusetts Supreme Judicial Court has explained, violations outside the limitations period may not be asserted "if, at the time of the earlier violations, the complainant knew or could have formed a reasonable belief that the earlier violations were discriminatory." Ocean Spray, 441 Mass. at 644 n.16.

Factual disputes as to when Thornton believed or could have concluded that UPS was discriminating against him preclude an award of summary judgment on this issue. Thornton contends that UPS's alleged failure to accommodate his disability over a period of several years was the result of a "100 percent medical release policy" requiring employees to be able to work without any restrictions before they may return from medical leave. A medical release policy of this kind would likely fall within the "systemic violation" category of the continuing violation doctrine. UPS denies such a policy has ever existed. The record is unclear as to when Thornton became aware of this alleged

policy.  Although Thornton's August 2001 MCAD complaint demonstrates that as of August 2001, he believed that UPS was discriminating against him by "misinterpreting" his medical restrictions, the continuing violation doctrine nevertheless may apply to Thornton's pre-February 2002 claims that stem from UPS's alleged 100 percent medical release policy.  Since the parties dispute whether the policy actually existed, and how it impacted Thornton, if at all, it would be premature to decide the timeliness Thornton's pre-February 2002 allegations at this stage in the proceedings.  See O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001) ("Unless there are no material facts in dispute permitting resolution as a matter of law as to whether a continuing violation occurred, it is a jury issue.").

III.

To prevail on his Chapter 151B and remaining ADA claims, Thornton must demonstrate that: (1) he suffered from a disability as defined by Chapter 151B and the ADA; (2) he was nevertheless able to perform the essential functions of his job, with or without a reasonable accommodation; and (3) UPS took adverse employment action against him because of, in whole or in part, his disability.  See Carroll v. Xerox Corp., 294 F.3d 231, 237-38 (1st Cir. 2002).

Genuine issues of material fact remain with regard to whether Thornton qualifies as disabled within the meaning of

Chapter 151B and the ADA.  Thornton contends that he cannot sit for more than ninety minutes or walk for more than thirty minutes without taking a break.  He asserts that his shoulder injury makes it difficult for him to lift or manipulate objects, brush his teeth, use utensils, or hold onto drinking glasses.  He further contends that the medication he must take for these injuries creates additional limitations.  While Thornton has made a sufficient showing to survive UPS's motion for summary judgment on this issue, the remaining questions of fact concerning whether Thornton is substantially limited in a major life activity also preclude an award of summary judgment in Thornton's favor.  Moreover, even if Thornton is disabled, questions of fact remain with regard to whether UPS failed to accommodate Thornton's disability.

Similarly, existing factual disputes prevent an award of summary judgment on the issue of whether Thornton suffered an adverse employment action.  There is authority to support Thornton's argument that UPS's alleged 100% medical release policy, if it actually exists, would constitute a per se violation of the ADA and Chapter 151B.  See e.g., Henderson v. Ardco Inc., 247 F.3d 645, 653 (6th Cir. 2001); McGregor v. Amtrak, 187 F.3d, 1113, 1116 (9th Cir 1999).  However, questions of fact persist concerning whether UPS ever had such a policy, and if so, whether it was applied to Thornton.

UPS's motion for summary judgment is GRANTED only with respect to Thornton's ADA claims based on allegations of discriminatory acts occurring after August 2001.  UPS's motion is DENIED on all other grounds and Thornton's motion for partial summary judgment is DENIED.

It is so ordered.


Dated:    August 20, 2007
          Boston, Massachusetts     /s/ Morris E. Lasker
                                    U.S.D.J.