UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHARLES THORNTON,<br>Plaintiff | ]<br>]<br>] C.A. NO. 05-10210-RGS |
| v. | ]<br>] |
| UNITED PARCEL SERVICE, INC.,<br>Defendant | ]<br>] |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE
PLAINTIFF'S EVIDENCE OF ANY CLAIM FOR ALLEGED
DAMAGES BASED ON EVENTS OCCURRING AFTER AUGUST 2001**

Defendant United Parcel Service, Inc. ("UPS") moves to preclude any testimony or

evidence of Plaintiff's alleged damages for any period of time after August 2001.  On September

16, 2002, Plaintiff Charles Thornton ("Mr. Thornton"), a tractor-trailer driver for UPS, lost his

ability to legally drive a commercial motor vehicle for UPS because he no longer had a valid

medical certification required by the U.S. Department of Transportation, or "DOT Card."  See

Amended Complaint, ¶¶ 42, 48.  He never performed services for UPS after that date.  See

Amended Complaint, ¶ 48.

The only claims relating to events occurring after August 2001 that have survived

summary judgment are Mr. Thornton's claim under Massachusetts law.  Plaintiff's Amended

Complaint (Feb. 10, 2006) claims that UPS failed to provide Mr. Thornton with an " 'inside job'

as provided for in the collective bargaining agreement between the Union and U.P.S."  Amended

Complaint, ¶ 26.  See also ¶¶ 27-28, 38-39, 44-50.  Consistent with these allegations, Mr.

Thornton's disclosure of his damages claim required by F. R. Civ. P. 26(a)(1)(C) and Local Rule

16.5 identifies *only* damages after September 16, 2002 and *only* as they relate to a theory that he

should have been given an "inside" job moving packages in a UPS warehouse facility.  It is not a

violation of Massachusetts law to refuse to transfer an employee to another position as a reasonable accommodation. Therefore, a legal theory that Mr. Thornton was entitled to an accommodation of an "inside" position, and that he has suffered damages because UPS did not provide him with an "inside" job, is precluded as a matter of law.

## I.   FACTS

Mr. Thornton began working at UPS in February 1968, last work for UPS in September 2002, and thereafter retired. See Amended Complaint ¶¶ 4, 44 and 50. At various times from 1978 to 2002, because of a variety of injuries, Thornton had medical restrictions, including lifting restrictions. For most of his tenure at UPS, Thornton was a feeder driver, first working out of the Worcester facility and then out of UPS Chelmsford facility. Feeder drivers are responsible for driving UPS tractor trailers and transporting packages from one UPS facility to another. Feeder jobs are classified both by the mileage (either over 140 miles or under 140 miles) and by what type of trailer a driver would be pulling. A "single" feeder means the driver pulls only one trailer and is not required to perform heavy lifting. A "double" means the driver pulls two trailers and on occasion is required to lift a seventy pound dolly in order to take apart the trailers. At all relevant times, because of Thornton's seniority date, he had the option of choosing single trailer routes.

During his entire tenure at UPS, Thornton was a member of the Teamster's Union ("Local 25"). The terms and conditions of Thornton's employment were governed by a Collective Bargaining Agreement ("CBA") between the Teamsters and UPS. Under the terms of the CBA, UPS held an annual bid each February. At that time, all of the bid jobs are posted on a master list at each Local 25 facility and the feeder drivers would bid on jobs based on their

seniority. A feeder driver could bid, in order of his seniority, on <u>any</u> job that was open at any facility within the Local Teamsters Local 25 jurisdiction.

During the course of a year, at various times, the Chelmsford facility also held its own separate bids. Jobs that were altered, for example, because either the start time or a leg of the route changed, would be posted again and the feeder drivers in the Chelmsford facility could re-bid on those jobs in seniority order. Under the terms of the CBA, a feeder driver's rate of pay was determined by the type of route he drove.

Beginning in 1978, Thornton began to claim a series of injuries to his back, wrist, leg, fingers and shoulder. From 1978 to his retirement in 2002, Thornton filed approximately 14 workers' compensation claims.

In February 2000, at the annual bid, Thornton was 18th on the seniority list for Local 25. He bid on a single trailer job that involved driving from Chelmsford to the Worcester Rail yard three times a day (the "Chelmsford to Worcester job").

