UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
CHARLIE THORNTON,           )
    Plaintiff,              )
                            ) CIVIL ACTION NO.: 05-10210-RGS
v.                          )
                            )
UNITED PARCEL SERVICE, INC.,)
    Defendant.              )
_____)

**PLAINTIFF'S TRIAL MEMORANDUM**

The Plaintiff hereby submits the following trial memorandum.

**INTRODUCTION**

The Plaintiff filed a claim against the Defendant, United Parcel Service, Inc., alleging violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. and its state-law counterpart, M.G.L. ch. 151B, §4. Specifically, the Plaintiff alleges that the Defendant maintains a policy and practice in which it requires all employees to obtain a "100% medical release" before they are allowed to return to work from injury leave. This policy means that U.P.S. requires an employee to be medically cleared to do every function (essential or not) which it believes to be required of his particular position, without accommodation, or U.P.S. does not allow that employee to work.

As a result of this policy, the Defendant, on numerous occasions from 2000 to 2002, failed to accommodate the Plaintiff's disability by refusing even the slightest requested modification to the available feeder driver routes, thus forcing the Plaintiff to either: 1) bid on a job outside his medical limitations; or, 2) go on unpaid medical leave. As a result of choosing the first option, the Plaintiff's injuries grew progressively worse

1

until he was unable to drive tractor trailers. After U.P.S. denied him the ability to work a non-driving job, he chose to retire rather than continue to fight with U.P.S.

## ARGUMENT

### A. JUDGE LASKER ALREADY RULED THAT THE PLAINTIFF MAY RECOVER DAMAGES FOR ALL CONDUCT ON THE STATE LAW CLAIM AND CONDUCT OCCURRING BEFORE AUGUST, 2001 ON THE ADA CLAIM

The purpose of the administrative charge is to "afford[] formal notice to the employer and prospective defendant of the charges that have been made against it." Powers v. Grinnell Corp., 915 F.2d 34, 37 (1st Cir. 1990). Thus, the scope of the civil complaint may include the charges filed with the administrative agency, as well as "the investigation which can reasonably be expected to grow out of that charge." Id.

Furthermore, "an administrative charge is not a blueprint for the litigation to follow. . . . [and] the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow. White v. New Hampshire Dep't of Corrections, 221 F.3d 254, 263 (1st Cir. 2000). Rather, the critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC [or MCAD] investigation which can reasonably be expected to grow out of the charge of discrimination. Id.

The Plaintiff's complaint at the MCAD alleged that in March of 2001, the Plaintiff was the victim of disability discrimination. Specifically, he alleged that his medical "restrictions were misinterpreted [by U.P.S.] and [he] was doing jobs that [he] was not physically able to do." In short, the Plaintiff was alleging that U.P.S. would not accommodate his disabilities. The MCAD dismissed this complaint in late-2003.

The Plaintiff's complaint in this Court includes allegations of the Defendant's March, 2001 failure to accommodate as well as its subsequent failures to accommodate in the late fall of 2001 and September, 2002, just before the Plaintiff ended his employment at U.P.S. Each of the three failures to accommodate is premised on the same facts: that the Plaintiff requested U.P.S. find him a driving route without heavy lifting and which allowed for short breaks every ninety minutes, but was denied his request. The Plaintiff's theory is that each of U.P.S.' refusals to accommodate was done pursuant to an unlawful employment policy of never accommodating and improperly requiring employees to obtain a "100% medical release."

In this case, Judge Lasker already ruled that the Plaintiff could recover for all conduct under ch. 151B and for all pre-charge conduct under the ADA.[1]

### B. JUDGE LASKER ALREADY RULED THAT THE PLAINTIFF'S CLAIMS ARE NOT BARRED BY THE STATUTE OF LIMITATIONS

The continuing violation doctrine, applicable to all of the Plaintiff's claims, is also an equitable exception to the statute of limitations that allows an employee to seek damages for otherwise time-barred allegations. Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir. 1988).

