UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

CHARLES THORNTON,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀) CIVIL ACTION NO.: 05-10210-RGS
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UNITED PARCEL SERVICE, INC.,)
⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀⠀)
_____)

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

The Plaintiff opposes the Defendant's supplemental motion for summary judgment.  As grounds therefore, the Plaintiff relies upon his previously-filed oppositions and submits this memorandum of law.

## **INTRODUCTION**

The Plaintiff filed a complaint against the Defendant, United Parcel Service, Inc., alleging violations of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. and its state-law counterpart, M.G.L. ch. 151B, §4.  Specifically, the Plaintiff alleges that the Defendant maintains a policy and practice in which it requires all employees to obtain a "100% medical release" before they are allowed to return to work from injury leave or to profess they are "100% healed" before they are allowed to continue work with an injury.  This policy means that U.P.S. requires its employees to clear themselves or to be cleared by a doctor to do every function (essential or not) which the Defendant believes to be required of the particular position, without accommodation, or U.P.S. does not allow that employee to work.  Because of this "100% release" or "100% healed" policy, an injured employee must choose to either 1) go on unpaid medical leave or 2) agree to work without regard to his medical restrictions.  The Plaintiff in this case chose the latter option.

## PROCEDURAL BACKGROUND

On February 1, 2005, the Plaintiff filed his complaint against U.P.S. alleging violations of state and federal law for U.P.S.' failure to accommodate his disability.  On February 10, 2006, the Plaintiff moved to amend his complaint to include a count alleging an unlawful employment policy.  The Defendant never opposed this motion to amend, nor did it ever move to dismiss the new claim.

On May 1, 2006, the Defendant moved for summary judgment on all counts.  In its supporting memorandum, U.P.S. argued only: 1) that the Plaintiff failed to exhaust his administrative remedies; 2) that the Plaintiff's complaints were time barred; 3) that he was not disabled within the meaning of the law; and 4) that the Plaintiff's various job assignments were all within his medical limitations.  At no point did it argue in its initial motion that: 1) reassignment was not required under the ADA; or that 2) reassignment was not a permitted accommodation under state law.

On August 20, 2007, Judge Lasker denied the Defendant's motion in all respects with regards to the state law claim and granted its motion on the ADA claim only for conduct occurring after August of 2001.  One week prior to the scheduled trial date, U.P.S. filed numerous motions in limine which, rather than addressing discrete evidentiary issues, improperly sought to re-open the various legal arguments it unsuccessfully made fifteen months prior, and improperly sought to raise new arguments which it should have raised fifteen months prior.

On the basis of its examination of the record and the numerous legal issues raised, again, by the Defendant, this Court decided to re-examine summary judgment.  Since the Defendant failed to press its arguments in a timely manner, failed to prevail on these arguments in its earlier

motion and failed to demonstrate that its arguments have a factual or legal basis, this Court

should deny the Defendant's motion and set the matter down for trial.

## ARGUMENT

### I.    THE PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE THAT U.P.S. MAINTAINED AN UNLAWFUL EMPLOYMENT POLICY AND APPLIED IT TO HIM

The Plaintiff has shown that the Defendant maintained an unlawful "100% medical

release" policy requiring employees to be completely healthy—or to profess complete health—in

order to continue employment at U.P.S.[1]  Furthermore, the Plaintiff has presented sufficient

evidence that the policy was applied to him.  The Defendant contends that the Plaintiff should

not be entitled to a trial on this claim because: 1) there is no evidence the policy exists and 2)

there is no evidence he was ever prohibited from returning to work.  These contentions are both

factually inaccurate and legally unsupportable.

First, the Plaintiff has presented numerous facts showing the existence of the policy.  As

outlined in his affidavit and his initial opposition, the Plaintiff's evidence of this policy and

practice is direct.  Three managers at U.P.S. with supervisory authority over the Plaintiff told

him that U.P.S. has a "100% release" policy and that, if the Plaintiff insisted that U.P.S. abide by

his medical restrictions, he would be put on unpaid leave.  Pl. Stmnt. of Mat. Facts at ¶¶38, 39.

