UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

05-CV-10210-RGS

CHARLES THORNTON,

v.

UNITED PARCEL SERVICE INC.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT

July 21, 2008

STEARNS, D. J.

Charles Thornton brought parallel federal and state causes of action against his employer, United Parcel Service Inc. (UPS), under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, and the Massachusetts Anti-Discrimination Law, Mass. Gen. Laws ch. 151B. Thornton alleges that UPS discriminated against him by failing to accommodate an injury to his shoulder and back. After discovery, UPS sought summary judgment on all counts of Thornton's Amended Complaint.[1] UPS maintained, *inter alia,* that Thornton failed to meet the definitions of "disabled" under federal and state law. Thornton countered by seeking a declaration that he is in fact disabled.

Judge Lasker allowed UPS's motion in part and denied Thornton's cross-motion for declaratory judgment. The case was then transferred to this session and given a trial date. At the pretrial conference, after hearing further argument from the parties, the court

---

[1] Thornton's Amended Complaint alleges ADA "disability discrimination" (Count I), ADA "policy and practice discrimination" (Count II), Chapter 151B "handicap discrimination" (Count III), and Chapter 151B "policy and practice discrimination" (Count IV).

continued the trial and agreed to revisit the parties' earlier dispositive motions. The parties were granted leave to submit additional briefing.

## BACKGROUND[2]

UPS hired Thornton in February of 1968. From the early 1980s, until his retirement in 2002, Thornton worked as a "feeder driver." A feeder driver transports packages in bulk between UPS facilities. Thornton was one of more than a hundred UPS feeder drivers based in Chelmsford, Massachusetts. A feeder driver's job is classified as "single" or "double." A single driver hauls one trailer and need not do heavy lifting. A double driver hauls two trailers and is required to lift a seventy-pound dolly when unhitching the trailers.

The terms of Thornton's employment were governed by a collective bargaining agreement (CBA) between the Teamsters Union and UPS. Under the CBA, a feeder driver was permitted to bid annually on his or her choice of jobs. Bidding was reopened at times during the year as UPS's business needs changed. Jobs were awarded according to a driver's seniority. Thornton's 1968 seniority date gave him priority over most other drivers.

In 2000, Thornton successfully bid on a single driver's job that required a daily run from Chelmsford to the Worcester Rail Yard. In the spring of 2000, Thornton experienced pain in his right shoulder. He agreed to see Dr. Albert Franchi, a UPS medical examiner. Dr. Franchi diagnosed Thornton with chronic ulnar nerve neuropathy and a severe nerve impingement of his right shoulder. Dr. Franchi determined that Thornton required right shoulder surgery and should not in the meantime drive a tractor trailer. On July 10, 2000,

---

[2]The facts are taken from the parties' L.R. 56.1 statements of undisputed material facts and are supplemented by undisputed facts that have support in the record. All facts are viewed in the light most favorable to the non-moving party.

Thornton's personal physician, Dr. George Kasparyan, agreed that surgery was needed, but was of the opinion that Thornton could continue driving. On July 11, 2000, after a second examination, Dr. Franchi cleared Thornton to resume driving after three additional weeks of rest. On July 26, 2000, Dr. Kasparyan changed his mind and revoked Thornton's clearance to drive.

Thornton wanted to return to work. He filed a grievance under the CBA's "third doctor" provision.[3] As a result, UPS submitted a list of unaffiliated doctors to the Union. Thornton chose Dr. Ralph Wolf as the "tie-breaker." Dr. Wolf examined Thornton and decided that he could drive.[4] On September 18, 2000, Thornton resumed driving the route from Chelmsford to the Worcester Rail Yard.[5]

Shortly after Christmas in 2000, UPS reopened the bidding on drivers' jobs. Thornton successfully bid on the Chelmsford-Worcester-Hartford single trailer route.[6] On January 20, 2001, Dr. Richard Hawkins examined Thornton and diagnosed "a lumbosacral strain with history of degenerative disk disease, rotator cuff strain, right shoulder with impingement syndrome [and] carpal tunnel syndrome, right wrist, status post carpal tunnel

---

[3]The CBA provides that when two physicians disagree as to a medical restriction, a third doctor is to be chosen to resolve the dispute.