From May through September 18, 2000, Thornton was out of work and received workers' compensation benefits. On or about July 27, 2000, Thornton filed a charge with the Massachusetts Commission Against Discrimination ("MCAD") against UPS, alleging that it discriminated against him because of his disability and age when it did not allow him to work because of the disagreement between a UPS recommended doctor, Dr. Franchi, and Thornton's own doctor about whether Thornton could drive tractor trailers. The MCAD eventually dismissed this claim.

When Thornton returned to work in September 2000 after invoking the "third doctor" procedure under the Collective Bargaining Agreement ("CBA"), Mr. Thornton stated he wanted

3

to drive his previous Chelmsford to Worcester route. Under the terms of the CBA, Thornton "bumped" a less senior driver and returned to driving the Chelmsford to Worcester route.

In November 2000 the Chelmsford facility opened up its entire bid. The Chelmsford facility at that time had approximately ninety-five (95) routes that a driver could bid on. Traditionally, during "peak" season (November and December of each year), management in Chelmsford reopened the bid so that drivers had the opportunity to earn more money during the holiday season. In November 2000, Thornton re-bid and retained the Chelmsford to Worcester job.

In January 2001, the drivers again had an opportunity to bid. At this time, Thornton bid on the Chelmsford-Worcester-Harford job, which was a single trailer job.

On or about January 20, 2001, Dr. Richard Hawkins, in the context of a workers' compensation claim that Thornton had filed, advised that Thornton's "restriction of no heavy lifting, such as loading and unloading trucks" should remain in place.

At the February 2001 annual bid, Thornton was 14th on the seniority list. At this bid, Thornton's first two choices were classified as "sleeper team" jobs. This was a double trailer job that required a team of two drivers. Under the terms of the CBA, in order to bid on a "sleeper team" job, the "A" driver (who was Thornton) was supposed to choose the "B" driver prior to the bid. Because Thornton failed to pick his team member prior to the bid, he could not bid on either his first or second choices, which were both sleeper team jobs. Sleeper team drivers are paid almost $1000 more per week than drivers on non-sleeper routes. Thornton's third choice was the Chelmsford-Worcester-Hartford job that he held prior to the annual bid. Thornton was fully capable, even with his lifting restriction, of performing this route. Regardless, Thornton's fourth

4

and fifth choices were also single trailer jobs, from Chelmsford to Worcester and were jobs that Thornton could also physically perform.

Instead of accepting his fourth or fifth choice, Thornton asked to rebid for routes different than those he had originally chosen. UPS allowed him to do so. On his second bid sheet, Thornton chose the Chelmsford to Philadelphia to Buffalo route, a "premium job" where the driver works only three and a half days each week. Similar to the "sleeper" jobs, drivers who drove the premium jobs earned more money per week than non-premium drivers. Because the job involved a double trailer, Ken Mundry, the Feeder Dispatch Manager, questioned Thornton's ability to perform the job. The Union supported Thornton and believed that UPS would be denying Thornton his seniority rights if it prohibited him from bidding on the premium job. Thornton took this route. He injured his back on his first trip to Buffalo. Dr. Wolf examined Thornton and imposed work related restrictions of no driving longer than ninety minutes without a break, a thirty pound lifting limit, a nine hour maximum work day, and no repetitive lifting or bending.

Upon his return to work, Thornton again chose the Chelmsford-Worcester-Hartford job. On or about June 20, 2001, UPS removed the Hartford portion from the Chelmsford-Worcester-Hartford job and the job was re-submitted for bids. Thornton bid on and received the reconfigured job, which was now Chelmsford to Worcester three times a day.

On or about August 30, 2001, Thornton filed a second charge with the MCAD against UPS, alleging that UPS misinterpreted Dr. Hawkins' January 20, 2001 medical restrictions and that on March 5, 2001, UPS "sent" him to Buffalo, where he was injured. The MCAD dismissed this second charge on the ground that Thornton voluntarily chose the Buffalo job and there was no evidence that UPS had subjected Thornton to an adverse employment action.

In November 2001, similar to the prior year, the Chelmsford facility opened up their entire bid. Thornton chose to bid on the Chelmsford to Philadelphia to Buffalo job, again, which was the double trailer job he had held earlier that year. Though concerned about his ability to do this job, UPS did not prevent Thornton from bidding on this route.

During the week in January 2002, UPS reopened the bid and Thornton bid on a Chelmsford to Buffalo double trailer job. At the 2002 annual bid, Thornton was 5th in seniority. He bid again on the Chelmsford to Buffalo job and again secured that job.