There are two types of continuing violations: serial and systemic. "A serial violation is a number of discriminatory acts emanating from the same discriminatory animus, each action constituting a separate wrong. Id. This theory "ensures that … claims are not foreclosed merely because the plaintiff[] needed to see a pattern of repeated acts before [he] realized that the individual acts were discriminatory." Thomas v. Eastman Kodak Co., 183 F.3d 38, 54 (1st Cir. 1999). A systemic violation, on the

---

[1] See Pl. Motion in Limine for argument in favor of admitting post-charge evidence under the ADA.

3

other hand, "has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint."  Sabree, 921 F.2d at 400 n.7.

The serial violation doctrine applies to this case because there was a violation within the statute of limitations period that anchors the earlier claims.  See Provencher, 145 F.3d at 14; see also Carter v. Commissioner of Correction, 43 Mass. App. Ct. 212, 221 (1997); Clifton v. Mass. Bay Transp. Auth., 62 Mass. App. Ct. 164, 170 (2004) *rev'd on other grounds* (continuing violation theory applies to three-year statute of limitations for ch. 151B claims).  Specifically, the Plaintiff claims that in February, 2001 and late fall, 2001, U.P.S. refused to accommodate his injuries and denied his request for an inside job.  Likewise, in September, 2002, U.P.S. failed to accommodate him.  This last allegation anchors his earlier claims since it occurred less than three years before the filing of the Plaintiff's complaint on February 1, 2005.

Furthermore, the systemic violation doctrine applies to this case because the Plaintiff U.P.S. maintained an unlawful employment practice continuing into the limitations period.  Sabree, 921 F.2d at 400 n.7.  Thus, under either continuing violation theory, the Plaintiff's claims are not barred by the statute of limitations.  Rather he is entitled to recover for each and every allegation in his complaint.  Judge Lasker ruled in the Plaintiff's favor on this issue as well.  See Memo and Order at 8-9.

### C. THE PLAINTIFF IS DISABLED WITHIN THE MEANING OF THE ADA AND CH. 151B

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42

4

U.S.C. §12102(2). "Major life activities" refer to those activities that are of central importance to daily life. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). These activities include, for example, caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. 29 C.F.R. §1630.2(i).

In the case at bar, the Plaintiff is disabled under prong "A" of the statute because he has physical impairments which substantially limit him in the major life activities of walking, eating, sleeping, sitting, lifting, learning, caring for himself and performing manual tasks. Furthermore, he also qualifies under prong "C" because U.P.S. "regarded" the Plaintiff as substantially limited in the major life activity of working.

When an impairment results in significant limitations, that impairment is "substantially limiting" even if the limitations are not insurmountable. Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 22 (1st Cir. 2002). "The focus is not on whether the individual has the courage to participate in the major life activity despite [his] impairment, but, rather, on whether [he] faces significant obstacles when [he] does so." Id. Furthermore, a court should take note of "[t]he EEOC's emphasis on 'condition, manner, or duration' in contrasting how a disabled person performs an activity and how a member of the general public performs that same activity." Id.

In paragraphs 27-30 of his affidavit, attached to his L.R. 56.1 Statement of Material Facts at Exhibit A, the Plaintiff outlines the ways in which his injuries have substantially limited his everyday life activities of walking and sitting:

> 27. The back injuries I described above substantially limited my ability to walk and sit. After a mere half-hour of walking, I required a twenty-minute break before I could resume. In addition, I could only sit for ninety minutes, at the

5

most. After ninety minutes, I would be in severe pain if I did not stand up and stretch.

In ¶28, he similarly explains how the corrective measures he employs to manage the pain cause further limitation in his ability to sleep, eat, learn and control the elimination of his bodily waste:

> 28. These injuries required me to take heavy pain medicine such as Tamiflu, Oxycontin (when I was out of work), Percoset, and Divorset. These medicines imposed further substantial limitations on my ability to eat, sleep, relieve myself, and concentrate. When taking these medicines I had no appetite, I was constipated, had difficulty focusing and I was often excessively drowsy when I first awoke. As a result of this drowsiness, it took me an extra sixty to ninety minutes to get ready for work in the morning.