As a result of the policy, the Plaintiff was often forced to bid on work outside his restrictions

because U.P.S. would not make any accommodations for his injuries.  Pl. Stmnt. of Mat. Facts at

¶¶6, 19, 23, 24, 28, 30.  Other U.P.S. employees were similarly subjected to this policy by their

supervisors.  Pl. Stmnt. of Mat. Facts at ¶39.

---

[1] The Defendant has made repeated attempts to disparage the Plaintiff and his attorney by somehow suggesting that the Plaintiff, by alleging a 100% release policy, is piggybacking off of a class action lawsuit, Hohider et al. v. U.P.S., 04-cv-00363-JFC (W.D.Pa).  The class action at issue, however, was certified on July 16, 2007, seventeen months after the Plaintiff moved to amend his complaint adding the policy claim.

Taking this evidence in a light most favorable to the Plaintiff, a jury would be entitled to accept the Plaintiff's testimony regarding the supervisors' statements for the truth of the matter asserted, and would be entitled to use these statements against U.P.S. See Fed. R. Evid. 801(d)(2) (A statement is not hearsay if "[t]he statement is offered against a party and is. . .the party's own statement… [or is] a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship…"). In other words, a jury would be entitled to find that, as recently as the end of 2002, the Defendant maintained a "100% release" policy and that it was applied to the Plaintiff.

Second, even though such evidence is not necessary to sustain the Plaintiff's policy claim, the record demonstrates that the Plaintiff was precluded from working, when he was not allowed the opportunity to perform an inside job in September, 2002, and was instead forced to retire. Moreover—and more importantly—the Plaintiff's claim is not just that the "100% healed" policy was used to prevent injured employees from returning to work. Rather, it was also used to prevent injured employees from working with permanent medical restrictions. The Plaintiff has shown that, as a result of this policy, injured employees with permanent medical restrictions were either: 1) forced onto unpaid medical leave or 2) were required to work as if they did not have these restrictions.

The Plaintiff falls into the second category. As he was repeatedly informed he could not come to work with permanent restrictions, he decided to forgo his limitations and bid on whatever jobs were available. Just because the policy may have been applied to other employees in a slightly different fashion than to the Plaintiff, does not mean that the other employees' testimony regarding the existence of the unlawful policy is irrelevant, nor does it mean that the

policy was not applied to the Plaintiff.  If the Defendant believes the policy was not applied to the Plaintiff, it can argue that fact to the jury.

The Defendant, citing <u>Teamsters</u> v. <u>United States</u>, 431 U.S. 324, 336 (1977), further argues that the Plaintiff's policy claim fails because he has not presented any expert or statistical evidence.  The Plaintiff's allegation, however, is not that U.P.S. engaged in a mathematically provable pattern of discrimination against its entire workforce; but rather, it is simply a claim that U.P.S. had a policy that was unlawful and that the policy was applied to the Plaintiff.  Whether this is technically a separate claim or simply another theory of recovery under the ADA is of no import.  If the Defendant had an unlawful policy and applied it to the Plaintiff, it is liable.[2]

Nonetheless, the Plaintiff has presented evidence that disability discrimination was rampant at U.P.S.  The "person most knowledgeable" about the ADA at U.P.S., Holly Manzo, claimed that when she received reports regarding injured employees, she referred them to her supervisor to determine if an accommodation was needed.  Pl. Stmnt. Mat. Facts at ¶¶14, 17.  She only remembered one instance in which U.P.S. actually made an accommodation.  It did not involve an injured employee, but rather an individual who had difficulty seeing his computer screen.  She did not recall any ADA referrals pertaining to the Plaintiff since 1992.  In fact, Manzo could not recall any employee who, upon returning to work from injury leave, had ever been given an accommodation.  <u>Id.</u>

The evidence in the record shows that U.P.S. never accommodated disabled employees, that it specifically admitted to the Plaintiff it maintained an unlawful employment policy, and

---

[2] The Defendant takes issue with the Plaintiff's citation to cases in which the defendants ultimately prevailed on other grounds.  <u>See</u> Def. Supp. Memo at 16, n.8.  Tellingly, however, it does not dispute the fact that a "100% release" policy is a per se violation of the ADA or that U.P.S. has previously admitted to the existence of such a policy.  Its only explanation for the pending class action is that the district court's certification order has been "stay[ed] pending appeal."

that it used that policy to deny accommodations to the Plaintiff. As such, the Plaintiff has raised a material dispute of fact as to this claim.