[4]After discussions with the Union, UPS paid Thornton the difference between what he would have earned during this time period and what he actually received in workers' compensation pay. Thornton Dep. at 42-43.

[5]In September 20, 2000, Thornton took his annual Department of Transportation (DOT) physical. He was recertified, but cleared to "drive a tractor trailer only."

[6]Thornton discussed this choice with UPS and was informed that the job had no medical restrictions.

3

release." Despite this litany of ailments, Dr. Hawkins concluded that Thornton was not disabled. However, he recommended that the medical restrictions, including a ban on heavy lifting, remain in place. In Dr. Hawkins's judgment, the restrictions had been "effective in allowing [Thornton] to continue to work on a regular basis."

For the 2001 bid round, Thornton submitted five route preferences. Thornton's first two choices were for "sleeper teams," long haul double trailer jobs that required a rotating team of two drivers. Because Thornton was unable to find a partner, he could not perfect the bid on his first and second choice of routes. Thornton's third choice was his existing Chelmsford-Worcester-Hartford single trailer route. According to Thornton, the job description for that route had been changed (without notice) to require heavy lifting.[7] Thornton's fourth and fifth choices were also single trailer jobs. Thornton did not bid on any of the remaining routes because they required physical tasks (the nature of which he has no memory) that he could not perform.

Kenneth Mundry gave Thornton permission to submit a revised bid.[8] Thornton's first choice was the Chelmsford to Philadelphia route,[9] a "premium job" with a three and one-half day work week. Thornton explained that he bid on and accepted this route because

---

[7]This is disputed. UPS insists that the lifting restriction did not prevent Thornton from driving the Chelmsford-Worcester-Hartford route because the job did not require any significant lifting. In his deposition, Thornton stated that UPS informed him shortly before the 2001 bidding that because of a change in the Chelmsford-Worcester-Hartford route, it was "no longer within [his] limitation." Thornton Dep. at 77.

[8]Mundry was the Feeder Driver Manager from 1998 until 2001.

[9]UPS refers to this route as the Chelmsford to Philadelphia route while Thornton describes it as the Buffalo route. The court will adopt Thornton's more concise description.

of the routes available, "it was the best job with [his] restrictions." While Mundry had doubts about Thornton's ability to lift heavy objects, he was more chary of the Union's insistence that the CBA's seniority provisions required UPS to grant Thornton his first choice of jobs. Mundry conferred with Bob Ritchie (the UPS North New England District Labor Manager) and Holly Manzo (the UPS Northeast Region Case Manager Supervisor). The group collectively decided that Thornton would be given the Buffalo route with another UPS employee assigned to lift the hitching dolly.

In February or March of 2001, Thornton requested an "inside job" as an operations clerk, pre-loader, or car washer. UPS denied the request. According to UPS, Thornton could have bid earlier on an inside job, but he chose to bid on the Buffalo route instead. Under company policy, an employee is permitted to "go from a high rate of pay to a lower rate of pay only during the annual bid."[10]

Thornton suffered a "back spasm" on March 5, 2001, during his second day driving the Buffalo route. After a week of treatment, Dr. Wolf cleared Thornton to return to work but imposed further restrictions, including a break every ninety minutes, a thirty-pound limit on lifting, a nine-hour maximum workday, and a ban on any repetitive physical exertion. Upon his return, Thornton opted for the Chelmsford-Worcester-Hartford route that he had driven prior to the Buffalo route. On June 20, 2001, UPS eliminated the Hartford leg from the route and re-bid the job. Thornton submitted the winning bid.

On November 12, 2001, Dr. Wolf reexamined Thornton and decided that the previously imposed work restrictions were no longer necessary. Thornton did not seek a

---

[10]Mundry Dep. at 80-81.

second opinion. He asked UPS for an inside job, but was again turned down. As a result, Thornton re-bid the Buffalo route. A concerned Mundry contacted Rich Reardon (the Union Business Agent), and the UPS Health and Safety Department. After discussing the issue they decided to award the job to Thornton and, despite the lifting of medical restrictions, to assign other UPS employees to lift the dolly.