On or about September 16, 2002, Thornton failed his DOT physical examination and could no longer work as a UPS Feeder Driver. Amended Complaint, ¶¶ 41-42. Mr. Thornton claims that he was promised an inside job, which promise was rescinded within an hour of its proffer. Amended Complaint, ¶ 44. Inside jobs all involve moving and lifting packages. Dr. Sarah Kramer, who performed the DOT physical, determined that Thornton was unable to physically perform the inside job, of a loader/unloader. In December 2002, Dr. Arthur Haffner determined that Thornton could not do any inside job with his restrictions, with the possible exception of small sorts. Amended Complaint, ¶ 47. Employees doing small sorts must also perform heavier lifting tasks so UPS determined that Thornton could not do any inside job with his permanent restrictions. Mr. Thornton filed a grievance because he did not receive an inside job, but the grievance was not pursued. Amended Complaint ¶¶ 45-46. Under the CBA, Mr. Thornton had the right to have a doctor of his choosing opine as to whether he could do any inside job. In the event of a disagreement, the "third doctor procedure" under the CBA would be invoked. Thornton chose not to present another opinion and did not pursue the matter.

Instead, Thornton applied for and received unemployment compensation benefits and accepted a lump sum settlement of his workers' compensation claim. He applied for and

6

received Social Security Disability benefits. He then retired form UPS. See Amended Complaint, ¶ 48.

Thornton did not file any new or additional or amended MCAD or EEOC claim after August 30, 2001.

## II.    ARGUMENT

### A.    Chapter 151B Does Not Require Reassignment

As a result of Judge Lasker's summary judgment decision, under the ADA, "Thornton's claims based on events occurring after August 2001 are barred." Memorandum and Order (August 20, 2007) at 7. Thus, any ADA claims based on events occurring after August 2001 are barred. Legally, Mr. Thornton could not have continued to drive after he lost his DOT Card on September 16, 2002. Plaintiff concedes this fact in his Amended Complaint, ¶¶ 41-42. Thornton's only claim under Massachusetts Law relating to events occurring after August 2001 is the claim that at various points in time UPS should have placed him in an "inside" job. This claim is barred, however, because Chapter 151B does not require an employer to reassign a disabled employee to a vacant job as a reasonable accommodation. Lolos v. Solutia, Inc., 193 F. Supp. 2d 364, 369-72 (D. Mass. 2002). (no duty to reassign to vacant position employees who cannot perform the essential functions of the job). See also St. Laurent v. UPS, 416 F.Supp. 2d 212 (2006) (Court granted UPS' motion for summary judgment and held under MA law that there is no duty to reassign).

Because UPS had no duty under Chapter 151B to reassign Mr. Thornton to another position, and because it is undisputed that Mr. Thornton was not longer legally qualified for his driver position, there is no actionable claim against UPS based on events occurring after August

2001. Therefore, Plaintiff should be precluded from putting on any liability or damages evidence relating to the fact that he did not receive an "inside" job.

> B.       Multiple Other Reasons Preclude Thornton's Claim for Damages

As stated above, Plaintiff's claim for damages disclosed pursuant to F. R. Civ. P. 26(a)(1)(C) and Local Rule 16.5 related entirely to damages sustained from September 2002 to 2010, when Mr. Thornton turns 65 years old, as a result of UPS not placing him in an inside job after he lost his DOT Card on September 16, 2002. In addition to this conclusive reason, discussed above, as to why none of that evidence is admissible, other substantial reasons would preclude this evidence.

> 1.       Analyzing Mr. Thornton's Claim for Reassignment Necessarily Involves Interpreting the Collective Bargaining Agreement between UPS and the Teamsters and Therefore, Such a Claim is Preempted.

Throughout his Amended Complaint Mr. Thornton refers to obligations and processes arising under the CBA. See, e.g., ¶¶ 17, 25, 26, 44-46. However, this case involves neither a claim that UPS violated the CBA nor that the Union breached its duty of fair representation. Therefore, any claim that UPS should have provided Mr. Thornton with an "inside" job, which necessarily involves an interpretation of the CBA, is barred. Private sector collective bargaining agreements are governed by the National Labor Relations Act, and interpretation of a collective bargaining agreement is a question of federal law. The United States Supreme Court has held that when a state law cause of action requires for its resolution the interpretation of a collective bargaining agreement, that state law cause of action is preempted by federal law. Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 412 (1988). See Jackson v. Liquid Carbonic Corp., 863 F.2d 111, 118 (1st Cir. 1988) ( Court held that plaintiff's retaliatory discharge claim was preempted and stated "[i]f state-law rights and obligations do not necessary 'exist independently

or private agreements,' they can be, and are, preempted by the protective gloss which section 301 provides to those agreements.") (quotations omitted).  See also Troconis v. Lucent Tech., 160 F.Supp. 2d 150 (D. Mass. 2001) (G.L. c. 151B retaliation claim preempted because it involved the interpretation of a collective bargaining agreement).