See Sutton, 527 U.S. at 482 ("The court must also take into account the effects of mitigating or corrective measures when judging whether a person is substantially limited in a major life activity."); Ryan v. Grae & Rybicki, 135 F.3d 867, 871 (2d Cir. 1998) ("assuming without deciding that the ability to control one's elimination of waste is a major life activity.")

In ¶29 and ¶30, the Plaintiff describes how he is limited in performing manual tasks, in caring for himself, and in lifting, due to his shoulder and hand injuries:

> 29. The shoulder injuries I described above substantially limited my ability to lift and to manipulate small objects because it caused pain and numbness to radiate down my arm. As a result, I would often drop drinking glasses, I had difficulty brushing my teeth, and it was difficult for me to hold a knife and fork. In fact, I often had to grab small objects with two hands. In addition, because I have to use my non-dominant hand, it takes me twice as long to brush my teeth.
>
> 30. The hand injuries described above were also limiting. Although I had surgery on my hand in 1998, there was lingering weakness and numbness. These symptoms caused limitations similar to those caused by my shoulder injury. In addition, although I am right-handed, my right hand has half the strength of my left due to my injuries.

Not only was the Plaintiff substantially limited in several major life activities, but U.P.S. "regarded" the Plaintiff as being substantially limited in the major life activity of "working."[2] A plaintiff may assert a "regarded as" claim when "(1) [an employer] mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." Id.

The "regarded as" element "turns on the employer's perception of the employee, a question of intent, not whether the employee has [an actual] disability." Francis v. City of Meriden, 129 F.3d 281, 284 (2d Cir. 1997). An employer is not shielded from liability under the ADA's "regarded as" element "merely by asserting its belief that [an employee's] known disability will limit her ability to perform a particular job to such an extent as to disqualify her from employment." Gillen, 283 F.3d at 29. Furthermore, even if the employer's belief about an employee's disability is honestly held, "on particular facts a jury still might conclude that it rested on an unfounded stereotype (and, therefore, constituted discrimination)." Id., citing Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 45-46 (1st Cir. 2002). To avoid liability in a "regarded as" case, the evidence must show that the employer understood the nature, extent, and implications of the employee's particular impairment, and that the employment decision reflected that understanding. Gillen, 283 F.3d at 29, citing Holiday v. City of Chattanooga, 206 F.3d 637, 643 (6th Cir. 2000).

---

[2] Employees "regarded as" disabled are entitled to as much accommodation as employees who are actually disabled. See, e.g., Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996); see also Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 773 (3d Cir. 2004) (collecting cases).

7

In the case at bar, U.P.S. regarded the Plaintiff as disabled in the major life activity of working in two distinct ways. First, by maintaining a "100% release" policy, U.P.S. essentially treated every employee with a medical restriction, including the Plaintiff, as being unable to work in any function at U.P.S.[3] Second, during the time leading up to the Plaintiff's retirement, the Defendant mistakenly concluded that the he was medically unfit to perform a broad class of jobs, when in fact there were positions at U.P.S. he could have physically performed.

The fact that the Plaintiff "chose" to work outside his restrictions rather than go on unpaid medical leave does not affect his claim that U.P.S. "regarded" him as disabled. In no way did the Plaintiff's "choice" to work lessen the impact of U.P.S.' attitudes towards employees with medical restrictions, such as the Plaintiff. Pursuant to its "100% release" policy, if an employee insisted on an accommodation, U.P.S. considered him unable to work altogether, and thus substantially limited in the major life activity of working. See Sutton, 527 U.S. at 491. The Plaintiff cannot be faulted because he instead "chose" to work and to endure the resulting physical pain. See Emory v. AstraZeneca Pharms, 401 F.3d 174, 181 (3d Cir. 2005) (the fact that a plaintiff, through sheer "force of will" has been able to become a productive member of society by…working…does not negate the significant disability-related obstacles he has overcome…")

As opposed to engaging in the "interactive process," as required by the ADA[4], U.P.S. concludes that any injured employee is in fact totally disabled, and thus

---

[3] See Henderson v. Ardco, Inc., 247 F.3d 645, 650 (6th Cir. 2001), where the court discussed the interplay between "regarded as" disability claims and "100% release" policies.
[4] This process is defined in the EEOC's regulations. See 29 C.F.R. §1630.2(o)(3); see also Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 109 (1st Cir. 2005) (recognizing potential employer liability under the ADA and ch. 151B for failing to engage in an "interactive process" with employee).

completely unfit to work in any position, even if he could perform the essential functions of the job with or without accommodation.