## II.    PLAINTIFF WAS DISABLED WITHIN THE MEANING OF THE ADA

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2). The Plaintiff is disabled under prong "A" of the statute because he has physical impairments which substantially limit him in the major life activities of walking, eating, sleeping, sitting, lifting, learning, caring for himself and performing manual tasks. Pl. Stmnt. of Mat. Facts at ¶41. Furthermore, he also qualifies under prong "C" because U.P.S. "regarded" the Plaintiff as substantially limited in the major life activity of working. Pl. Stmnt. of Mat. Facts at ¶¶36-39.

### A.  THE PLAINTIFF WAS ACTUALLY DISABLED

The Plaintiff was substantially limited in several major life activities at the time that he requested, and was denied, accommodation by U.P.S. In paragraph 27 of his affidavit, attached to his L.R. 56.1 Statement of Material Facts at Exhibit A, the Plaintiff explained how he is, and was, substantially limited in his ability to walk and sit:

> 27. The back injuries I described above substantially limited my ability to walk and sit. After a mere half-hour of walking, I required a twenty-minute break before I could resume. In addition, I could only sit for ninety minutes, at the most. After ninety minutes, I would be in severe pain if I did not stand up and stretch.

In ¶28, he similarly explained how the corrective measures he employs to manage the pain caused further limitation in his ability to sleep, eat, learn and control the elimination of his bodily waste:

> 28. These injuries required me to take heavy pain medicine such as Tamiflu, Oxycontin (when I was out of work), Percoset, and Divorset. These medicines imposed further substantial limitations on my ability to eat, sleep, relieve myself, and concentrate. When

6

taking these medicines I had no appetite, I was constipated, had difficulty focusing and I was often excessively drowsy when I first awoke. As a result of this drowsiness, it took me an extra sixty to ninety minutes to get ready for work in the morning.

See Sutton, 527 U.S. at 482 ("The court must also take into account the effects of mitigating or corrective measures when judging whether a person is substantially limited in a major life activity."); Ryan v. Grae & Rybicki, 135 F.3d 867, 871 (2d Cir. 1998) ("assuming without deciding that the ability to control one's elimination of waste is a major life activity.")

In ¶29 and ¶30, the Plaintiff describes how he is, and was, limited in performing manual tasks, in caring for himself, and in lifting, due to his shoulder and hand injuries:

29. The shoulder injuries I described above substantially limited my ability to lift and to manipulate small objects because it caused pain and numbness to radiate down my arm. As a result, I would often drop drinking glasses, I had difficulty brushing my teeth, and it was difficult for me to hold a knife and fork. In fact, I often had to grab small objects with two hands. In addition, because I have to use my non-dominant hand, it takes me twice as long to brush my teeth.

30. The hand injuries described above were also limiting. Although I had surgery on my hand in 1998, there was lingering weakness and numbness. These symptoms caused limitations similar to those caused by my shoulder injury. In addition, although I am right-handed, my right hand has half the strength of my left due to my injuries.

This Plaintiff's statements are clearly supported by medical documentation, which demonstrates serious injuries to his back, shoulders and hand. Pl. Stmnt. of Mat. Facts at ¶¶7, 9, 11, 15, 32, 33, 36. Furthermore, the doctor conducting the D.O.T. examination determined that his injuries are permanent and non-remedial. Pl. Stmnt. of Mat. Facts at ¶36.