During the 2002 round, Thornton bid again on the Buffalo route. On September 16, 2002, Thornton failed his Department of Transportation (DOT) physical. As a result, he lost his certification to work as a feeder driver. Thornton formally retired from UPS in late 2002. He applied for and received Social Security Disability Benefits in the fall of 2002. He also filed a workers' compensation claim, and in July of 2003, received a lump sum settlement.

Procedural History

On July 27, 2000, the day after Dr. Kasparyan revoked his medical clearance, Thornton filed a charge against UPS with the Massachusetts Commission Against Discrimination (MCAD).[11] The charge alleged disability and age discrimination. On December 16, 2002, the MCAD notified Thornton of its finding of lack of probable cause. The charge was subsequently dismissed.

---

[11] Thornton had filed a discrimination claim against UPS in 1995, complaining that he had not been allowed to return to his feeder driver's job when a DOT examination revealed that he had been taking a prescription drug for back pain. Thornton alleged in the MCAD charge that UPS had denied him a reasonable accommodation and had retaliated against him by "constantly changing the requirements to be met in order for [Thornton] to return to work." Other than establishing that UPS knew that Thornton had had back problems earlier in his career, the 1995 charge has no apparent relevance to this lawsuit.

On August 30, 2001, Thornton filed a second charge with the MCAD alleging that UPS had misinterpreted his medical restrictions and had assigned him to routes for which he was physically unqualified. Thornton alleged that his March 5, 2001 injury (while working the Buffalo route) had happened "because of extensive driving." On November 20, 2003, the MCAD again found lack of probable cause and dismissed the charge. The MCAD concluded that Thornton had voluntarily chosen the Buffalo route and that there was no evidence of an adverse employment action on the part of UPS.

On November 4, 2004, the Equal Employment Opportunity Commission (EEOC) notified Thornton that it had adopted the MCAD's lack of probable cause finding, and that he had ninety days in which to file suit. (The EEOC had earlier adopted the MCAD's finding with regard to the 2000 charge).

Thornton filed this lawsuit on February 1, 2005, alleging that UPS had violated the ADA and Mass. Gen. Laws ch. 151B, § 4(16), in the following respects: (1) a failure between 2001 and September 2002 to offer Thornton an accommodation with a maximum lifting restriction of thirty pounds and a ninety-minute limit on driving without a break or, in the alternative, to offer him an "inside" job; (2) a failure to honor his medical restrictions and offer him a less demanding job either "inside" or as a driver between February of 2001 and September 16, 2002; (3) discrimination based on his shoulder and back injuries; (4) a failure to offer him a reasonable accommodation because of an unlawful company policy requiring employees to obtain a "100% medical release" before being allowed to return to work after a medical leave; and (5) forcing Thornton by virtue of the "100% medical release" policy to bid on jobs incompatible with his disability. See Amend. Cmpl. ¶¶ 49-53.

DISCUSSION

A district court grants summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. R. 56(c); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52-53 (1st Cir. 2000). A party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue as to a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmovant in turn bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). "The mere existence of a scintilla of evidence is insufficient to defeat a properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Consequently, "a party opposing summary judgment must present definite, competent evidence to rebut the motion." Torres v. E.I. Dupont De Nemours & Co., 219 F.3d 13, 18 (1st Cir. 2000) (internal quotations and citations omitted).

The principal argument advanced by UPS on summary judgment involves the statute of limitations.[12] As a prerequisite to the filing of a civil suit under Title I of the ADA, a plaintiff must comply with the administrative procedures set out in Title VII of the Civil Rights Act, 42 U.S.C. § 2000e. See 42 U.S.C. §§ 12101-12213; Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277-278 (1st Cir. 1999). These require that a plaintiff file an

---

[12]Perhaps more accurately, the argument is one of Thornton's failure to exhaust his administrative remedies.