Here, the Amended Complaint states: "The Union declined to proceed with Mr. Thornton's grievance regarding U.P.S.' failure to provide him with an 'inside' job." ¶ 46.  Since Mr. Thornton has not asserted a claim under Section 301 of the National Labor Relations Act, he cannot pursue this claim under the guise of an ADA claim.

> 2.      Mr. Thornton's Receipt of a Lump Sum Settlement of His Workers' Compensation Claim Precludes Mr. Thornton's Claims.

Mr. Thornton's acceptance of a lump sum settlement of his workers' compensation in July 2003 precludes any claim that his was a *qualified* individual with a disability.  See M.G.L. ch. 152, § 48.

> 3.      Mr. Thornton's Receipt of SSDI Cuts Off Damages

In April 2003, Mr. Thornton was declared eligible for and began receiving Social Security Disability Benefits.  The standard for receiving such benefits is a finding that the individual is unable to perform any job available in the national economy.  Mr. Thornton's statements in the application process would wholly preclude a finding that he was a qualified handicapped person under Chapter 151B.

> 4.      Mr. Thornton Voluntarily Retired

While the fact that Chapter 151B provides no remedy for the alleged denial of an inside position to Mr. Thornton, the damages arising after September 16, 2002 should be precluded because Mr. Thornton voluntarily retired from his position at UPS.  See Amended Complaint,

¶ 48. He was never terminated from his position and remained on the seniority list, providing him with the contractual right to bid on jobs in accordance with his seniority until he decided to retire.

     5.     Mr. Thornton's Massachusetts Law claims are not "Saved" by the "Scope of Investigation" Rule.

Mr. Thornton did not file any other administrative complaint with either the MCAD or the EEOC subsequent to the complaint he filed in August 2001, and the subsequent events do not naturally arise from the earlier complaints. Accordingly, Thornton is precluded from seeking damages on any events the occurred after August 2001, including his allegations that UPS failed to accommodate his alleged handicap and failed to provide him with an inside position after his failed his DOT examination. Respectfully, contrary to Judge Lasker's conclusion, the alleged adverse employment action in not providing Mr. Thornton with an "inside job" is not "the same type of discrimination" alleged in the 2000 and 2001 administrative charges. See Memorandum and Order at 6. Nor should Mr. Thornton be permitted to avoid the fact that his Massachusetts claims regarding events after August 2001 are unsupported by an underlying administrative charge by testifying that an MCAD representative told him that he need not file a new claim. Mr. Thornton would need to establish that the individual who gave him the advice was acting on behalf of the agency, and, in addition, would need to show "extraordinary circumstances." Bonilla v. Muebles J. J. Alvarez, Inc., 194 F.3d 275, 278-79 (1st Cir. 1999).

UNITED PARCEL SERVICE, INC.

By its attorneys,

/s/ Elizabeth A. Kowal
Barry J. Waters, BBO #645595
bwaters@murthalaw.com
Elizabeth A. Kowal, BBO #646326
ekowal@murthalaw.com
Murtha Cullina LLP
99 High Street
Boston, MA 02110
617-457-4000

## CERTIFICATE OF SERVICE

I, Elizabeth A. Kowal, hereby certify that I have on this 4th day of February, 2008,

electronically filed Defendant's Motion in Limine to Preclude Plaintiff's Evidence of Any Claim

for Alleged Damages Based on Events Occurring After August 2001 with the Clerk of Court

using the CM/ECF system which will send notification of such filing to the following:

Michael L. Tumposky, Esq.
tumposky@masscriminallawyer.com
Stephen B. Hrones, Esq.
hrones@masscriminallawyer.com
Hrones, Garrity & Hedges, LLP
Lewis Wharf - Bay 232
Boston, MA 02110

/s/ Elizabeth A. Kowal