Not only was the Plaintiff "regarded as" disabled due to the Defendant's unlawful "100% release" policy, but he was also treated as disabled near the end of his employment with U.P.S when, because of his perceived physical limitations, he was not allowed to work at U.P.S. in any capacity.

In September of 2002, due to the fact that he had been forced to work outside his medical restrictions for years, the Plaintiff's physical condition had deteriorated to the point where he failed his D.O.T. physical. Although this legally prohibited him from driving tractor trailers, it did not prevent him from performing other tasks at U.P.S., such as light duty or inside jobs. On December 16, 2002, however, a doctor told the Defendant that the Plaintiff was not fit to perform various inside jobs,[5] although he could physically do the inside job of a "small sorter."

Therefore, with respect to the position of small sorter, it is clear that the Plaintiff was a "qualified individual with a disability." 42 U.S.C. §12111. First, he was "regarded as" substantially limited in the major life activity of working because U.P.S. treated him as though he were unfit to perform a broad-class of jobs. Second, he was, in fact, able to perform the "essential functions" of the small sorter position. Therefore, as the Plaintiff had satisfied the first two elements of an ADA claim as a matter of law, U.P.S. was required to offer him the reasonable accommodation of the small sorter position, or

---

[5] See Gillen, 283 F.3d at 31 ("the mere obtaining of [a medical] opinion does not automatically absolve the employer from liability under the ADA. The employer has an obligation to ensure that its applicants are treated as individuals; thus, an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.") (internal citations omitted).

9

engage in the interactive process to determine if he could work at another position within the company.  U.P.S. did neither.[6]

### D. THE PLAINTIFF SUFFERED ADVERSE EMPLOYMENT ACTION

Courts have consistently found that "100% release," "100% healed," or "fully healed" policies violate the ADA.  McGregor, 187 F.3d at 1116 ("'100% healed' policies are per se violations of the ADA. A '100% healed' or 'fully healed' policy discriminates against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without reasonable accommodation."); Beveridge v. Northwest Airlines, Inc., 259 F. Supp. 2d 838, 848 (D. Minn. 2003) (a '[100 percent healed]' policy would ignore the individualized assessment that is required by the ADA, in favor of a categorical, generalized appraisal, and thus, would run[] afoul of the ADA."); Allen v. Pacific Bell, 212 F. Supp. 2d 1180, 1196 (C.D. Cal. 2002) (same); Hutchinson, 883 F. Supp. at 396-97 (same); Norris v. Allied-Sysco Food Services, Inc., 948 F. Supp. 1418, 1437 (N.D. Cal. 1996) (a policy which prohibits an employee from returning to work unless she can do so "without medical restrictions" would be a "per se violation of the ADA's requirement that employers reasonably accommodate employees with disabilities."); Heise v. Genuine Parts Co., 900 F. Supp.

---

[6] Any argument by U.P.S. that the collective bargaining agreement foreclosed the possibility of the Plaintiff working as a small sorter is wholly without merit.  Under the ADA, "the term 'discriminate' includes…(2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this title (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs)."  42 U.S.C. §12112.

1137, 1154 n.10 (D. Minn. 1995) ("The court notes that a '100% healed' policy is a per se violation of the ADA as such a policy does not allow for a case-by-case assessment of an individual's ability to perform the essential functions of the individual's job, with or without an accommodation.")