The crux of the Defendant's argument is that none of the job limitations[3] provided to U.P.S. rose to the level required of a disability under the ADA. Such an argument not only misstates the record and but also betrays a deep misunderstanding of the statute.[4]

---

[3] This Court has found that a lifting restriction alone qualifies a plaintiff as disabled. See Clark v. Lincare, Inc., 2005 U.S. Dist. LEXIS 14794 (D. Mass. 2005) (finding that plaintiff was "disabled" because he was unable to lift more than thirty five pounds)

In determining whether an individual is disabled under the ADA, the question is not how a plaintiff's impairments affect his job performance, but rather how it affects his everyday life. See, e.g., Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 200-01 (2002) ("When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.") Thus, the analysis of whether a plaintiff is "disabled" must be done without reference to his employment capabilities, unless the plaintiff is claiming a limitation in the life activity of working.[5] Ocean Spray Cranberries, Inc. v. Mass. Comm'n Against Discrimination, 441 Mass. 632, 638 (2004) (error to consider plaintiff's disabilities in the context of how it affected his work performance).

The purpose of the medical documentation, cited by U.P.S. in its motion, was to determine whether the Plaintiff's ability to do his specific job was limited in some way, exactly the inquiry that Toyota says is irrelevant for the purpose of analyzing disability under the ADA. Nevertheless, contrary to the Defendant's admirable attempt to downplay the severity of the Plaintiff's injuries, U.P.S. was aware of the significant physical limitations that the Plaintiff faced on a day to day basis.

For example, in May of 2000, the Plaintiff complained to management that he had pain in his shoulder.  U.P.S. scheduled him for an exam with their physician, Dr. Albert Franchi, on May

---

[4] It also suggests willful blindness on the part of the Defendant, as it refuses to engage in the interactive process so it can preserve the later defense that the Plaintiff never presented with any disabilities.

[5] Normally, such capabilities would come into play under the second element of an ADA claim: whether the employee can perform "the essential functions" of the job with or without accommodation.  42 U.S.C. §12111.  In this case, the Defendant concedes that the Plaintiff could perform the essential functions of his position.  See Def. First Sum. Judg. Memo at 19.  Thus, if the Plaintiff is "disabled" under the ADA, then he is certainly a "qualified individual with a disability."  42 U.S.C. §12111.

9, 2000.  Dr. Franchi diagnosed Mr. Thornton with chronic ulnar nerve neuropathy on the right

side and severe nerve impingement of the right shoulder.  Pl. Stmnt. of Mat. Facts at ¶7.

On January 20, 2001, Mr. Thornton underwent a medical evaluation at the request of

U.P.S. related to a worker's compensation claim from the previous summer.  As a result of that

exam, Dr. Richard Hawkins diagnosed the Plaintiff with "a lumboscral strain with history of

degenerative disk disease, rotator cuff strain, right shoulder with impingement syndrome, [and]

carpal tunnel syndrome..." Pl. Stmnt. of Mat. Facts at ¶15.

Given the Plaintiff's extensive medical history and the limitations resulting from his

permanent injuries, the Defendant's claim that the Plaintiff was not actually disabled is simply

without merit.  Therefore, the Court should deny its motion for summary judgment on this

ground.

### B.  U.P.S. REGARDED THE PLAINTIFF AS DISABLED

Not only was the Plaintiff substantially limited in several major life activities, but U.P.S.

"regarded" the Plaintiff as being substantially limited in the major life activity of "working," thus

giving him an alternative basis for his claim that he is "disabled."[6]  A plaintiff may assert a

"regarded as" claim when "(1) [an employer] mistakenly believes that a person has a physical

impairment that substantially limits one or more major life activities, or (2) [an employer]

mistakenly believes that an actual, nonlimiting impairment substantially limits one or more

major life activities."  Sutton, 527 U.S. at 489.  These misperceptions often "resul[t] from

stereotypic assumptions not truly indicative of . . . individual ability."  Id.