8

administrative charge with the EEOC within 180 days of an alleged act of discrimination. If the plaintiff initially proceeds in a timely fashion with the MCAD, he has an additional 120 days to file a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1). When this stand-still period (which is intended to permit the exploration of a possible administrative conciliation) expires, a plaintiff may request a right-to-sue letter from the EEOC. A lawsuit may be filed only after receipt of the EEOC letter. See 42 U.S.C. § 2000e-5(f)(1); Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005). A plaintiff has 90 days after the issuance of the letter to file suit. 42 U.S.C. § 12117(a); 42 U.S.C. §§ 2000e-5(f)(1). The 90-day period is jurisdictional and a failure to file within the allotted time is (almost) always fatal. Basch v. Ground Round, Inc., 139 F.3d 6, 9 (1st Cir. 1998).

      Thornton did not seek a right-to-sue letter from the EEOC after the MCAD found a lack of probable cause with regard to the July 2000 charge. His second filing with the MCAD in August of 2001 alleged that UPS had discriminated against him by "constructively coercing" him into bidding on the Buffalo route. Again the MCAD found lack of probable cause and the charge was dismissed. Thornton did not file any subsequent charge with the MCAD or the EEOC and is therefore precluded from litigating any allegedly discriminatory act that occurred after August of 2001. To allow a plaintiff "to allege one thing in the administrative charge and later allege something entirely different in a subsequent civil action would frustrate the very purpose of the administrative procedure,

i.e., to put the employer on prompt notice of the alleged wrong and to create an opportunity for early conciliation." Lattimore v. Polaroid Corp., 99 F.3d 456, 464 (1st Cir. 1996).[13]

In Ledbetter v. Goodyear Tire & Rubber Co., Inc., __ U.S. __, 127 S. Ct. 2162, 2175 (2007), and National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), the Supreme Court held that for purposes of federal employment discrimination law the EEOC limitations period begins to run "at the first discrete act of discrimination." See Ledbetter, 127 S.Ct. at 2168 ("We pointed to 'termination, failure to promote, denial of transfer, [and] refusal to hire' as examples of such 'discrete' acts, and we held that a Title VII plaintiff 'can only file a charge to cover discrete acts that 'occurred' within the appropriate time period.'"). Accordingly, Thornton's claims under the ADA (Counts I and II) are confined to acts described in his 2001 MCAD charge that occurred during the period 300 days prior to August 30, 2001 (that is, after November 3, 2000).[14] In the charge, Thornton made the following allegations:

> I have been employed with United Parcel Service for approximately thirty-three years. I suffer from chronic lower back pain. After being on light duty

---

[13] The only exception is when, despite a looseness of language in a plaintiff's administrative charge, the undisclosed discriminatory act would reasonably have been expected to come to light during the MCAD investigation. See Davis v. Lucent Techs., Inc., 251 F.3d 227, 233 (1st Cir. 2001) ("[T]he scope of the investigation rule reflects the idea 'that the scope of a civil action is not determined by the specific language of the charge filed with the agency, but rather, may encompass acts of discrimination which the MCAD investigation could reasonably be expected to uncover.'"). As will be seen, Thornton's 2001 administrative charge bears no resemblance to the bulk of the allegations in his Amended Complaint.

[14] "Federal courts should not apply equitable tolling liberally to extend time limitations in discrimination cases. . . . In a nutshell, equitable tolling is reserved for exceptional cases." Chico-Velez v. Roche Prods., Inc., 139 F.3d 56, 58-59 (1st Cir. 1998).

10

> (driving only), I went for a check-up exam and received a review from the doctor saying that my light duty was still active. UPS interpreted the note as saying that I can do anything except lifting heavy things. They began to give me more duties as a result of this. On 3/05/01, I was sent to Buffalo on a duty. While in Buffalo, because of the extensive driving, I needed to seek medical attention immediately. I believe that I was discriminated against because my disability restrictions were misinterpreted and I was doing jobs that I was not physically able to do.

Pl. Ex. W.