In addition, U.P.S. has previously been found to have such a policy, including in one very recent case. See Hohider v. United Parcel Serv., 2005 U.S. Dist. LEXIS 35911 *12-13 (D. Pa. Dec. 23, 2005) (noting that, in 2003, the EEOC found that: "Creditable [sic] Testimony has determined that [the defendant] has a 100% full medical release practice, which it has been determined is a per se violation of the ADA.")

A district court judge discussed this U.P.S. policy in detail in Hutchinson, 883 F. Supp. at 386.  In that case, the court noted that counsel for U.P.S. "conceded that at one time there had been a '100% healed' policy for return to work at UPS, but that, upon advice of counsel, UPS had dropped any such policy." Id.  It commented that "[t]he court finds it unfortunate that one of the defendants found to have a policy that constituted a per se violation of the ADA should appear again as a defendant faced with a similar charge…" Id. at 397.  Finally, the Hutchinson court held that "not only does the court believe that the '100% healed' policy of UPS would be a per se violation of the ADA, the court finds that there is a genuine issue of material fact as to whether such a policy still exists at UPS." Id.

In the case at bar, the Plaintiff's evidence of the existence of this policy and practice is direct, as well his proof of its applicability to him.  Three managers at U.P.S. with supervisory authority over the Plaintiff told him that U.P.S. has a "100% release" policy and that, if the Plaintiff insisted on abiding by his medical restrictions, he would

be put on unpaid leave. As a result, the Plaintiff was often told to bid on work outside his restrictions. Other U.P.S. employees were similarly subjected to this policy by their supervisors.

A jury would be entitled to accept this testimony regarding the supervisors' statements for the truth of the matter asserted, and would be entitled to use these statements against U.P.S. See Fed. R. Evid. 801(d)(2) (A statement is not hearsay if "[t]he statement is offered against a party and is. . .the party's own statement… [or is] a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship…"). In other words, a jury would be entitled to find that, as recently as the end of 2002, the Defendant maintained a "100% release" policy, and that the policy was applied to the Plaintiff. .

Under the ADA, the term "'discriminate' [also] includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Higgins, 194 F.3d at 264. Unlike other enumerated constructions of "discriminate," a failure to accommodate claim "does not require [proof] that an employer's action [was] motivated by a discriminatory animus directed at the disability." Id. Rather, "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability.'" Id. As such, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship[7] for its business." Id., citing 42 U.S.C. §12112(b)(5)(A).

---

[7] U.P.S. does not assert the "undue hardship" defense in its motion, and thus it is waived.

Under the ADA, the term "reasonable accommodation" includes:

> [J]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. §12111(9)(B). The evidence presented by the Plaintiff will show that, on three specific occasions, he requested two distinct reasonable accommodations. In response, the Defendant refused his requests, refused to engage in the interactive process, and refused to make any effort to find an accommodation it considered reasonable. Specifically, in each instance, the Plaintiff asked U.P.S. to modify an existing route to fit his restrictions or give him an inside job. The Defendant refused both of these requests. See Marshall v. Federal Express Corp., 130 F.3d 1095, 1099 (1997) ("if working conditions inflict pain or hardship on a disabled employee, the employer fails to modify the conditions upon the employee's demand, and the employee simply bears the conditions, this could amount to a denial of reasonable accommodation, despite there being no job loss, pay loss, transfer, demotion, denial of advancement, or other adverse personnel action. Such a scenario might be viewed as the ADA equivalent of the hostile working environment claim cognizable under other discrimination laws."). ¶35-37.

                                                Respectfully Submitted,
                                                Charlie Thornton
                                                By his attorneys

DATED: February 5, 2008                //s// Michael Tumposky
                                                Stephen Hrones
                                                BBO No. 242860
                                                Michael Tumposky
                                                BBO No. 660618
                                                Hrones, Garrity & Hedges
                                                Lewis Wharf –Bay 232
                                                Boston, MA 02110
                                                (617) 227-4019

## CERTIFICATE OF SERVICE

    I, Michael Tumposky, hereby certify that, on this the 5th day of February, 2008, I served a copy of this document, where unable to do so electronically, by first-class mail on all counsel of record in this matter.

                                                //s// Michael Tumposky
                                                Michael Tumposky