In the case at bar, U.P.S. regarded the Plaintiff as disabled in the major life activity of

working in two distinct ways.  First, by maintaining a "100% release" policy, U.P.S. essentially

---

[6] Employees "regarded as" disabled are entitled to as much accommodation as employees who are actually disabled.
See, e.g., Katz v. City Metal Co., 87 F.3d 26, 32 (1st Cir. 1996); see also Williams v. Phila. Hous. Auth. Police
Dep't, 380 F.3d 751, 773 (3d Cir. 2004) (collecting cases).

treated every employee with a medical restriction, including the Plaintiff, as being unable to work in any function at U.P.S. See Henderson v. Ardco, Inc., 247 F.3d 645, 650 (6th Cir. 2001) (discussing the interplay between "regarded as" disability claims and "100% release" policies.) Second, during the time leading up to the Plaintiff's retirement, the Defendant mistakenly concluded that the he was medically unfit to perform a broad class of jobs, when in fact there were positions at U.P.S. he could have physically performed. Pl. Stmnt. of Mat Facts at ¶¶36, 37.

The Defendant does not address this prong of the statute in its supplemental motion for summary judgment. As such, rather than duplicating his earlier arguments in their entirety, the Plaintiff refers the Court to his initial opposition to the Defendant's first motion for summary judgment.

### III.    THE DEFENDANT IS LIABLE FOR DAMAGES UNDER THE ADA AND STATE LAW FROM 2000 TO THE PRESENT

#### A.  THE PLAINTIFF IS ENTITLED TO RECOVER FOR POST-CHARGE CONDUCT UNDER THE ADA

On cross-motions for summary, Judge Lasker determined that the Plaintiff could recover for acts that occurred after he filed his administrative charge, up through and including his "retirement," because the later acts were encompassed by the "scope of the investigation rule." See Memorandum and Order at 5-6. Specifically, Judge Lasker ruled that, under ch. 151B "Thornton's allegations of additional failures to accommodate and adverse employment actions [(post August, 2001)] are merely further instances of the same type of alleged discrimination and fall squarely within the scope of the investigation rule." See Memorandum and Order at 6.

Citing AMTRAK v. Morgan, 536 U.S. 101, 114 (2002) and Ledbetter v. Goodyear Tire & Rubber Co., 127 S. Ct. 2162, 2175 (2007), however, Judge Lasker ruled that the law for the

ADA claim was different.  Therefore, he dismissed Plaintiff's post-charge claims under the

ADA, even though he had allowed them to go forward under state law.  Respectfully, Judge

Lasker misinterpreted <u>AMTRAK</u> and <u>Goodyear</u>.  Those cases dealt with whether a plaintiff can

recover for acts which occur long *before* he files his administrative charge.  The issue in this

case, decided by the judge in the Plaintiff's favor, was whether the Plaintiff could recover under

the ADA for acts which occurred *after* he filed his charge.

Given Judge Lasker's ruling that U.P.S.' post-charge conduct fell under the "scope of the

investigation rule," the Plaintiff should be entitled to recover for post-charge conduct under both

the ADA and ch. 151B.[7]

**B.  THE DEFENDANT FAILED TO ACCOMMODATE THE PLAINTIFF'S
DISABILITY BY REFUSING TO MODIFY THE NON-ESSENTIAL
FUNCTIONS OF ANY EXISTING JOB WITHIN THE PLAINTIFF'S
CLASSIFICATION OR REASSIGNING THE PLAINTIFF TO A JOB
WITHIN HIS RESTRICTIONS**

In addition to discriminating against the Plaintiff through the maintenance and

application of its 100 % release policy, <u>see</u> Section I, <u>supra</u>, U.P.S. is also liable to the Plaintiff

for its repeated failure to accommodate his request for job modification or reassignment.  42

U.S.C. §12111(9) ("The term 'reasonable accommodation' may include--…job restructuring,

part-time or modified work schedules, reassignment to a vacant position…and other similar

accommodations for individuals with disabilities.")  The burden is on the Defendant to

demonstrate that a requested accommodation would cause an undue hardship to its business.

<u>Higgins</u> v. <u>New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 264 (1st Cir. 1999).