Counts I and II under the ADA

An ADA plaintiff bears the burden of establishing a prima facie case of disability discrimination. See Gillen v. Fallon Ambulance Serv., 283 F.3d 11, 29-30 (1st Cir. 2002). To satisfy this burden, Thornton must prove that: (1) he was disabled within the meaning of the ADA; (2) he was able to perform the essential functions of his job with or without accommodation; and (3) he was discharged or adversely affected, in whole or in part, because of his disability. See Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 82 (1st Cir. 2008). Thornton has failed to meet the first and third elements of his prima facie ADA case.

Disabled Under the ADA

Under the ADA, having an impairment does not make one *per se* disabled. See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002). A person is disabled under the ADA if he: (a) has a physical or mental impairment that substantially limits one or more of his major life activities; (b) has a record of such an impairment; or (c) is regarded as having such an impairment. Id. at 195; 42 U.S.C. § 12102(2). See also Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166-1167 (1st Cir. 2002) (same). The definitional aspects of

"disability" are strictly interpreted. See Rolland v. Potter, 492 F.3d 45, 47 (1st Cir. 2007), citing Toyota Motor, 534 U.S. at 197.

EEOC regulations further refine the three elements of disability: (1) "physical or mental impairment;" (2) "substantially limits;" and (3) "major life activities." See 29 C.F.R. §§1630.2(h)-(j). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." § 1630.2(h)(1). The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform," or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." Id. § 1630.2(j). "Substantially in the phrase substantially limits suggests considerable or to a large degree." Toyota Motor, 534 U.S. at 197.  Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § § 1630.2(I); Sutton v. United Air Lines, Inc., 527 U.S. 471, 479-480 (1999).

When the major life activity in which a plaintiff claims to be substantially limited is "working," EEOC regulations further explain that

>    (I) [t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.
>
>    (ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":
>
>    >   (A) The geographical area to which the individual has reasonable access;
>    >
>    >   (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>    >
>    >   (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. §§ 1630.2(j)(3)(ii)(A)-(C).

The ADA requires "those claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial." Toyota Motor, 534 U.S. at 198 (internal citations omitted). See also 29 C.F.R. pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual. . . . The determination of whether an individual is substantially limited in a major

13

life activity must be made on a case by case basis."). In conducting this inquiry, the court must consider "the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long-term impact, or the expected permanent or long-term impact of, or resulting from, the impairment." Id.

Thornton asserts in his Amended Complaint that he suffers from physical disabilities (back, shoulder, and hand injuries) that substantially limit his ability to walk, sit, lift, sleep, eat, learn, and control the elimination of his bodily wastes. In this respect, the Amended Complaint bears almost no resemblance to Thornton's 2001 MCAD Charge. The litany of physical ailments and impaired life activities asserted in this litigation is missing in Thornton's 2001 MCAD charge, which mentions only chronic lower back pain.

The Amended Complaint asserts (although the assertion is not mentioned in the 2001 charge), that UPS was aware of Thornton's manifold (recently alleged) impairments. UPS admits that it knew of Thornton's episodic back pain and that it had in its possession the medical opinions rendered by Dr. Hawkins and Dr. Wolf during the charge period (November of 2000 to August of 2001).[15] These opinions, however, offer little in support of Thornton's attempt to recast the intent of his disability and the significance of its impact during the charge period on his ability to work.

---

[15]"When 'working' is the major life activity at issue in an ADA suit, a plaintiff 'must demonstrate not only that the employer thought that he was impaired in his ability to do the job that he held, but also that the employer regarded him as substantially impaired in performing either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities.'" See Ruiz Rivera, 521 F.3d at 83, quoting Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999).

Dr. Hawkins, who examined Thornton in connection with his worker's compensation claim, noted that Thornton's low back pain was "intermittent" and that he had "occasional flare-ups which require the use of Percocet at night." Dr. Hawkins diagnosed Thornton with "lumbosacral strain with history of degenerative disc disease; [r]otator cuff strain, right shoulder, with impingement syndrome; and [c]arpal tunnel syndrome, right wrist, status post carpal tunnel release." Significantly, Dr. Hawkins' January 20, 2001 examination indicated that Thornton "is healthy, . . . walks normally, transfers easily on and off the examining table," and that he possessed a normal range of motion, flexion, grip strength, and reflexes. Dr. Hawkins concluded "in his orthopedic opinion that [Thornton] is presently not disabled. As stated previously, [Thornton] is working 9 hours per day and 45 hours per week driving tractor trailers to and from Hartford."