The Defendant first contends that it did not discriminate because the Plaintiff "chose" his

routes."[8]  <u>See</u> Def. Supp. Memo at 8.  This concept of "choice" is flawed <u>ab</u> <u>initio</u>, because the

---

[7] Although the Plaintiff would be content to the leave the parties where they stood after Judge Lasker's decision, if
this Court is inclined to re-open the matter, it is only fair to also re-examine areas in which the judge may have erred
in the Defendant's favor.

choice itself is from the routes designed and arranged by U.P.S. management. U.P.S. creates the routes and the corresponding duties involved. To assert that the Plaintiff had the complete freedom to "choose" a job within his medical restrictions is misleading since he was restricted by what jobs were actually available, and, in fact, there were often no jobs within his limitations.

The fact that the Plaintiff "chose" to work outside his restrictions rather than go on unpaid medical leave simply has no effect on his claim that U.P.S. failed to accommodate him. Even if the Plaintiff "chose" his particular route, this does not relieve U.P.S. from the requirement of making a reasonable modification to that route if necessary. Furthermore, the Plaintiff cannot be faulted because he instead "chose" to work and to endure the resulting physical pain. See Emory v. AstraZeneca Pharms, 401 F.3d 174, 181 (3d Cir. 2005) (the fact that a plaintiff, through sheer "force of will" has been able to become a productive member of society by…working…does not negate the significant disability-related obstacles he has overcome…")

Under the Defendant's logic, a driver who bids on his route has essentially waived any claim that the route is beyond his physical limitations. If this Court accepts the Defendant's argument that a plaintiff who "chooses" his job assignments cannot pursue a reasonable accommodation claim, then the Court will be insulating U.P.S. from virtually all ADA liability. Instead, the Court should see through the Defendant's transparent attempt to shield itself from liability and should find that the mere offering of a "choice" of jobs does not relieve an employer from at least attempting to find an accommodation for a disabled employee.

---

[8] The Defendant also incredibly contends that, in March, 2001, the Plaintiff's manager Kenneth Mundry was "concern[ed]" that the Buffalo route was beyond the Plaintiff's limitations. See Def. Supp. Memo at 9-10; Pl. Stmnt. Mat Facts at ¶24. Mundry has claimed that, at the Plaintiff's request, U.P.S. agreed to waive his medical restrictions so he could bid on the Buffalo route. Manzo had never heard of anyone at U.P.S. ever agreeing to "waive" medical restrictions. Id.

U.P.S. also points to passages in the Plaintiff's deposition where he "admits" that he

"could" perform the jobs that he bid, essentially contending that it cannot be held liable where an

employee is able perform his job.  See Def. Memo at 8.  This argument turns the ADA on its

head.  It is not a defense to an ADA claim that an employee can perform his job, rather it is one

of the elements that the Plaintiff must prove.  The Plaintiff's testimony that he could do the

Chelmsford-Buffalo route does not mean that it was medically wise for him to do so.[9]  It merely

supports his claim that he is a qualified individual with a disability.  See 42 U.S.C. §12111(8)

("The term 'qualified individual with a disability' means an individual with a disability who,

with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires.")

In fact, this identical argument was rejected by the SJC in Ocean Spray, where the Court

understood that the mere fact a disabled employee could perform his job does not mean he would

not be entitled to an accommodation:

> As a preliminary matter, we reject Ocean Spray's contention that the fact that [the plaintiff] had been performing his job without accommodation conclusively demonstrates that he needed no accommodation. …Although [the plaintiff] may have been able to perform the essential functions of his position without accommodation (albeit with great difficulty), he was not able to do so under equal terms and conditions… [The plaintiff] took significantly longer to do his repair work, and worked under 'considerable stress' that posed a specific and significant risk to his [health].  In these circumstances, [the plaintiff] was entitled to request a reasonable accommodation and his employer was 'obligat[ed] to participate in the interactive process of determining one.'

See Ocean Spray, 441 Mass. at 648-49.

## C.  THE STATE LAW CLAIMS ARE NOT TIME BARRED

The state law claims are timely because U.P.S. engaged in systemic and serial

discrimination continuing into the statutory period (post-February, 2002).  See DeNovellis v.

---

[9] In fact, the Plaintiff testified that he took whatever jobs he thought were the least taxing physically.  See Plaintiff's Affidavit, ¶13.