Dr. Wolf's opinion was issued in connection with Thornton's clearance to return to work after he suffered the March 5, 2001 back injury, while driving the Buffalo route.[16] Thornton was cleared by Dr. Wolf to return to work on March 14, 2001, with limited restrictions: (1) driving at no more than ninety-minute intervals without a break; (2) a thirty pound lifting limit; (3) a nine-hour maximum work day; and (4) no repetitive lifting or bending. There was no suggestion by Dr. Wolf that Thornton's back injury was "permanent

---

[16]There is no evidence that UPS knew that Thornton sought treatment in Buffalo or that any medical record of that care was ever submitted to UPS. Mundry testified that UPS allowed Thornton to rebid his job when the Health and Safety Department determined that medical restrictions precluded Thornton from continuing the Buffalo/Philadelphia route. Plaintiff's counsel asked if "this was after his hospitalization?" Mundry responded that, "I believe – I don't know if it was hospitalization. I believe Charlie did this job once. I could be wrong, but I think it was once. I think he went to Philadelphia on a Saturday morning, came back on Saturday night and I think he went to Buffalo on Monday, and he took a train home cause he was complaining of back pain while he was in Buffalo."

or long-term." Id. at 691. On March 14, 2001, Thornton resumed driving the Chelmsford-Worcester-Hartford route, a job that he acknowledged he could do.[17] Thornton continued to drive this route for nine months until the 2002 bid round when he bid on and was awarded the Buffalo route.

Thornton cites Clark v. Lincare, Inc., 2005 WL 1721213 (D. Mass. July 21, 2005) for the proposition that "lifting restrictions alone qualif[y] or [sic] a plaintiff as disabled." Pl. Supp. Opp. at 7 n.3. However, the First Circuit held subsequently in Rolland, 492 F.3d at 49, that a lifting limitation of twenty pounds, combined with other physical limitations, was not sufficient to permit the plaintiff in that case to survive summary judgment on the question whether the plaintiff had a disability or impairment for purposes of the Rehabilitation Act. The inability to perform a single, particular task does not amount to a "substantial limitation." Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 11 (1st Cir. 1999), citing 29 C.F.R. § 1630.2(j)(3)(I). See also Carroll v. Xerox Corp., 294 F.3d 231, 239 (1st Cir. 2002) (plaintiff "failed to show that he was precluded by his [claimed] impairment [of heart disease] from a substantial class of jobs or a broad range of jobs."); Gelabert-Ladenheim v. American Airlines, Inc., 252 F.3d 54, 60 (1st Cir. 2001) (same, plaintiff's carpal tunnel syndrome); Lebron-Torres v. Whitehall Labs., 251 F.3d 236, 240 (1st Cir. 2001) (same, back injury). What the record shows here is that Thornton was able to do his job (other than during an eight-day rehabilitation period in March of 2001) as evidenced by his testimony and his performance of the job without complaint from November 3, 2000, through August 30, 2001. The only grievance Thornton made known to UPS during that

---

[17] Thornton Dep. at 105.

period was insisting, through the Union, that he had the right to bid on the Buffalo route under the CBA.[18]  There is simply no evidence in the record that supports a finding that Thornton was disabled in August of 2001 when he filed his second MCAD charge.

Thornton argues in the alternative that whether or not he was disabled, UPS nonetheless "regarded" him as such.  "Regarded as" claims fall into two categories: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sullivan v. Neiman Marcus Group, Inc., 358 F.3d 110, 117 (1st Cir. 2004), citing Sutton, 527 U.S. at 489.  According to Thornton's charge, UPS misinterpreted an examining physician's note regarding his "disability restrictions" which resulted in UPS's giving him "more duties."  As explained by the First Circuit Court of Appeals, a "plaintiff claiming that he is 'regarded' as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the employer regarded him as disabled within the meaning of the ADA." Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1169 (1st Cir. 2002), citing Giodano v. City of N.Y., 274 F.3d 740, 748 (2d Cir. 2001).  The inherent contradiction in Thornton's claim in this regard – which is not that UPS regarded him as disabled, but the UPS did not regard him as "disabled enough" – does not warrant extended comment.[19]

---

[18]Mundry Dep. at 79-80.