Shalala, 124 F.3d 298, 307-08 (1st Cir. 1997) ("A continuing violation allows a plaintiff not only

to allege otherwise time-barred acts, but more concretely, to receive damages, such as back pay,

based on and reaching back to those acts.")

The Defendant engaged in a serial violation as evidenced by three discriminatory acts, the

last of which occurred during the limitations period.  In February, 2001 and the Fall of 2001, the

Plaintiff became concerned that the Chelmsford-Worcester route would now include "doubles,"

or heavy lifting.  In both instances, he asked for an accommodation, a job modification, so that

he would not have to lift the 70-90 pounds often required of the drivers of those routes.  As an

alternative, he asked for reassignment to an inside job, which was not as rigorous.  The

Defendant informed the Plaintiff in both instances that neither accommodation would be made.

It did not engage in any further discussions with him about his disabilities or possible

accommodations.  Pl. Stmnt. Mat. Facts ¶¶18-20, 22, 29, 30.

A similar pattern played out in September, 2002, when the Defendant, injured as a result

of working outside his restrictions for years, requested to switch to part time, or requested a

reassignment to an inside job.  Again U.P.S. refused his request and refused to engage in the

interactive process to determine if another accommodation was possible which would allow him

to continue working.  Pl. Stmnt. Mat. Facts ¶¶32-27; see also Ocean Spray, 441 Mass. at 644 ("It

is the employee's initial request for an accommodation which triggers the employer's obligation

to participate in the interactive process of determining one….The refusal of an employer to

participate in that process once initiated, or to make a reasonable accommodation once it has

been identified, is a violation of our discrimination laws.") (internal citations omitted).

The first two instances of discrimination were sufficiently similar to the September, 2002[10] incident so as to trigger the serial violations doctrine.  All three instances involved failures to accommodate (either through modification or reassignment) and all three involved a failure to engage in the interactive process, which is itself a violation of the law.  .

In addition to its serial violations of disability laws, the Defendant also engaged in a systemic violation because it maintained a per se unlawful employment policy which continued into the limitations period.  See Section I, supra.  In circumstances such as this, summary judgment on pre-limitations claims is inappropriate "[u]nless there are no material facts in dispute...as to whether a continuing violation occurred."  O'Rourke v. City of Providence, 235 F.3d 713, 727 (1st Cir. 2001).

## CONCLUSION

Therefore, the Plaintiff respectfully requests that this Court deny the Defendant's motion in its entirety and allow the Plaintiff's case to proceed to trial on all claims.

Respectfully Submitted,
Charlie Thornton
By his attorneys

DATED: March 17, 2008                    //s// Michael Tumposky
Stephen Hrones
BBO No. 242860
Michael Tumposky
BBO No. 660618

---

[10] Even if the Defendant had no duty to reassign the Plaintiff to a vacant position under state law, it would still be liable for the Plaintiff's lost wages because he has presented sufficient evidence that the Defendant's repeated failure to accommodate caused his injuries to worsen and eventually resulted in his total disability.  See Blockel v. J. C. Penney Co., 337 F.3d 17, 27 (1st Cir. 2003) ("Compensatory damages may include those that make 'the aggrieved party whole…including those which are the natural and probable consequences . . . of the illegal conduct….When an employee's total disability is caused by an employer's failure to reasonably accommodate her, the loss of employment can be an element of special damages that the jury may consider in fashioning a remedy for the failure to accommodate.")  Specifically, the Plaintiff's injury on his trip to Buffalo in March, 2001, and the fact that his medical condition deteriorated dramatically between September, 2001 and 2002 suggest that the damage caused by working beyond his physical limitations finally caught up to him.

Hrones, Garrity & Hedges
Lewis Wharf –Bay 232
Boston, MA 02110
(617) 227-4019

### CERTIFICATE OF SERVICE

I, Michael Tumposky, hereby certify that, on this the 17th day of March, 2008, I served a copy of this document, where unable to do so electronically, by first-class mail on all counsel of record in this matter.

<u>//s// Michael Tumposky</u>
Michael Tumposky

16