[19]In order to sustain a "regarded as" claim, under the ADA, a plaintiff must select and identify the major life activity that he will attempt to prove the employer regarded as being substantially limited by her impairment.  See 42 U.S.C. § 12102(2); 29 C.F.R. §

Adverse Employment Action

Lastly, to demonstrate a prima facie claim of discrimination under the ADA, Thornton must show that during the 300 days from November 3 of 2000 to August 31, 2001, UPS discharged him or that he was adversely affected by UPS because of his disability. Thornton claims that from September 18, 2000, to January of 2001, he satisfactorily performed the Chelmsford-Worcester-Hartford route. Pl.'s Facts in Opp. ¶¶ 12 and 13. In January of 2001, Thornton bid the Chelmsford/ Philadelphia job, was injured, and after a week off, bid and resecured the Chelmsford-Worcester-Hartford job. In June of 2001 when UPS removed the Hartford portion of the route, Thornton bid on and won the Chelmsford to Worcester job. There was no identifiable adverse action by UPS against Thornton during this 300-day period.

The court need go no further. As Thornton is unable to demonstrate that he was disabled, nor did he allege in his 2001 MCAD Charge that UPS considered him disabled, nor that he suffered any adverse employment action during the period between November

---

1630.2(l). Thornton contends that

> UPS regarded Thornton disabled in the major life activity in two distinct ways. First, by maintaining a "100% release" policy, UPS essentially treated every employee with a medical restriction, including the Plaintiff, as being unable to work in any function at UPS. Second, during the time leading up to the Plaintiff's retirement, the Defendant mistakenly concluded that he was medically unfit to perform a broad class of jobs, when in fact there were positions at UPS he could have physically performed.

Pl. Supp. Opp. at 9-10. While the court is unpersuaded that either of these contradictory assertions are covered by Thornton's August 2001 MCAD charge, Thornton nonetheless has failed to adduce any evidence that UPS treated him as "unable to work in any function" or "unfit to perform a broad class of jobs" during the operable time period (November 3, 2000 to August 30, 2001).

2000 and August 2001, the ADA claims must be dismissed. The remaining state law claims under Chapter 151B require consideration of the Massachusetts "continuing violation doctrine" as it might affect the applicable state limitations period, and the MCAD charges. These issues are better addressed by the Massachusetts court.[20]

## ORDER

For the foregoing reasons, UPS's motion for summary judgment on Counts I and II of the Amended Complaint is <u>ALLOWED</u>. Counts III and IV are <u>DISMISSED</u> without prejudice.[21] The Clerk may now close the case.

SO ORDERED.

s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[20] When a federal court dismisses a complaint's foundational federal claims, the balance of competing factors favors declining jurisdiction over any pendent state law claims, particularly in the early stages of a suit. <u>Camelio v. American Federation</u>, 137 F.3d 666, 671 (1st Cir. 1998). The factors to be considered under the pendent jurisdiction doctrine include judicial economy, convenience, fairness, and comity. <u>Rodriguez v. Doral Mortg. Corp.</u>, 57 F.3d 1168, 1177 (1st Cir.1995). Although this litigation is well-advanced, principles of comity weigh heavily in favor of declining Thornton's Chapter 151B claims and permitting the matter to be resolved by the Massachusetts court, which has a greater stake in an outcome involving the application of statute of limitation principles that may differ from those applied in a federal employment discrimination context.

[21] Plaintiff's attention is directed to Mass. Gen. Laws ch. 260, § 32. <u>See also</u> <u>DeSantis v. Commonwealth Energy Sys.</u>, 68 Mass.App.Ct. 759, 766 (2007) ("After dismissal of DeSantis's pendent State claims he was entitled to renew them in the Superior Court within one year.").

20